24-MR-80
24-MR-81

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**AFFIDAVIT IN SUPPORT OF APPLICATION**

I, Zackari S. Mercado, Special Agent of the Federal Bureau of Investigation ("FBI"),

being duly sworn, depose and state that:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search the following locations and vehicles, as further

described in Attachment A, for the things more fully described in Attachment B:[1]

    a.  Clear & Clear PA law firm located at 7112 Aztec Rd NE, Albuquerque, NM 87110
        (**SUBJECT PREMISES 1**);

    b.  Ricardo MENDEZ's residence, located at 412 Judith Lane SW, Albuquerque, New
        Mexico 87121 (**SUBJECT PREMISES 2**).

2.      I have been a Special Agent with the FBI since August 25, 2023. I have received

basic law enforcement training at the FBI Academy in Quantico, Virginia. I am currently assigned

to the FBI's Albuquerque Field Office, where I am responsible for conducting and assisting in

public corruption investigations, including related white-collar and financial crimes. My training

included instruction on investigative tools and criminal law, such as the development and

identification of probable cause to support the affidavits in support of applications to intercept wire

---

[1] Because the locations in question are a law office and the residence of someone who works for an attorney, the United States, in an abundance of caution, intends to use a filter team to ensure that the materials seized are handled in a manner that comports with relevant potential privilege.

and electronic communications. I have become familiar with the methodology utilized in criminal conspiracies and activities.

3.　Since becoming an FBI agent, I have (a) conducted, monitored, and reviewed physical surveillance, in investigations involving public corruption matters; (b) executed search warrants at locations where records of criminal activity have been found; (c) reviewed and analyzed numerous recorded conversations and other documentation of criminal activity; (d) debriefed confidential human sources; and (e) conducted other surveillance of individuals engaged in public corruption and white-collar crimes. As a result of my training and experience, I am aware that public corruption and white-collar criminals frequently use wire and electronic communications in furtherance of their criminal activities. I am also aware that such criminals often communicate using vague, guarded, or coded language when discussing their illegal activities in an effort to further prevent detection.

4.　The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## RELEVANT STATUTES

5.　This investigation concerns alleged violations of certain activities relating to the following federal crimes (the "TARGET OFFENSES"), or aiding and abetting such crimes:

a.　18 U.S.C. § 1951 (Hobbs Act extortion under color of official right);

b.　18 U.S.C. § 1952 (Travel Act interstate travel or transportation in aid of racketeering enterprises);

c.　18 U.S.C. § 371 (conspiracy);

d. 18 U.S.C. § 666 (bribery);

e. 18 U.S.C. § 1343 (wire fraud); and

f. 18 U.S.C. §§ 1343, 1346 (honest services wire fraud).

6. There is also probable cause to search the locations described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## BASIS OF INFORMATION

7. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

a. my experience and the experience of experienced public corruption investigators investigating public-corruption, white-collar criminal conspiracies, and complex criminal conspiracies;

b. oral and written reports, as well as documents about this investigation that I have received from members of the FBI and other federal law enforcement agencies;

c. discussions I have personally had concerning this investigation with experienced public corruption and white-collar investigators;

d. telephone toll records, pen register information, trap and trace information, and telephone subscriber information;

e. financial records;

f. consensual recordings;

g. statements of a confidential source;

h. interviews of witnesses;

i. messages sent to and from a phone used by Ricardo MENDEZ (the **MENDEZ PHONE**);

a. Title III-authorized interceptions of phone calls and text messages on the **MENDEZ PHONE**, a phone used by Honorio ALBA (the **ALBA PHONE**), and a phone used by Joshua MONTANO (the **MONTANO PHONE**).

3

8.    In addition to the foregoing, I specifically relied on oral reports/opinions from other law enforcement officers.

9.    Since this Affidavit is being submitted for the limited purpose of obtaining search warrants, I have not included each and every fact known to me concerning this investigation or every aspect of the investigation to date.  I have set forth only the facts that I believe are necessary to establish the foundation for probable cause for the requested warrants.

## INVESTIGATION OVERVIEW

10.    The FBI is investigating a scheme to divert and/or refer individuals arrested for driving while under the influence of intoxicating liquor or drugs (DWI) by Albuquerque Police Department (APD) officers – including Joshua MONTANO, Honorio ALBA, Harvey JOHNSON, Nelson ORTIZ, and others known and unknown – to Thomas J. CLEAR III (Thomas CLEAR) and Ricardo MENDEZ (a.k.a Rick MENDEZ), a defense investigator for a criminal defense law firm, Clear & Clear PA. Clear & Clear PA is operated by criminal defense attorney Thomas CLEAR. As detailed here, there is probable cause to believe that Ricardo MENDEZ receives both public and non-public information from the police officers who conduct the DWI arrests. There is also probable cause to believe that information is then used to attempt to extort or otherwise solicit cash payments from the alleged DWI offenders in exchange for the arresting officer never filing DWI charges or, if charges have been filed, interfering in the court process to trigger the dismissal of the pending case. Finally, during the course of the investigation, FBI has discovered information establishing probable cause to believe that the criminal scheme extends to other traffic offenses charged by APD officers.

11.    The following information comes from the following sources and criminal indices: confidential human source reporting, physical surveillance, pen register/trap and trace data, toll analysis, footage from cameras, queries of law enforcement databases, legal orders, and publicly available information:

    a.    **CLEAR, Thomas**, date of birth ▮▮▮▮▮▮▮▮, social security account number ending in ▮▮▮, last known address 9814 Greenbrier NE, Albuquerque, New Mexico, 87110, is the user of 505-980-2897 (the **CLEAR PHONE**).[2] A review of NCIC and New Mexico Court records identified a 1995 felony charge for Use of a Telephone to Harass associated with Thomas CLEAR.[3]

        1.    Thomas CLEAR is an attorney who owns and runs the Clear & Clear PA law firm, located at 7112 Aztec Rd NE, Albuquerque, NM 87110 (**SUBJECT PREMISES 1**). According to his website, Thomas CLEAR specializes in defending DWI and drug charges.

    b.    **MENDEZ, Ricardo**, date of birth ▮▮▮▮▮▮▮▮, social security account number ending in ▮▮▮, last known address 412 Judith Lane SW, Albuquerque, New Mexico 87121 (**SUBJECT PREMISES 2**). Ricardo MENDEZ's criminal history includes two separate drug cases in the 1990's. Specifically, Ricardo MENDEZ was arrested on or about March 8, 1993, for possession with intent to distribute less than 50 kilograms of marijuana, and again on February 26, 1998, for conspiracy and possession with intent to distribute 500 grams and more of cocaine. Both cases were dismissed. Ricardo MENDEZ is the user of 505-980-4946 (the **MENDEZ PHONE**).[4]

---

[2] Thomas CLEAR is the subscriber of CLEAR PHONE based on subscriber information included in records received from Verizon Wireless. Moreover, Thomas CLEAR provided this phone number to a cooperator (CW1), as explained herein, as his cell phone number in an email and has directed CW1 to contact him on this number. Internal database checks also indicate that this phone number is utilized by Thomas CLEAR. This belief is also based on law enforcement interception of communications between Thomas CLEAR and Ricardo MENDEZ on the **MENDEZ PHONE**

[3] This prior felony charge is reflected in the New Mexico State Court online database (case number D-202-CR-1995-00212). Because of the age of the case, the documents are not available online. However, the docket reflects that the case was dismissed with prejudice on March 27, 1995.

[4] Verizon Wireless records indicate the **MENDEZ PHONE** is subscribed to by Thomas CLEAR with contact name Rick Mendez. Thomas CLEAR is Ricardo MENDEZ's employer at Clear and Clear PA law firm. Ricardo MENDEZ is believed to be the user of the **MENDEZ PHONE** based on Ricardo MENDEZ's communications on the **MENDEZ PHONE**. Title III-authorized interceptions on the **MENDEZ PHONE** confirmed that Ricardo MENDEZ is the user of the phone.

1. Ricardo MENDEZ is currently a defense investigator/paralegal for Thomas CLEAR at Clear & Clear PA. Ricardo MENDEZ handles client consults, pre-trial interviews, and other tasks for Thomas CLEAR, often at a residence out of which Thomas CLEAR operates his law firm. According to the website for Clear & Clear PA, Ricardo MENDEZ works with Clear & Clear PA's clients daily, keeping them posted on the status and progress of their cases.

2. Based on the information and evidence available to date, Ricardo MENDEZ is extorting and/or soliciting cash payments from suspected DWI offenders who have been diverted or referred to him by certain police officers, in exchange for the police officer not filing the charging paperwork against the suspected offender or interfering with the criminal charges once filed.

c. **ALBA, Honorio**, date of birth ███████, social security account number ending in ███, last known address 68 McCall Loop, Edgewood, NM 87015. No criminal record in NCIC checks. Honorio ALBA is the user of (505) 526-3366 (the **ALBA PHONE**).[5]

1. Honorio ALBA is currently a police officer with the Albuquerque Police Department. Honorio ALBA is assigned to the DWI unit. Based on the information and evidence available to date, Honorio ALBA is diverting suspected DWI offenders to Ricardo MENDEZ, who in turn is extorting and/or soliciting cash payments from suspected DWI offenders in exchange for the police officer not filing the charging paperwork against the suspected offender or interfering with the criminal charges once filed.

d. **MONTANO, Joshua**, date of birth ███████, social security account number ending in ███, last known address 9808 Cameron Street NW, Albuquerque, New Mexico 87114. No criminal record in NCIC checks. Joshua MONTANO is believed to be the user of (505) 918-8132 (the **MONTANO PHONE**).[6]

---

[5] Honorio ALBA is believed to be the user of the **ALBA PHONE** based on a review of open-source records, to include the CLEAR Law Enforcement Database, and internal database checks. According to Verizon Wireless, Honorio ALBA is also the listed subscriber for the **ALBA PHONE**. Title III-authorized interceptions on the **MENDEZ PHONE** and the **ALBA PHONE** confirmed that ALBA is the user of the phone.

[6] Joshua MONTANO is believed to be the user of the **MONTANO PHONE** based on a review of open-source records, to include the CLEAR Law Enforcement Database, and internal database checks. According to AT&T Wireless, Joshua MONTANO is also the listed subscriber for the **MONTANO PHONE**. Interceptions on the

1. Joshua MONTANO is currently a police officer with the Albuquerque Police Department.  Joshua MONTANO is assigned to the DWI unit. Based on the information and evidence available to date, Joshua MONTANO is diverting suspected DWI offenders to Ricardo MENDEZ, who in turn is extorting and/or soliciting cash payments from suspected DWI offenders in exchange for the police officer not filing the charging paperwork against the suspected offender or interfering with the criminal charges once filed.

e. **ORTIZ, Nelson**, date of birth ▮▮▮▮▮▮▮▮▮▮▮, social security account number ending in ▮▮▮▮, last known address 30004 22nd Avenue SE, Rio Rancho, New Mexico 87124. No criminal record in NCIC checks. Nelson ORTIZ is believed to be the user of (505) 907-8727 (the **ORTIZ PHONE**).[7]

1. Nelson ORTIZ is currently a police officer with the Albuquerque Police Department. Based on the information and evidence available to date, Nelson ORTIZ did not show up to a court appearance at the request of Ricardo MENDEZ, as detailed further herein. Moreover, based on communications obtained on the **MENDEZ PHONE**, Nelson ORTIZ has illegally referred a DWI offender to Ricardo MENDEZ as part of this criminal scheme, discussed further below.

f. **JOHNSON, Harvey**, date of birth ▮▮▮▮▮▮▮▮▮▮▮, social security account number ending in ▮▮▮▮, last known address 4203 Highway 314 SW, Los Lunas, New Mexico, 87131. Harvey JOHNSON is believed to be the user of 505-269-1121 (the **HARVEY JOHNSON PHONE**).[8]

1. Harvey JOHNSON is currently a police officer with the Albuquerque Police Department.  Harvey JOHNSON is assigned to the DWI unit. Based on the information and evidence available to date, Harvey JOHNSON is

---

**MENDEZ PHONE** and the **MONTANO PHONE** have confirmed that Joshua MONTANO is the user of the **MONTANO PHONE**.

[7] Nelson ORTIZ is believed to be the user of the ORTIZ PHONE based on information received from the APD IA, which confirmed that Nelson ORTIZ listed the **ORTIZ PHONE** as his phone number in APD internal databases. Moreover, interceptions on the **MENDEZ PHONE** have corroborated that Nelson ORTIZ is the user of the **ORTIZ PHONE**.

[8] Harvey JOHNSON is believed to be the user of the **HARVEY JOHNSON PHONE** based on information received from the APD IA, which confirmed that Harvey JOHNSON has listed the **HARVEY JOHNSON PHONE** as his phone number in APD internal databases. This information has been corroborated based on open-source records, to include the CLEAR Law Enforcement Database, internal database checks, and recent interceptions over the **MENDEZ PHONE**.

diverting suspected DWI offenders to Ricardo MENDEZ, who in turn is extorting and/or soliciting cash payments from suspected DWI offenders in exchange for the police officer not filing the charging paperwork against the suspected offender or interfering with the criminal charges once filed.



**SOURCES OF INFORMATION**

12.     Special Agents of the FBI have received information concerning the illegal conspiracy detailed throughout this affidavit from individuals cooperating with the government, including Confidential Witness #1 ("CW1").

13.     CW1 began cooperating with law enforcement on or about September 1, 2023. CW1 has provided FBI agents with information concerning the TARGET OFFENSES and the TARGET SUBJECTS.

14.     CW1's information has been verified through consensually monitored and recorded text messages and phone calls between CW1 and Ricardo MENDEZ in which Ricardo MENDEZ corroborated specifics of the scheme as detailed by CW1. Additionally, the information provided by CW1 has been verified by financial and toll records obtained through subpoenas. Further, all calls between CW1 and the **MENDEZ PHONE** have been verified through pen register data and

toll records. Additionally, all electronic communications between CW1 and the **MENDEZ PHONE** have been verified via copies of the communications that were retrieved from CW1's phone, using photographs which have allowed law enforcement to preserve historical communications.

15.    CW1 has not received any benefits from law enforcement for cooperating in this investigation. CW1 has not been offered any benefits from law enforcement, to include financial rewards or promises of leniency.  CW1 has no reported criminal history, with the exception of the arrest of CW1 by Joshua MONTANO, as detailed herein. Based on the information provided by CW1 and the other information available as a result of this investigation, law enforcement believes CW1 is credible and that the information provided is reliable.

16.    It is my opinion that CW1 is motivated to cooperate with law enforcement because CW1 views themselves as a victim of an attempted extortion by Ricardo MENDEZ.

## FACTS ESTABLISHING PROBABLE CAUSE

### I.    *Overview and Background*

17.    The United States is investigating potential violations of crimes including 18 U.S.C. § 1951 (Hobbs Act extortion under color of official right), 18 U.S.C. § 1952 (Travel Act interstate travel or transportation in aid of racketeering enterprises), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 666 (bribery), and 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. §§ 1343, 1346 (honest services wire fraud), and 18 U.S.C. § 2 (aiding and abetting), committed by Thomas CLEAR, Honorio ALBA, Ricardo MENDEZ, Joshua MONTANO, Harvey JOHNSON, Nelson ORTIZ, and others both known and unknown to the government.

18.     For the reasons described below, there is reason to believe that APD Police Officer Joshua MONTANO, APD Police Officer Honorio ALBA, APD Police Officer Harvey JOHNSON, APD Police Officer Nelson ORTIZ and others yet unknown, divert and/or refer individuals arrested for Driving While Impaired (DWI) to Thomas CLEAR and Ricardo MENDEZ, and that Ricardo MENDEZ, while working in concert with Joshua MONTANO, Honorio ALBA, Harvey JOHNSON, Nelson ORTIZ, and other referring officers, subsequently requests cash payments from the alleged DWI offenders in exchange for the offenders' charges being improperly dismissed or not filed. There is also probable cause to believe that Ricardo MENDEZ splits the proceeds from the scheme with the referring police officers.

## II.     The April 2022 arrest of Witness #1 by Joshua MONTANO

19.     On or about April 29, 2022, the FBI received an allegation from an attorney who was contacted by a separate criminal defense attorney about a potential client. The client will hereinafter be referred to as Witness #1 (W1).[10] W1 was subsequently interviewed by the FBI on October 5, 2023, after CW1 came forward with a similar account. When W1 spoke with agents in October 2023, they had already pled guilty to the DWI charge at issue, detailed further below. W1 has not received any benefits from law enforcement for cooperating in this investigation.[11] W1 has not been offered any benefits from law enforcement, to include financial rewards or promises of leniency. W1 has no reported criminal history, with the exception of the arrest of W1 by Joshua MONTANO, as detailed herein, and a charge for driving on a revoked driver's license, which was

---

[10] The FBI referred the April 29, 2022, allegation to APD Internal Affairs (IA) on June 24, 2022.

[11] W1 stated that he was willing to talk to agents because he wanted to do what was right, and that he believed others would pay the money to try to get out of trouble.

recently dismissed. Based on the information provided by W1 and the other information available as a result of this investigation, law enforcement believes W1 is credible and that the information provided is reliable.

20.    Information gathered during W1's interview is summarized below.

21.    On or about Friday, April 22, 2022, at approximately 1:30 a.m., W1 was driving northbound on I-25. APD Police Officer Joshua MONTANO stopped W1 in the vicinity of the Comanche exit on northbound I-25.

22.    Joshua MONTANO asked W1 if W1 had been drinking. W1 denied drinking. Joshua MONTANO conducted a field sobriety test on W1. After administering the test, Joshua MONTANO advised that W1 had failed. Joshua MONTANO then arrested W1 and transported W1 to a police station in downtown Albuquerque, New Mexico.

23.    Once at the police station, an unidentified individual gave W1 a "breath test."[12] Joshua MONTANO remained present during the administration of the test.[13] The breath test result was .21, which qualified as an aggravated driving while under the influence (DWI) in New Mexico.[14] After the administration of the test, an officer (either Joshua MONTANO or another

---

[12] I understand that when W1 is referring to a "breath test," this is in reference to a breathalyzer. A breathalyzer is a breath alcohol testing instrument used by law enforcement to estimate a person's blood-alcohol levels by testing the alcohol content of that person's breath.

[13] The FBI reviewed Joshua MONTANO's body camera footage. Based on that review, the FBI believes it was in fact Joshua MONTANO who administered the test.

[14] Under New Mexico state law, it is unlawful for a person who is under the influence of intoxicating liquor to drive under the influence. See NMSA 1978, § 66-8-102(A). A person commits driving under the influence (DWI) if that person has a blood alcohol concentration (BAC) of at least .08. See id. at § 66-8-102(C)(1). A person commits aggravated DWI if he or she has a BAC of .16 or higher. See id. at § 66-8-102(D)(1).

officer) clarified W1's identifying information. W1 did not recall exactly what identifiers W1 provided, but thought it included address, phone number, date of birth and social security account number.

24.    A transport vehicle eventually arrived to transport W1 to the Metropolitan Detention Center (MDC), which is located in Albuquerque. W1 went to the restroom prior to loading into the transport vehicle. Joshua MONTANO escorted W1 to the restroom. While in the restroom, Joshua MONTANO told W1 that he had found the bag of mushrooms in W1's car and that W1 should feel lucky it was Joshua MONTANO that found it and not someone else.[15] Joshua MONTANO said he would not charge W1 for possession of the mushrooms. Joshua MONTANO also told W1 that when W1 got out of jail, someone would call W1 to help W1 resolve this situation. W1 did not understand what Joshua MONTANO meant. Joshua MONTANO was in police uniform during the entirety of their interactions.[16]

25.    On April 22, 2022, W1 was booked into custody at the Metropolitan Detention Center (MDC) and Joshua MONTANO filed a Criminal Complaint charging W1 with Aggravated DWI. The Criminal Complaint was signed by Joshua MONTANO as the Complainant and █████

---

[15] During W1's October 2023 interview with FBI agents, W1 admitted that W1 had a bag containing mushrooms in the vehicle when W1 was arrested. Based on my training and experience, I believe that the term "mushrooms" refers to psilocybin mushrooms. Psilocybin is a Schedule I controlled substance under New Mexico state law. *See* NMSA 1978, § 30-31-6(C)(14).

[16] The FBI obtained a copy of Joshua MONTANO's body camera footage from April 22, 2022. The footage on the body camera was consistent with W1's description of events. However, based on a review of the footage, Joshua MONTANO appears to have removed his body camera and left it unattended during the period when W1 used the bathroom.

███████████ as the approving law enforcement officer. When W1 was eventually released from custody, APD personnel returned all W1's belongings, except for W1's driver's license, which was issued by the State of New Mexico. W1 last recalled seeing it during the traffic stop.[18]

26.    According to W1, on or about Monday, April 25, 2022, W1 called and left messages with three or four law firms but did not speak with anyone. W1 could not remember the specific law firms.[19]

27.    According to W1, on April 25, 2022, around 4:00 p.m. or 5:00 p.m., W1 received a telephone call from Ricardo MENDEZ. Agents have reviewed toll records for the **MENDEZ PHONE**, which show that, on April 25, 2022, at approximately 4:55 p.m., the **MENDEZ PHONE** called W1's phone and the call lasted approximately 3 minutes.[20] The phone contact is consistent with what W1 described during their interview.[21] During the phone call, Ricardo MENDEZ asked W1 if W1 was interested in a free consultation. Ricardo MENDEZ told W1 that he was aware of

████████████████████████████████████████████████

---

[18] According to New Mexico state court records, W1 was charged by criminal complaint and booked into custody on April 22, 2022.

[19] A subpoena of toll records for W1's phone from T-Mobile and subpoenaed toll records for the **MENDEZ PHONE** identified a call between W1's phone and the **MENDEZ PHONE** occurred on April 22, 2022, at approximately 12:44 p.m.

[20] Verizon Wireless does not retain historical text message data beyond one-year.

[21] Toll records for the **MENDEZ PHONE** from April 25, 2022, do not show any calls from W1 to the **MENDEZ PHONE** on that day.

W1's current DWI situation. W1 and Ricardo MENDEZ agreed to meet on April 27, 2022.[22] W1 indicated that W1 believed at the time that Ricardo MENDEZ was calling on behalf of one of the law firms that W1 had contacted earlier in the day.

28.     On or about April 27, 2022, at approximately 12:00 p.m., W1 met with Ricardo MENDEZ at Thomas CLEAR's law office (the **SUBJECT PREMISES 1**), which is located at 7112 Aztec Rd NE, Albuquerque NM 87110. W1 indicated that attorney Thomas CLEAR was in and out of the room during the meeting.

29.     Upon W1's arrival, W1 observed an unidentified individual leaving Thomas CLEAR's office. W1 recalled Ricardo MENDEZ telling W1 that the individual who was leaving the office was on his way to an ATM to withdraw money.

30.     During the meeting, Ricardo MENDEZ told W1 that W1's DWI arrest could all be made to go away and that W1 would not have to attend an arraignment. Ricardo MENDEZ told W1 that if W1 agreed to pay Ricardo MENDEZ $10,000 and plead not guilty, W1's case would all go away. Thomas CLEAR was in a corner of the room working on a laptop while Ricardo MENDEZ was speaking with W1. W1 had no doubt that Thomas CLEAR was able to hear what Ricardo MENDEZ told W1.

---

[22] At the time the FBI interviewed W1, W1 was no longer in possession of Ricardo MENDEZ's telephone number or text messages between W1 and Ricardo MENDEZ.

31.     Ricardo MENDEZ then pulled out W1's license from a shirt pocket and placed it on the desk in front of W1.[23] W1 asked Ricardo MENDEZ when W1 could get the driver's license back. Ricardo MENDEZ responded that W1 could have it back as soon W1 paid Ricardo MENDEZ. W1 told Ricardo MENDEZ that W1 did not have $10,000. In response, Ricardo MENDEZ told W1 that W1 could pay $5,000 up front and make $1,000 monthly payments until the debt was settled. Ricardo MENDEZ told W1 that W1 had until the following day to pay – that is, until April 28, 2022.

32.     When W1 asked Ricardo MENDEZ about getting a second legal opinion, Ricardo MENDEZ replied that W1 was looking at felony charges for the mushrooms. W1 told Ricardo MENDEZ that W1 was never charged with the mushrooms, to which Ricardo MENDEZ and Thomas CLEAR then both responded in near-unison, "Not yet."[24] W1 interpreted this to imply that that if W1 did not pay Ricardo MENDEZ $10,000, W1 would be charged with a felony. Thomas CLEAR then walked up to the chair where W1 was sitting and showed W1 a website with

---

[23] In my training and experience I am not aware of any legitimate reason that a defense attorney's employee would be given an arrestee's identification card by the arresting officer before the arrestee had retained the services of the law firm.

[24] The FBI has reviewed the criminal complaint, police report, and "tow-in" report filed by Joshua MONTANO relating to W1's arrest on April 22, 2022. The complaint and police report make no mention of any mushrooms being found in W1's vehicle. The tow-in report indicates that mushrooms were located in a clear bag in the center console of the vehicle. Because I believe it unlikely that Ricardo MENDEZ could have received the tow-in report from the arrest through a public records request during that short period, I believe that Ricardo MENDEZ may have learned of the mushrooms in W1's vehicle by speaking with Joshua MONTANO directly. Based on my training, experience, and information gathered in the instant investigation, I am not aware of any legitimate reason that a defense attorney's employee would be speaking with the arresting officer about evidence found in the arrestee's vehicle before the arrestee had retained the services of the law firm.

a list of controlled substances. Thomas CLEAR stated that mushrooms would fall under the category of a 4th degree felony.

33.    Ricardo MENDEZ said he was friends with Joshua MONTANO and that he obtained W1's driver's license from Joshua MONTANO. W1 believed Thomas CLEAR was in the room at this time but was unsure. Ricardo MENDEZ then asked W1 if W1 remembered "Josh" telling W1 that someone would call him, seemingly in reference to the conversation W1 had with Joshua MONTANO in the bathroom prior to being transported to MDC. Based on my training and experience, I believe the possession of the license and Ricardo MENDEZ's statements strongly imply that Ricardo MENDEZ was the person who Joshua MONTANO assured W1 would "be in touch" with him. The possession of the license and allusion to Ricardo MENDEZ's relationship with Joshua MONTANO also imply a significant relationship with Joshua MONTANO and the ability to influence the outcome of the pending criminal matter.

34.    W1 asked Ricardo MENDEZ if W1 could think about the offer. Ricardo MENDEZ told W1 that W1 needed to pay by the following day at 6:00 p.m. Ricardo MENDEZ and Thomas CLEAR then walked W1 out of the meeting and shook W1's hand.

35.    The next day, at approximately 6 p.m. or 7 p.m., W1 received two telephone calls and a text message from Ricardo MENDEZ. W1 did not answer the phone calls or the text message. W1 did not interact with Ricardo MENDEZ or Thomas CLEAR again. W1 never received their driver's license back from Ricardo MENDEZ or Thomas CLEAR.

36.    W1 did not pay Ricardo MENDEZ the requested $10,000 and retained a different attorney to represent W1 in W1's DWI case.

16

37.     According to a docket obtained from the New Mexico court's system, W1 was charged by Criminal Complaint with DWI, Speeding, and Failure to Maintain Traffic Lane. The Criminal Complaint listed the arresting officer as Joshua MONTANO. W1's DWI case was dismissed about two months later due to Joshua MONTANO being involved in a serious car accident. On or about May 4, 2023, the case against W1 was re-filed. W1 pled guilty to DWI on June 29, 2023 and received a deferred sentence of one year of probation.  W1's probation ends on June 29, 2024.  The Speeding and Failure to Maintain Traffic Lane charges were dismissed.[25]  W1 was never charged with possession of the mushrooms.

38.     Agents reviewed Ricardo MENDEZ's phone records which revealed that on April 22, 2022 (the day of W1's arrest), the **MENDEZ PHONE** called W1's phone at approximately 12:44 p.m. The duration of the call was approximately 1 minute. Although W1 did not mention to agents that they received this call from Ricardo MENDEZ, based on the timing of the call to W1, W1 was likely in custody at the time of the call and would not have had access to their phone.[26] A review of the toll records for the **MENDEZ PHONE** do not show any incoming calls from W1 to the **MENDEZ PHONE** on April 22, 2022, prior to the **MENDEZ PHONE** attempting to reach W1 at approximately 12:44 p.m.

39.     Agents reviewed Ricardo MENDEZ's phone records which revealed the following calls between the **MENDEZ PHONE** and the **MONTANO PHONE** around the time of W1's

---

[25] W1 also advised agents that on June 17, 2023, W1 was pulled over in Sandoval County and spent three days in jail for driving with a revoked license.

[26] W1 recalled being released from jail around 5 p.m. on April 22, 2022.

17

arrest and W1's meeting with Ricardo MENDEZ. Based on my training, experience, and familiarity with this investigation, the following contacts between the **MENDEZ PHONE** and the **MONTANO PHONE**, when coupled with the timing of the **MENDEZ PHONE's** contact with W1, likely demonstrate that Ricardo MENDEZ and Joshua MONTANO were discussing W1's arrest and the solicitation of payment from W1.

    a. On or about April 22, 2022, at approximately 10:29 a.m., the **MENDEZ PHONE** received an approximately 1-minute voicemail from the **MONTANO PHONE**.

    b. On or about April 22, 2022, at approximately 10:33 a.m., the **MENDEZ PHONE** received an approximately 9-minute incoming telephone call from the **MONTANO PHONE**.

    c. On or about April 25, 2022, at approximately 1:02 p.m., the **MENDEZ PHONE** received an approximately 8-minute incoming telephone call from the **MONTANO PHONE**.

    d. On or about April 25, 2022, at approximately 2:45 p.m., the **MENDEZ PHONE** was used to make an approximately 2-minute outgoing telephone call to the **MONTANO PHONE**.

    e. On or about April 26, 2022, at approximately 7:51 p.m., the **MENDEZ PHONE** received an approximately 1-minute incoming telephone call from the **MONTANO PHONE**.

f.  On or about April 27, 2022, at approximately 10:32 a.m., the **MENDEZ PHONE** received an approximately 4-minute incoming telephone call from the **MONTANO PHONE**.

g.  On or about April 27, 2022, at approximately 10:51 a.m., the **MENDEZ PHONE** received an approximately 4-minute incoming telephone call from the **MONTANO PHONE**.

h.  On or about April 27, 2022, at approximately 12:35 p.m., the **MENDEZ PHONE** received an approximately 4-minute incoming telephone call from the **MONTANO PHONE**.

i.  On or about April 27, 2022, at approximately 3:06 p.m., the **MENDEZ PHONE** was used to make an approximately 1-minute outgoing telephone call to the **MONTANO PHONE**.

40.  Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ's possession of W1's driver's license was done in furtherance of this criminal scheme and in violation of APD policy. The APD has an SOP specifically for DWI investigations (SOP 2-42). Under those procedures, the DWI offender's driver's license should never remain in the custody and care of the arresting police officer, let alone a criminal defense investigator during an initial meeting. Under SOP 2-42, when there is a failed breath test, a New Mexico-issued driver's license should be confiscated and provided to the MVD with a copy placed in the offender's property. *See* SOP 2-42(E)(2)(a)-(c). For driver's licenses issued by another state, the driver's license must be returned to the individual. *See id.* at

2-42(E)(2)(a). If the arrest involves a blood draw following the issuance of a warrant, the DWI offender's driver's license must remain with the DWI offender's property when booked. *See id.* at 2-42(F)(1)(k), (2)(k). As such, under the APD SOPs, there is a requirement that the DWI offender's driver's license either be submitted to the MVD or placed in the DWI offender's property. In other words, by retaining a DWI offender's driver's license, the arresting officer would be in direct violation of these SOPs.

41.    Moreover, I understand from speaking with an APD Commander who was previously in the APD DWI unit, for driver's licenses that are confiscated as part of a DWI arrest, the MVD paperwork is stapled to the driver's license and placed in a lockbox in the APD substation. The MVD then collects the seized driver's licenses, along with the paperwork stapled to it, for use in the MVD proceedings.

42.    Based on this information and the APD SOP's, there is probable cause to believe that Ricardo MENDEZ's possession of W1's driver's licenses (and the driver's licenses of other DWI offenders discussed further herein) was done in furtherance of the criminal scheme. There is probable cause to believe that the police officers retain the driver's licenses following a DWI offender's arrest, which is in contravention of the APD SOPs, and then the police officers provide the driver's license to Ricardo MENDEZ for use in the criminal scheme.

### III.    The August 2023 arrest of CW1 by Joshua MONTANO

43.    On or about September 1, 2023, the FBI received an allegation from a now-cooperating witness, hereinafter referred to as Cooperating Witness #1 (CW1).[27] CW1 has been interviewed multiple times by the FBI.[28] Below is a summary of the information the FBI has gathered from CW1:

44.    On the night of August 25, 2023, and into the morning of August 26, 2023, CW1 was driving and ran out of gas near the intersection of Coors Boulevard and Montano Road in Albuquerque, New Mexico. Two APD vehicles approached CW1's car. Joshua MONTANO was one of the officers. The second officer was not identified. Joshua MONTANO interviewed CW1. CW1 admitted to drinking alcohol. Joshua MONTANO performed a field sobriety test on CW1. Joshua MONTANO then arrested CW1 and transported CW1 to an APD substation for a breathalyzer test.

45.    At the substation, CW1 was given a breathalyzer examination. Joshua MONTANO told CW1 that if CW1 did not blow twice the legal limit, CW1 would not go to jail. Joshua MONTANO said twice the limit would be an aggravated DWI. CW1's breathalyzer results were

---

[27] As described in further detail above, CW1 is cooperating with the FBI. Information provided by CW1 was corroborated through review of relevant documents, review of text messages with Ricardo MENDEZ, and consensually recorded telephone calls with Ricardo MENDEZ. CW1 was promised no favorable treatment or service from the United States Government.

[28] CW1 was provided with a "target letter" which allowed CW1 to obtain appointment of counsel through the United States District Court. CW1 conferred with their federal court-appointed attorney and has agreed to continue cooperating with the government.

0.13 and 0.14. CW1 received a ticket and paperwork for DWI.[29] Joshua MONTANO drove CW1 home. CW1's driver's license was kept by APD.

46.    CW1 told agents that, on or about August 28, 2023, Ricardo MENDEZ called CW1. At the time, CW1 understood Ricardo MENDEZ to be affiliated in some way with the public defender's office. During this call, Ricardo MENDEZ requested to meet with CW1 at a Freddy's Frozen Custard & Steakburgers (Freddy's) located in the vicinity of Coors Boulevard and Central Avenue in Albuquerque, New Mexico.[30] CW1 agreed to the meeting. Agents have reviewed the phone records for the **MENDEZ PHONE**, and the records reflect a phone call from the **MENDEZ PHONE** to CW1, on August 28, 2023, at 12:36 p.m. Based on my training, experience, and familiarity with this investigation, I believe Ricardo MENDEZ made this call to arrange a meeting with CW1 to discuss the scheme of soliciting payment from CW1 in exchange for Joshua Montano improperly interfering with the Criminal Complaint against CW1.

---

[29] Although CW1 stated that Joshua MONTANO provided him with a ticket, no criminal charges were filed against CW1 at this time. As discussed further herein, Joshua MONTANO did not file the Criminal Complaint until September 11, 2023. In terms of who initiates the filing of these types of charges, based on my training, experience, and familiarity with this investigation, it is the officer who submits the paperwork (the Criminal Complaint) for filing, which initiates the criminal case. All Criminal Complaints must be signed by a supervisor. If an offender is booked the night of their arrest, the Criminal Complaint is provided to the Metropolitan Detention Center (MDC), along with the booking sheet, at the time of booking. If an offender is not brought to the MDC following their arrest for booking, the officer can later file the Criminal Complaint to initiate criminal charges against them. Because of this process, the Police Department – and not the District Attorney's Office – controls the timing of the initiation of – and whether to initiate – criminal charges following a DWI arrest.

[30] Freddy's is located in close proximity to **SUBJECT PREMISES 2** (approximately 1.2 miles away). Because Ricardo MENDEZ's requested to meet CW1 at Freddy's and not **SUBJECT PREMISES 1** (which is on the other side of town, approximately 13 miles away), there is probable cause to believe that Ricardo MENDEZ either came from and/or was going to **SUBJECT PREMISES 2** following this meeting.

47.      Later that day, on or about August 28, 2023, CW1 met with Ricardo MENDEZ at Freddy's. Prior to the meeting, Ricardo MENDEZ used the **MENDEZ PHONE** to communicate via text message with CW1 concerning what vehicle CW1 would be arriving in.[31] Below are the messages between CW1 and Ricardo MENDEZ (RM):

**RM:**  What are you driving

**CW1:** I'm almost there I'm in a blue 2020 Volvo

**CW1:** I'm here

**RM:**  B there in a bit

**CW1:** *[ok hand emoji]*

**RM:**  Just pulled up

**RM:**  Little wagon

**RM:**  ?

**CW1:** Yes

48.      Based on my training, experience, and familiarity with this investigation, I believe that Ricardo MENDEZ and CW1 were discussing the location and arrival for the meeting in the Freddy's parking lot.  At some point during the meeting, Ricardo MENDEZ produced CW1's driver's license. Ricardo MENDEZ told CW1 that he could make CW1's charges go away, and would return CW1's driver's license, if CW1 paid Ricardo MENDEZ $6,000. Ricardo MENDEZ emphasized he would not return CW1's driver's license until CW1 paid Ricardo MENDEZ.[32]

---

[31] CW1 provided consent for FBI agents to take photographs of text messages between CW1 and the **MENDEZ PHONE**.

[32] To date, CW1's driver's license has not been returned to him. When CW1 asked about its status, Ricardo MENDEZ directed CW1 to claim that they lost their driver's license and to get a new one from the MVD.

CW1 asked Ricardo MENDEZ how specifically Ricardo MENDEZ would make the charges go away. Ricardo MENDEZ did not answer CW1's question. Instead, Ricardo MENDEZ said CW1 had until Wednesday, August 30, 2023, to pay the $6,000. Ricardo MENDEZ explained that he would normally give someone in CW1's position until a Friday to pay, but because it was Labor Day week, CW1 would have to pay by Wednesday.

49.     After meeting with Ricardo MENDEZ, CW1 described the interaction with Ricardo MENDEZ to a friend. CW1 and the friend both agreed the situation was weird. The two subsequently called Ricardo MENDEZ and attempted unsuccessfully to record the conversation. During the phone call, Ricardo MENDEZ told CW1 that the $6,000 payment had to be in cash. Agents have reviewed the phone records for the **MENDEZ PHONE**, and the records reflect a phone call from CW1 to the **MENDEZ PHONE**, on August 28, 2023, at 6:47 p.m.

50.     CW1 began cooperating with the FBI on or about September 1, 2023. CW1 described being motivated to work with the FBI out of a desire to see justice served.

51.     On or about September 5, 2023, at approximately 1:38 p.m., CW1 had a consensually recorded telephone call with Ricardo MENDEZ (using the **MENDEZ PHONE**). This call was made in the presence of agents and has been confirmed by review of phone records for **MENDEZ PHONE**. Below is a transcription of the call:

**CW1:** Hi this is [CW1]. You know I'm I've been real worried about this ticket. And all this sh- crap going on. Is this am I still able to give you some money for it or what?

**RM:** Uh so remind me what ticket it was. I'm sorry.

**CW1:** It was uh [CW1]. It was um for the ticket that I got on last Saturday. The 27th. 26th.

**RM:** What was the ticket for though?

**CW1:** DWI

**RM:**   Ok

**CW1:** We met at Freddy's

**RM:**   Oh. Yeah man that all went up.

**CW1:** That all went up?

**RM:**   It's- yeah.

**CW1:** Ok.

**RM:**   You remember I told you to call me because I was leaving out of town Thursday at my desk. And I got back this morning at 3:30

**CW1:** Ok so there's nothing we can do then.

**RM:**   Oh I can still I can still help you but as far as uh I mean they're gonna file. You could've beat it you know before it went before it got filed.

**CW1:** Oh ok.

**RM:**   I mean we can still beat it but you're gonna wind up paying more now.

**CW1:** Oh I'm gonna end up being paying more now? Uh what do you mean? What do you mean?

**RM:**   Well it wasn't filed. Nothing had been filed.

**CW1:** Ok

**RM:**   I mean let me find out. I I like I said I took and I haven't been back. I got back this morning.

**CW1:** Ok

**RM:**   Um I'll call you back.

**CW1:** Ok

52.      Based on my training, experience, and familiarity with this investigation, when Ricardo MENDEZ told CW1 "You could've beat it you know before it went before it got filed," I believe that Ricardo MENDEZ was suggesting that Ricardo MENDEZ and Joshua MONTANO could have improperly prevented the filing of charges in exchange for the $6,000 payment Ricardo MENDEZ was requesting from CW1.

53.      A review of toll records for the **MENDEZ PHONE** revealed that on or about September 5, 2023, at approximately 1:40 p.m. - which was almost immediately after the conclusion of the above telephone call - the **MENDEZ PHONE** made a telephone call to the **MONTANO PHONE** which lasted approximately 47 seconds. Based on my training and experience, and the proximity in time to the communications with CW1, I believe that these calls were in reference to the communications Ricardo MENDEZ had with CW1, and the scheme to ensure that, in exchange for payment, MONTANO improperly delayed filing or failed to file a criminal complaint. Taken together, I believe that when Ricardo MENDEZ said to CW1, "You could've beat it you know before it went before it got filed," Ricardo MENDEZ was telling CW1 that CW1's payment of money would have prevented criminal charges from being filed against CW1. In my training and experience, there would not be a lawful basis where payment to a defense attorney employee would prevent the filing of criminal charges unless it was a diversionary resolution negotiated with the prosecuting authority (in this case, the Second Judicial District Attorney's Office). When Ricardo MENDEZ said, "I mean we can still beat it but you're gonna wind up paying more now," and then discussed the status of whether the charges had been filed, I

believe Ricardo MENDEZ was telling CW1 that if the charges had been filed, Ricardo MENDEZ could still arrange for the charges to be dismissed, but CW1 would have to pay more.

54.    On or about September 5, 2023, at approximately 2:04 p.m., CW1 had a consensually recorded telephone call with Ricardo MENDEZ (on the **MENDEZ PHONE**). This call was made in the presence of agents and has been confirmed by review of phone records for the **MENDEZ PHONE**. Below is a transcription of the call:

**CW1:** Hey Ricardo.

**RM:** I'll find out for you uh tonight or tomorrow.

**CW1:** You'll find out for me tonight or tomorrow?

**RM:** Yeah

**CW1:** Ok

**RM:** So were you ready to that or what?

**CW1:** So I can come up with some of the money. I came up with 36. Um

**RM:** Yeah no.

**CW1:** How much. How much-

**RM:** I told you

**CW1:** Can I can you some?

**RM:** All of it up front

**CW1:** Um 6,000?

**RM:** Mmhmm

**CW1:** Ok. Ok um let me see what I can do then

**RM:** See yeah that's what we talked about last week

**CW1:** Ok

**RM:** So if eh. Are you gonna be able to do that because I'm can't tell him to uh hold-

**CW1:** Yes

**RM:** Yeah because I don't want to be responsible for that money

**CW1:** Yeah. So how would I get it to you?

**RM:** Uh uh are you gonna be able to get that money?

**CW1:** Yes. Yes.

**RM:** Like tonight? Tomorrow morning?

**CW1:** Tomorrow morning. That way-

**RM:** Hello?

**CW1:** That way I can get ahold of my um my uncle and he can give me the rest of the money.

**RM:** Yeah but that's what you told me last week

**CW1:** Well yeah that's cause he was out of town just like you were out of town for Labor Day

**RM:** Yeah let me know tonight cause I'm gonna I'm gonna ask him to do something if you can't do it

**CW1:** Ok. Ok so I'll let you know tonight.

**RM:** Alright.

**CW1:** Ok.

55.     When Ricardo MENDEZ asked CW1, "Are you gonna be able to do that because I'm can't tell him to uh hold-," I believe Ricardo MENDEZ was indicating that the payment of money by CW1 would allow Ricardo MENDEZ to tell Joshua MONTANO to not file the criminal charges against CW1. In my training and experience, there would be no lawful basis for such an

arrangement. When Ricardo MENDEZ told CW1, "I'm gonna ask him to do something if you can't do it," I believe that Ricardo MENDEZ was saying that Joshua MONTANO would file the criminal charges if CW1 did not pay the money.

56.    A review of telephone toll data for the **MENDEZ PHONE** revealed that on or about September 5, 2023, beginning at approximately 2:07 p.m. – which was minutes after the conclusion of the above telephone call – and continuing until approximately 5:17 p.m., the **MENDEZ PHONE** communicated via SMS text message with the **MONTANO PHONE** approximately six (6) times. The timing of these text messages in relation to the previous telephone call between Ricardo MENDEZ and CW1, when viewed in combination with the fact that Joshua MONTANO was the arresting officer in the matter being discussed above, lead me to believe that Ricardo MENDEZ and Joshua MONTANO were communicating about the scheme to have CW1 pay money in exchange for CW1's criminal charges not being filed.

57.    On or about September 5, 2023, at approximately 5:49 PM, CW1 had a consensually recorded telephone call with Ricardo MENDEZ (using the **MENDEZ PHONE**). This call was made in the presence of agents and has been confirmed by review of phone records for **MENDEZ PHONE**. Below is a transcription of the call:

**CW1:** Hey Ricardo.

**RM:** Yes sir.

**CW1:** Yeah this is [CW1] again.

**RM:** Yes.

**CW1:** Um so um. I believe I'm going to be able to get all the money. Um so if I'm gonna give you this the six thousand…how how am I going to be sure this is just gonna go away.

**RM:** What ha- what has what has happened since when I met you.

**CW1:** Uh nothing so far.

**RM:** Exactly.

**CW1:** Ok. Alright. Alright so if um…so I I'm I'll be able to get most of the money um is there any way that I can um get you's most of the money and then I can give you the rest by Friday. Cause I just want to make sure this is gonna go away. And I'm I'm I'm like um

**RM:** You're playing with fire.

**CW1:** I'm sorry?

**RM:** I said you're playing with fire. Be careful. Um uh uh it's not in my control

**CW1:** Ok. It's out of your contr- ok.

**RM:** Yeah. Uh I mean I I held it off.

**CW1:** Ok.

**RM:** But uh you know if it go it it's not in my control.

**CW1:** Alright.

**RM:** As I told you I mean if you If you have friends or family or anybody that could help.

**CW1:** Yeah that's what I'm…I've got most of the money but they a lot of them are still coming into town and I'm trying to get more money in and I I can get most of it in

**RM:** How much is most of it?

**CW1:** Most of it is like 3600 right now.

**RM:** Eh

**CW1:** I got that. I'm gonna get more. I'm just waiting for it to come in.

**RM:** Yeah that's not on me sir.

**CW1:** What was that?

**RM:** I said it's not on me.

**CW1:** It's not.

**RM:** Keep keep me uh posted uh uh I'll call and let them know.

**CW1:** Ok.

**RM:** Alright. Mm bye.

**CW1:** Mm.

58.    In this call, CW1 asked, "how am I going to be sure this is just gonna go away." In response, Ricardo MENDEZ said, "what has what has happened since when I met you." When CW1 said "nothing," Ricardo MENDEZ responded by saying, "Exactly." In my training and experience, I believe that Ricardo MENDEZ was indicating to CW1 that CW1's relationship with Ricardo MENDEZ, and MENDEZ's relationship with Albuquerque Police Officers, was the reason that criminal charges had not yet been filed against CW1. When Ricardo MENDEZ later told CW1 that "You're playing with fire," I believe Ricardo MENDEZ was telling CW1 that if the full amount of money was not paid by CW1, then CW1 was at risk of the criminal charges being filed. When Ricardo MENDEZ said, "Yeah. Uh I mean I I held it off," I believe that Ricardo MENDEZ was confirming for CW1 that Ricardo MENDEZ was the reason that criminal charges had not been filed against CW1. In my training and experience, there is no legitimate reason that a defense attorney's employee would have the ability to "hold off" criminal charges for a potential client.

59.     On or about September 5, 2023, at approximately 6:25 p.m.,[33] CW1 sent a text message to the **MENDEZ PHONE** which read, "Hello, this is [CW1] any updates." A review of telephone toll data for the **MENDEZ PHONE** revealed that minutes later, between approximately 6:27 p.m. and 6:32 p.m., the **MENDEZ PHONE** communicated with the **MONTANO PHONE** via SMS text message approximately three (3) times. The timing of these text messages in relation to the previous telephone call between Ricardo MENDEZ and CW1, when viewed in combination with the fact that Joshua MONTANO was the arresting officer in the matter being discussed above, indicates to me that Ricardo MENDEZ and Joshua MONTANO were likely continuing to communicate about the scheme to have CW1 pay money in exchange for CW1's criminal charge not being filed.

60.     On or about September 6, 2023, at approximately 12:33 p.m., CW1 had a consensually recorded telephone call with Ricardo MENDEZ (using the **MENDEZ PHONE**). This call was made in the presence of agents and has been confirmed by review of phone records for the **MENDEZ PHONE**. Below is a transcription of the call:

**CW1:** Hello Ricardo.

**RM:**  Yes.

**CW1:** Hi this is [CW1] again. Wondering if you heard anything back. If the money that I have will work until F- I get more money or cause I need to get this fixed.

**RM:**  Now you weren't able to raise the money?

---

[33] A photograph of text message sent by CW1 indicates the text message was sent at approximately 6:25 p.m., however, subpoenaed toll records reflect an approximate time of 5:25 p.m. Agents believe that the difference in time on the toll records is based on the toll records referring to a different time zone. Agents believe that the times listed above are correct for Mountain Standard Time.

**CW1:** Um I've got about 38. I almost have it all.

**RM:** Um uh you know what let me try calling again and I'll call you back.

**CW1:** Ok.

61.     Based on my training, experience, and familiarity with this investigation, I believe that CW1 was asking if Ricardo MENDEZ had heard back from Joshua MONTANO about whether Joshua MONTANO had filed the Criminal Complaint, and Ricardo MENDEZ told CW1 he would try calling Joshua MONTANO again to find out. Based on my training and experience, and the proximity in time of the actions, when Ricardo MENDEZ said he would "try calling again," he was referring to calling Joshua MONTANO. A review of telephone toll data for the **MENDEZ PHONE** revealed that later that day, on or about September 6, 2023, at approximately 3:55 p.m., the **MENDEZ PHONE** communicated via SMS text message with the **MONTANO PHONE** approximately one (1) time. Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that, in this text message, Ricardo MENDEZ reached out to Joshua MONTANO to discuss the status of CW1's case. Later that same day, at approximately 4:50 p.m., the **MENDEZ PHONE** made a telephone call to the **MONTANO PHONE** that lasted approximately six minutes and 38 seconds in duration. Moreover, based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ and Joshua MONTANO may have discussed the status of CW1's case during this phone call.

62.     On or about September 7, 2023, at approximately 10:33 a.m., the **MENDEZ PHONE** sent an SMS text message to the **MONTANO PHONE**. Shortly thereafter, at approximately 11:37 a.m., the **MENDEZ PHONE** made a telephone call to the **MONTANO PHONE** that lasted approximately five minutes and 49 seconds. Then, between 11:02 a.m. and

11:33 a.m., the **MENDEZ PHONE** communicated via SMS text message with the **MONTANO PHONE** approximately eight (8) times. Based on my training, experience, and familiarity with this investigation, I believe that Ricardo MENDEZ and Joshua MONTANO were discussing the status of CW1's criminal case and CW1's efforts to secure money to pay Ricardo MENDEZ.

63.     On or about September 7, 2023, at approximately 1:00 p.m., CW1 had a consensually recorded telephone call with Ricardo MENDEZ (using the **MENDEZ PHONE**). This call was made in the presence of agents and has been confirmed by review of phone records for the **MENDEZ PHONE**. Below is a transcription of the call:

**CW1:** Ricardo this is [CW1] I'm calling about the

**RM:** *Unintelligible (UI)*

**CW1:** Huh?

**RM:** Yes sir

**CW1:** I'm calling to see if we can get this settled. Um-

**RM:** Ok.

**CW1:** If I uh I think I can get all the money. I got all the money together. Um I just want to get this done. I can't sleep. I'm like freaking out because I'm afraid I'm gonna lose my job.

**RM:** Yeah. Yeah uh so you were able to do that now.

**CW1:** Yeah

**RM:** Alright um and you want to do it in the evening?

**CW1:** Sure

**RM:** Ok. Call um you after 5 after 6. Something like that.

**CW1:** Ok

**RM:** Alrighty then

**CW1:** Alright. Thanks.

64. When CW1 said to Ricardo MENDEZ, "If I uh I think I can get all the money. I got all the money together," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that CW1 was discussing collecting money to pay Ricardo MENDEZ. When CW1 stated they "just want[ed] to get this done," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that, at the direction of agents, CW1 was referring to paying Ricardo MENDEZ money to try to resolve their DWI arrest. When CW1 stated, "I'm like freaking out because I'm afraid I'm gonna lose my job," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that CW1 was conveying to Ricardo MENDEZ their concern that CW1 could lose their job if convicted of DWI. Based on my training, experience, and familiarity with this investigation, in this case, CW1 and Ricardo MENDEZ then arranged a time to discuss CW1's payment of money to Ricardo MENDEZ.

65. A review of telephone toll data for the **MENDEZ PHONE** revealed that on or about September 7, 2023, from approximately 4:04 p.m. to 4:21 p.m., the **MENDEZ PHONE** communicated via SMS text message with the **MONTANO PHONE** approximately two (2) times. Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ was providing Joshua MONTANO an update on CW1 wanting to discuss the status of the case.

66. On or about September 7, 2023, beginning at approximately 4:59 p.m., CW1 communicated with Ricardo MENDEZ via SMS text messages sent and received from the

**MENDEZ PHONE**. Agents have reviewed this text message exchange between CW1 and the **MENDEZ PHONE**, and the text messages have been confirmed by review of phone records for the **MENDEZ PHONE**. Below are the text messages:

**CW1:** Hello this is [CW1] is still on.

**RM:** I'm still working Whenever I leave I will call you

**CW1:** Ok

**CW1:** Any idea on time I'm needing to pick up my mom from my sisters house?

**RM:** Do whatever you have to do I just got home & I'm waiting

**CW1:** Ok should it text when done?

**RM:** Are u ready?

**CW1:** Yes just got back

**RM:** I meant Do u have everything already?

**CW1:** yes I have the cash

**CW1:** ?

**RM:** hang tight

**CW1:** Ok

**RM:** I'm on the phone

**CW1:** Ok

**CW1:** Hey can we do this tomorrow I've been up early and I need to get to sleep early day tomorrow.

67.     Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that when Ricardo MENDEZ asked CW1 via SMS message, "Are u ready?" and CW1 said, "Yes just got back," that Ricardo MENDEZ was not asking if CW1 was ready to meet and was instead asking if CW1 had the required amount of cash to make the entire

payment, which he clarified by sending an SMS message to CW1 that said, "I meant Do u have everything already?" When Ricardo MENDEZ referred to "everything" and CW1 responded, "yes I have the cash," and Ricardo MENDEZ directed him to "hang tight," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ understood that CW1 possessed the required amount of cash to make the full payment that would lead to Joshua MONTANO not filing DWI charges against CW1.

68.     Between on or about September 7, 2023, and on or about September 9, 2023, CW1 and Ricardo MENDEZ attempted numerous times, unsuccessfully, to re-establish contact with one another. By way of example, on or about September 7, 2023, at approximately 8:54 p.m. and again at 8:58 p.m., the **MENDEZ PHONE** attempted to call CW1 two times. The next morning, on or about September 8, 2023, at approximately 8:42 a.m., CW1 sent Ricardo MENDEZ a text message that read, "sorry, I didn't answer your phone call last night. I fell asleep." I am aware that September 9, 2023, was a Saturday.

69.     Certain communications between the **MENDEZ PHONE** and the **MONTANO PHONE** during and after this time lead me to believe that Ricardo MENDEZ was likely telling Joshua MONTANO that the money was not going to be paid and to go ahead and file the charges against CW1:

        a. On or about September 7, 2023, the **MENDEZ PHONE** sent two (2) text messages to the **MONTANO PHONE** (one at approximately 8:54 p.m. and another at 8:58 p.m.). Later that same day, the **MONTANO PHONE** sent one (1) text message to the **MENDEZ PHONE** at 9:06 p.m.

b.  On or about September 7, 2023, the **MENDEZ PHONE** called CW1 two (2) times (once at approximately 8:49 p.m. and a second time at approximately 8:51 p.m.). Thereafter, at approximately 9:07 p.m., the **MENDEZ PHONE** called the **MONTANO PHONE**. The call lasted approximately 97 seconds.

c.  On or about September 8, 2023, the **MENDEZ PHONE** and the **MONTANO PHONE** spoke telephonically. The phone call lasted approximately 280 seconds.

d.  From on or about September 8, 2023, to on or about September 12, 2023, there were approximately 27 text messages between the **MENDEZ PHONE** and the **MONTANO PHONE** (including 16 text messages from the **MONTANO PHONE** to the **MENDEZ PHONE** and approximately 11 text messages from the **MENDEZ PHONE** to the **MONTANO PHONE**).

70.    On or about September 8, 2023, at approximately 8:42 a.m., CW1 communicated with Ricardo MENDEZ via SMS text messages sent to the **MENDEZ PHONE**. Below are the text messages (which were later photographed by the FBI):

**CW1:** sorry, I didn't answer your phone call last night. I fell asleep

**CW1:** Can we get this done please. I am trying to get this go [sic]

71.    Court records shows that on Monday, September 11, 2023, a Criminal Complaint was filed against CW1. The Criminal Complaint showed the arresting officer as Joshua MONTANO. The Criminal Complaint was signed by Joshua MONTANO as the Complainant and was signed by ▮▮▮▮▮▮▮ as the approving law enforcement officer. The basis of the Criminal Complaint was the traffic stop conducted of CW1 on August 26, 2023. Based on my

38

conversations with APD internal affairs, most DWI arrests are booked into custody following their arrest and the Criminal Complaint is filed at that time. In some instances, Criminal Complaints are filed at a later time, but that is less common. If the Criminal Complaint is filed at a later date (which then triggers having the defendant appear on a summons), the average amount of time between arrest and the filing of a Criminal Complaint is within one week.

72.     On or about October 6, 2023, the FBI asked CW1 to re-establish contact with Ricardo MENDEZ. That same date, at approximately 3:36 p.m., CW1 sent two text messages via SMS to the **MENDEZ PHONE**. Below are the text messages:

**CW1:**  Hello I really need your help my date is coming up next week I drive a company truck I really can't lose my job I take care of my mother. Is there anyway we can take care of this still.

**CW1:**  I've reached out for assistance and it's going to cost me the same if not more and not sure this will be gone and you promised for it to go away

73.     Soon thereafter, on or about October 6, 2023, at approximately 6:25 p.m., the **MENDEZ PHONE** called the **MONTANO PHONE**. The phone call lasted approximately two minutes and 14 seconds. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that Ricardo MENDEZ and Joshua MONTANO discussed CW1's re-initiation of contact with Ricardo MENDEZ to discuss the status of CW1's case.

74.     On or about October 10, 2023, the **MENDEZ PHONE** replied to CW1. Beginning at approximately 8:22 p.m., CW1 exchanged a series of SMS text messages with the **MENDEZ PHONE**. Below are the text messages:

**RM:**  I'm available tomorrow afternoon I can text you after court

**CW1:**  Hey just hoping you can still help me out my arraignment hearing is coming up and I'm freaking out

**RM:** I should be done by 2 or 230pm You shouldn't have procrastinated

**CW1:** I had the money anything we can do Sdo [sic] I call you tomorrow?

**RM:** I will reach out after court

**CW1:** Ok

75. Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that, in this text message exchange, CW1 is asking for help from Ricardo MENDEZ in resolving their DWI case. When Ricardo MENDEZ stated, "You shouldn't have procrastinated," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ was likely referring to CW1 not paying the full amount to Ricardo MENDEZ earlier so that charges would not have been filed.

76. Less than an hour later, on or about October 10, 2023, at approximately 8:31 p.m., the **MENDEZ PHONE** sent a text message to the **MONTANO PHONE**. Then, at approximately 9:02 p.m., the **MONTANO PHONE** responded to the message, and at approximately 9:04 p.m., the **MENDEZ PHONE** replied to the **MONTANO PHONE**. Based on my training, experience, and familiarity of this investigation, there is reason to believe that Ricardo MENDEZ and Joshua MONTANO discussed CW1's request to discuss payment.

77. On or about October 11, 2023, CW1 exchanged a series of SMS text messages with the **MENDEZ PHONE**. Below are the text messages:

**CW1:** I don't want to miss you call again because I'm at work

**CW1:** Sorry to bug

**RM:** 7112 aztec road ne 87110 Located in a residential area 415pm

78. On or about October 11, 2023, at approximately 4:15 p.m., CW1 had a consensually recorded meeting with Ricardo MENDEZ at the law office of Clear & Clear (the

**SUBJECT PREMISES 1**). Below is a partial transcript of the conversation between Ricardo

MENDEZ and CW1:

**CW1:** I never got in trouble before. I started freaking out so bad that I, my, I need my job. I can't afford to -to…

**RM:** So, this…(voices overlap)

**CW1:** …lose my license.

**RM:** …this, so it's a- it's already been filed.

**CW1:** Okay.

**RM:** It's already in the court system. And if you'd of done it when I told you to, it wouldn't have gone through the court system. None of this woulda happened.

**CW1:** Mmm hmm.

**RM:** It would've been done and over with. So, that's why I told you, we don't do any (UI) crime. We don't have to do anything, and I was gonna be (UI). Otherwise it was gonna be more. So… I you was saying you s- you saw a bunch of different attorneys. Not -- and I told you this when I met you, nobody's gonna be able to guarantee you could get rid of this. Uh, uh so having said that, I mean, what we charge for a DWI, when it comes in here is eighty five hundred. That's not, that's not a guarantee. You want a guarantee completely get out of it, it's gonna be ten grand. Or, or, or, or more, but… it, cause it's in the system now.

**CW1:** Yeah.

**RM:** …and you wouldn't, and you wouldn't of had anything, you would've had your license, would've been fine.

**CW1:** See man I was just a-I was just afraid because I didn't know how it was gonna work out. I didn't know if you were gonna ask for money b-more money later. Or what, what was going on.

**RM:** You sh-you should've looked us up. You would've seen that, dang this guy's legit.

**CW1:** Uh huh.

**RM:** I mean…it's a legitimate business. I mean this is all we do is criminal defense. So, now we're stuck like we're gonna have to do the whole case if you want us to do anything. Um but it's gonna cost you twice as much.

41

**CW1:** Shit.

**RM:** Now I'll, I'll, I'll work with you in payments, but it's the same thing. You're s- you're still gonna have to come up with a great majority upfront.

**CW1:** Mmm hmm. At least five thousand.

**RM:** No about say sixty five (UI, voices overlap)

**CW1:** About fifty five?

**RM:** And then I'll do the rest up in payments…

**CW1:** (UI).

**RM:** …for you. But the, you know, we've gotta have it paid off in three to four months.

**CW1:** Yeah. Shit.

**RM:** Same thing though…

**CW1:** Yeah.

**RM:** …it'll be completely off there.

**CW1:** It'll be completely off.

**RM:** It's just a slow process. You're gonna have, it's gonna have to take its course. But, you won't have to worry about anything. The MVD[34] hearing is set for next month.

**CW1:** It's set for, it's set for next month? Okay, cause I haven't received any paperwork, anything on that yet either.

**RM:** Yeah.

**CW1:** Okay.

**RM:** Well this is what I do.

**CW1:** Yeah.

---

[34] Based on the context of this comment, I believe that MVD stands for the New Mexico Motor Vehicle Division.

**RM:** This is what I do all day long. I know uh where everything's, you know… what's going on.

**CW1:** Okay. Well let me work on getting the money together. I know I had already talked to my uncle, he still has that money saved for me. So let me talk with him and see what I can do. Because I'm like, like you said, I just wanna make sure that it's… I don't have to deal with it.

**RM:** Yeah. You won't have to. I mean but… you just, you just, you, you just shouldn't of waited.

**CW1:** Yeah, well I was, I, I, I was freaking out like I said and then I worked, like I say, I, I travel when I work, I drive, so I was out of town for a couple of weeks.

**RM:** (sighs) Yeah but it was over, almost two months ago.

**CW1:** Yeah. Shit.

**RM:** I mean y-you could go to any attorney in the state and nobody's gonna guarantee you off.

**CW1:** Mmm hmm.

**RM:** They can't.

**CW1:** Okay. And you can, you can guarantee?

**RM:** This is what we do.

**CW1:** Okay. Well let me see what, let me get my shit together…

**RM:** So tomorrow, what you're gonna have to do is you're gonna have to uh call in…

**CW1:** Uh huh.

**RM:** …and uh and just plead not guilty, and say give me, give me some time to get an attorney.

**CW1:** Okay.

**RM:** And, and they'll give you two weeks to get an attorney.

**CW1:** Okay.

**RM:** If you go try to get a public defender or get another attorney, there's, there, I know there's some cheap ones out there.

**CW1:** Yeah.

**RM:** You know there's, there's attorneys that are good and real cheap. I, I tell everybody the people who come to us are the ones that need to get off. You know what I mean? If you don't need to get off, don't come to us. That's what those attorneys out there are for, you know, a few thousand, three or four thousand, they'll tell you maybe. Uh but if you need to get off, th-this is where you come.

**CW1:** And you can guarantee it? Okay. Okay. Alright, let me see what I can do then.

**RM:** Yeah and, and, and like I said if you do, if we roll this way, I'm gonna tell you to stop worrying.

**CW1:** Okay.

**RM:** Don't even think about this. It's done.

**CW1:** Okay. Okay.

**RM:** Yeah, tomorrow's no biggie. Tomorrow you call in and you say I'm pleading not guilty. They're gonna read-give the charges. The charge is DWI first offense. You're potentially facing up to ninety days in jail, one year r-revocation of your license, one year um uh probation, uh and uh forty eight hours community service, three hours of victim (UI) panel, um twelve hours of DWI school, um up to fifteen hundred dollars in fines and fees, um… and court costs, what else, let's see…

**CW1:** Damn, I don't have time for (laughs)…

**RM:** Yeah, that's, I mean…

**CW1:** Yeah.

**RM:** That's if you roll the dice.

**CW1:** Okay.

**RM:** But you don't need to roll the dice.

**CW1:** Yeah. Okay. Okay. So I'll make that phone call tomorrow and then um I'll uh start working on the rest of that money and then I'll get a hold of you. See what I can do.

**RM:**    And let's see what our schedule looks like tomorrow… (pause) So I should be done by three o'clock so uh you could call me or text me or, you know if you wanna just (UI) for tomorrow. Uh it's up to you.

**CW1:**    Let me, let me give you a call. Let me text you.

**RM:**    (speaks soft) Okay.

**CW1:**    Okay. Bueno. Shit. (UI) right to my friend's house.

**RM:**    What's that?

**CW1:**    (laughs) (UI) might be at my friend's house a little bit. (laughs)

**RM:**    Yeah, nobody lives here. This is just our office.

**CW1:**    Oh. Oh wow. Very nice. Okay. (background noise) Gracias, and I'll get a hold of you. Fuck, fuck, fuck, fuck. (background noise/bell sound/engine starts) (01:17) I'll be there on Monday, probably around… ten o'clock. If they wanna start, that's fine. If they can be there at ten o'clock, that would be great.

79.    When Ricardo MENDEZ said, "And if you'd of done it when I told you too, it wouldn't have gone through the court system. None of this woulda happened," I believe Ricardo MENDEZ was telling CW1 that if CW1 had paid the money sooner, Ricardo MENDEZ could have prevented the criminal charges from being filed against CW1. When Ricardo MENDEZ said, "I mean, what we charge for a DWI, when it comes in here is eighty five hundred. That's not, that's not a guarantee. You want a guarantee completely get out of it, it's gonna be ten grand. Or, or, or, or more, but… it, cause it's in the system now," I believe Ricardo MENDEZ was telling CW1 that a higher price is charged for a "guarantee." In my training, experience, and knowledge of the investigation, I believe that Ricardo MENDEZ was using the word "guarantee" as a shorthand way of telling CW1 that CW1's payment of money to Ricardo MENDEZ would assure a favorable outcome of CW1's charges based on an improper method.

80.     Ricardo MENDEZ told CW1, "you could go to any attorney in the state and nobody's gonna guarantee you off" and CW1 responded by asking, "And you can, you can guarantee?" Ricardo MENDEZ answering by saying, "This is what we do." When taken together with the other information known, I believe that when Ricardo MENDEZ said, "This is what we do," I believe that Ricardo MENDEZ was confirming for CW1 that Ricardo MENDEZ had the ability to do something that other criminal defense law firms could not do, which was to assure that CW1's criminal charges were improperly dismissed in exchange for CW1's payment of money.

81.     A review of telephone toll data for the **MENDEZ PHONE** revealed that on or about October 11, 2023, at approximately 4:08 p.m. to 4:21 p.m., the **MENDEZ PHONE** communicated via SMS text message with the **MONTANO PHONE** approximately two (2) times. On or about October 11, 2023, at approximately 4:25 p.m., the **MENDEZ PHONE** made a telephone call to the **MONTANO PHONE** that lasted approximately 90 seconds. While it is unknown what was discussed, the timing of these text messages and subsequent phone call in relation to the consensually monitored meeting between Ricardo MENDEZ and CW1, when viewed in combination with the fact that Joshua MONTANO was the arresting officer in the matter being discussed above, lead me to believe that Ricardo MENDEZ and Joshua MONTANO were using both the **MENDEZ PHONE** and the **MONTANO PHONE** to continue their communications about the scheme to have CW1 pay money in exchange for CW1's criminal charges being dismissed.

82.     Later that night, at approximately 11:22 p.m., CW1 sent a text message via SMS to the **MENDEZ PHONE** that read, "That's a lot of moneys 100% guaranteeing off , How ?" Ricardo MENDEZ did not respond to the message.

83.     On or about October 13, 2023, CW1 communicated with the **MENDEZ PHONE** via SMS text messages sent and received from the **MENDEZ PHONE**. Below are the text messages:

**RM:**   Good morning We are available at 3pm today if you are ready

**CW1:**   Just want to make sure just like expressed in my last text.

No further communications were had between CW1 and Ricardo MENDEZ that day and a meeting between CW1 and Ricardo MENDEZ did not happen at that time.

84.     On or about November 2, 2023, at approximately 4:45 p.m., at the direction of agents, CW1 met with Ricardo MENDEZ at the Clear & Clear law office (**SUBJECT PREMISES 1**) located at 7112 Aztec Road NE, Albuquerque, New Mexico, 87110. CW1 paid Ricardo MENDEZ $6,500 in cash.[35] CW1 observed Thomas CLEAR meeting with unknown clients in the living room of the office, but Thomas CLEAR was not present for the meeting between CW1 and Ricardo MENDEZ. The money was United States government money provided to CW1 by the FBI in order to make the payment. CW1 provided Ricardo MENDEZ the $6,500 which Ricardo MENDEZ counted at his desk. Ricardo MENDEZ did not provide CW1 with any documentation or receipt for the $6,500 payment.

85.     During the meeting, which was consensually recorded, Ricardo MENDEZ told CW1 that Ricardo MENDEZ would contact CW1 via email and advised that CW1 would not need to attend any court hearings. When CW1 asked how Ricardo MENDEZ could possibly guarantee that the DWI charge would go away, Ricardo MENDEZ indicated that the charge would be dismissed due to a lack of evidence.

---

[35] This money was provided to the CHS by the FBI for purpose of paying MENDEZ the bribe he requested.

86.    Ricardo MENDEZ went on to state that because CW1 took so long to pay Ricardo MENDEZ, thereby resulting in the charges being filed, the process of getting the charges dismissed would now take approximately six (6) months. According to Ricardo MENDEZ, once the DWI got dismissed, Ricardo MENDEZ would file a motion to have CW1's arrest expunged from CW1's record.

87.    Ricardo MENDEZ specifically told CW1, "Well shit. I had your license. You could have taken it […] It wasn't filed. That's the best thing. Shit. You could have walked away with nothing. You know, not even had to risk it […] If you had done it the way I told you, nothing would have showed ever."

88.    CW1 also asked Ricardo MENDEZ how CW1 could get his/her driver's license back. Ricardo MENDEZ told CW1 to go to the Motor Vehicle Department and mislead the agency by omitting any information that CW1 received a DWI, and to lie by stating that CW1 lost his/her driver's license.

89.    Prior to CW1 departing from the meeting, Ricardo MENDEZ requested that CW1 send him any documents CW1 had received related to CW1's New Mexico Motor Vehicle Department hearing for the DWI charge. Ricardo MENDEZ indicated CW1 could either email the documents or drop them off in person.

90.    On or about November 2, 2023, at approximately 7:00 p.m., Special Agents with the FBI Albuquerque Field Office received a telephone call from CW1. CW1 told the FBI that Ricardo MENDEZ called CW1 after the consensually monitored meeting and demanded that CW1 go to the law office to pick up the $6,500 that CW1 had given to Ricardo MENDEZ earlier in the day. According to CW1, Ricardo MENDEZ told CW1 that somebody informed Ricardo MENDEZ that CW1 was having Ricardo MENDEZ investigated and that Ricardo MENDEZ

wanted to return the money to CW1. CW1 informed MENDEZ that CW1 had no idea what Ricardo MENDEZ was talking about, but that CW1 would nonetheless make arrangements to retrieve the $6,500 from Ricardo MENDEZ the following day (November 3, 2023). Because the return phone call from Ricardo MENDEZ was unexpected, agents were not present to overhear the conversation between Ricardo MENDEZ and CW1 and no recording was completed.

91.    A review of pen register/trap and trace data from November 2, 2023, for the **MENDEZ PHONE** indicated that at approximately 5:29 p.m. – which was shortly after meeting with CW1 (again, at approximately 4:45 p.m.) - Ricardo MENDEZ placed a call to the **MONTANO PHONE**. The call that lasted 29 seconds. Then, at approximately 5:29 p.m., the **MONTANO PHONE** called the **MENDEZ PHONE**. That phone call lasted approximately 291 seconds. Thereafter, at approximately 5:35 p.m., the **MENDEZ PHONE** called the **MONTANO PHONE** again. The call lasted approximately 134 seconds. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that, in these calls, Ricardo MENDEZ and Joshua MONTANO discussed Ricardo MENDEZ's concerns about CW1 having MENDEZ investigated.

92.    According to pen register data for the **MENDEZ PHONE**, on or about November 2, 2023, at approximately 6:24 p.m., the **MENDEZ PHONE** called CW1. The call lasted approximately one minute 19 seconds. Based on my training, experience, and familiarity with this investigation, I believe this is the phone call CW1 received from Ricardo MENDEZ complaining that CW1 was having Ricardo MENDEZ investigated. At approximately 6:25 p.m. the **MENDEZ PHONE** called the **MONTANO PHONE** once again. This call lasted approximately two minutes 23 seconds.

93.     Later that same evening, on or about November 2, 2023, at approximately 8:17 p.m., the **MENDEZ PHONE** sent a text message to the **MONTANO PHONE**. Thereafter, at approximately 8:50 p.m., the **MONTANO PHONE** called the **MENDEZ PHONE**. The phone call lasted approximately two minutes 7 seconds. That phone call was almost immediately followed up with another phone call at 8:52 p.m., from the **MONTANO PHONE** to the **MENDEZ PHONE**, lasting around two minutes 17 seconds. Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that, in these communications, Ricardo MENDEZ and Joshua MONTANO continued to discuss Ricardo MENDEZ's concerns about CW1 having MENDEZ investigated.

94.     A review of pen register and trap and trace device data for the **MENDEZ PHONE** revealed that the **MENDEZ PHONE** was used to communicate via text message with Thomas CLEAR numerous times on November 2, 2023, following the communications between the **MENDEZ PHONE** and the **MONTANO PHONE**. Specifically, starting at approximately 10:17 p.m. and 10:24 p.m., the **MENDEZ PHONE** and the **CLEAR PHONE** communicated via text message approximately ten (10) times.

95.     Based on my training, experience, and knowledge of the investigation, I believe this November 2, 2023, phone contact between the **MENDEZ PHONE** and the **MONTANO PHONE** was done for the purpose of communicating about Ricardo MENDEZ's suspicion that he was under investigation and the request Ricardo MENDEZ made to CW1 to retrieve the money.

96.     On or about November 4, 2023, CW1 had a consensually recorded meeting with Ricardo MENDEZ in the parking lot of Freddy's for the purpose of retrieving the $6,500.[36] The

---

[36] As noted above, Freddy's is located in close proximity to **SUBJECT PREMISES 2**.

FBI conducted physical surveillance of the meeting. During surveillance, the FBI observed an APD marked DWI unit arriving at Freddy's. Consensually monitored footage of the meeting showed Ricardo MENDEZ meeting with CW1 in between the APD marked DWI unit and CW1's vehicle. CW1 later told agents that CW1 observed Ricardo MENDEZ get out of the front passenger seat of the APD police car.

97.    During the meeting, CW1 told Ricardo MENDEZ that CW1 had no idea what Ricardo MENDEZ was talking about, in reference to Ricardo MENDEZ being investigated. Ricardo MENDEZ indicated he had heard CW1 was talking about him with other attorneys. CW1 denied the accusations. Ricardo MENDEZ then went on to tell CW1 that Ricardo MENDEZ could still get CW1 "out of this shithole" and suggested he was the only person who could do so. Ricardo MENDEZ offered to keep the $6,500 and help CW1 but emphasized that he needed to be able to "trust" CW1 and warned CW1 not to "bad mouth" him going forward. Ricardo MENDEZ then told CW1 that CW1 did not have to worry about anything.

98.    After the conclusion of the meeting, CW1 informed the FBI that Ricardo MENDEZ re-entered the APD marked DWI unit. (Ricardo MENDEZ did not return the money to the CW1 during the meeting.) Video recordings of the meeting did not capture Ricardo MENDEZ re-entering the car. Shortly thereafter, the FBI drove by Ricardo MENDEZ's residence (**SUBJECT RESIDENCE 2**). An APD marked DWI patrol unit was parked near **SUBJECT RESIDENCE 2**, however, agents were not able to definitively say if it was the same APD vehicle that was present for the meeting with CW1. Agents have since obtained the DWI unit numbers from APD IA, and have confirmed that the DWI unit parked near **SUBJECT RESIDENCE 2** following the meeting with CW1 on November 4, 2023, belonged to Honorio ALBA.

99.     On or about November 11, 2023, at approximately 10:30 a.m., CW1 received an email from Thomas CLEAR. Ricardo MENDEZ was also included as a recipient of the email. The email was titled, "Success at MVD Implied Consent Administrative License Revocation Hearing and Notice of Initial Virtual Pre-Trial Conference." The email read, in relevant part:

> Please be advised that we were successful in our representation of you at the Motor Vehicle Division Administrative Implied Consent License Revocation Hearing help on Thursday, November 9, 2023, at 1:00 p.m. before Administrative Law Judge Irma Gonzales! One down and one to go!! Now we must win the Criminal D.W.I. case.
>
> The Initial Virtual Pre-Trial Conference for your Driving While Intoxicated case will be held on Monday, November 20, 2023, at 9:45 a.m., before the Honorable Renee Torres. The Initial Virtual Pre-Trial Conference will originate from Judge Torres's Courtroom, Sixth Floor, Courtroom #660, Metropolitan Courthouse, 401 Lomas Northwest, but we will be appearing remotely by videoconference. […].
>
> Please call me this coming week, to discuss that will happen at the Initial Virtual Pre-Trial Conference. I can best be reached on my cellular phone at 505-980-2897.

100.    Later that evening, on or about November 11, 2023, at approximately 6:10 p.m., CW1 received a phone call from the CLEAR PHONE. The phone call was not answered. Thereafter, at approximately 6:10 p.m., CW1 received a text message from the CLEAR PHONE that read, "Hello [CW1]: this is Tom Clear, your lawyer … my cell phone is 505-980-2897…please call when you have a minute".

101.    On or about November 12, 2023, CW1 had a consensually recorded telephone call with Thomas CLEAR. This call was made in the presence of agents. During the phone call, Thomas CLEAR reiterated what was in the email and confirmed details such as CW1's mailing address. CW1 was instructed to call Thomas CLEAR instead of Ricardo MENDEZ going forward.

102.    On November 11, 2023, Thomas CLEAR entered his appearance on behalf of CW1.

103.    On November 16, 2023, at the direction of Agents, CW1 met with Ricardo MENDEZ at **SUBJECT PREMISES 1** located at 7112 Aztec Road NE, Albuquerque, New Mexico, 87110. CW1 paid MENDEZ $900 in cash.[37] CW1 did not observe Thomas CLEAR in the office. The money was United States government money provided to CW1 by the FBI in order to make the payment. During the meeting, after CW1 provided Ricardo MENDEZ with the $900 payment, Ricardo MENDEZ told CW1 that the agreement was an initial payment of $6,500 and two additional payments of $2,000 every two weeks from the initial payment. Ricardo MENDEZ told CW1 that he would accept the $900, but CW1 would have to pay an additional $1,100 before the final payment was due on or about December 15, 2023. Ricardo MENDEZ then typed a receipt on his computer for the $900 payment, printed it, signed it, and handed it to CW1. The receipt was on letterhead for Clear & Clear law firm.

104.    On November 30, 2023, at the direction of Agents, CW1 met with Ricardo MENDEZ at the **SUBJECT PREMISES 1** located at 7112 Aztec Road NE, Albuquerque, New Mexico, 87110. CW1 paid MENDEZ $1,100 in cash.[38] CW1 could hear somebody typing inside the office, but did not observe Thomas CLEAR in the office. The money was United States government money provided to CW1 by the FBI in order to make the payment. During the meeting Ricardo MENDEZ told CW1 that it had been a busy holiday busting people. After CW1 provided Ricardo MENDEZ with the $1,100, Ricardo MENDEZ counted the money; then typed a receipt for the $1,100 payment on his computer, printed it, signed it, and handed it to CW1. The receipt was on letterhead for Clear & Clear law firm.

---

[37] This money was provided to the CHS by the FBI for purpose of paying MENDEZ the bribe he requested.

[38] This money was provided to the CHS by the FBI for purpose of paying MENDEZ the bribe he requested.

105.    On December 13, 2023, at approximately 5:04 p.m., CW1 attempted to provide Ricardo MENDEZ an additional payment and exchanged the following text messages with Ricardo MENDEZ:

**CW1**:  I was hoping to drop off some money before I leave town. Can I stop by?

**RM**:   No sir we are Not Next week maybe

**RM**:   Home already

**CW1**:  With the holiday an' work I'll be out of town.

**CW1**:  If my schedule gets too crazy maybe I can Zelle my payment.

106.    Ricardo MENDEZ did not reply to CW1's text messages and a meeting or payment between CW1 and Ricardo MENDEZ did not take place on December 13, 2023.

107.    On December 20, 2023, at approximately 3:43 p.m., CW1 attempted to provide Ricardo MENDEZ an additional payment and exchanged the following text messages with Ricardo MENDEZ:

**CW1**: Hello I have a payment for you is it ok to stop by.

**RM**: We are at court

**CW1**: Ok no worries can I stop by tomorrow

**RM**: How's Friday if not maybe meet up some other time

**CW1**: Friday works thank you

108.    On December 22, 2023, at approximately 9:20 a.m., CW1 attempted to arrange a meeting to provide Ricardo MENDEZ an additional payment and exchanged the following text messages with Ricardo MENDEZ:

**RM**:   Good morning We decided to close for the holidays We can meet up at some point

54

**CW1**: I'm getting ready to leave town can we meet up before I leave. Hoping I can drop it off before I spend it.

109.    Ricardo MENDEZ did not reply to CW1's text messages and a meeting or payment between CW1 and Ricardo MENDEZ did not take place on December 22, 2023.

110.    On December 28, 2023, CW1 made an additional payment of $1,300 to Ricardo MENDEZ. However, due to the office closure for the holidays, Ricardo MENDEZ instructed CW1 to meet him outside of the office in the parking lot of a local business. Due to the impromptu nature of the meeting, Ricardo MENDEZ accepted the money and quickly departed without further discussion with CW1.

### IV.    *Information and allegations concerning Honorio ALBA*

111.    After the conclusion of the meeting between CW1 and Ricardo MENDEZ on November 4, 2023, the FBI showed CW1 a photograph of APD Police Officer Honorio ALBA. CW1 stated they were eighty-five percent certain that Honorio ALBA was the driver of the APD police car that transported Ricardo MENDEZ to the meeting.

112.    The marked patrol unit that was observed by the FBI transporting Ricardo MENDEZ to and from the meeting with CW1 was marked as Unit #C91.

113.    On or about November 6, 2023, the FBI conducted physical surveillance at the residence of Honorio ALBA – that is, 68 McCall Loop, Edgewood, NM 87015, and the residence of Joshua MONTANO – that is, 9808 Cameron Street NW, Albuquerque, NM 87114. APD police unit #C91 (bearing New Mexico license plate # 13515G) was observed parked at the residence of Honorio ALBA. APD Internal Affairs confirmed that this unit (#C91) is assigned to Honorio ALBA.

114.    The FBI was aware of Honorio ALBA's potential involvement in the scheme because several months prior, on or about July 3, 2023, a local attorney (hereinafter LA) contacted the United States Attorney's Office for the District of New Mexico with an allegation against two APD police officers. FBI agents interviewed LA, who provided the following information.

115.    LA had a consult with a DWI client, hereinafter referred to as Witness #2 (W2).[39] W2 told LA that W2 had been arrested by APD, breath tested, released and never formally charged. Shortly thereafter, W2 received a call from Ricardo MENDEZ, during which Ricardo MENDEZ told W2 that W2 needed to visit Ricardo MENDEZ. W2 agreed to the meeting.

116.    W2 told LA that Ricardo MENDEZ told W2 that the arresting officer was Honorio ALBA and that Honorio ALBA was Ricardo MENDEZ's cousin. As purported proof, Ricardo MENDEZ showed W2 an Instagram picture.

117.    Ricardo MENDEZ then told W2 that if W2 agreed to pay Ricardo MENDEZ $10,000 in cash, there would be no charges filed and no hearing with the New Mexico Motor Vehicles Department (MVD).

118.    A review of toll records for **MENDEZ PHONE** revealed that on September 16, 2022, Ricardo MENDEZ had an approximately eight (8) minute telephone call with a phone number associated with W2.

---

[39] FBI Agents have attempted to speak with W2 through the LA, but, so far, those efforts have not been successful.

119.    According to LA, W2 was never formally charged. The FBI conducted a query of court records and could not locate any record of charges ever being filed against W2.[40]

120.    Separately, LA had a consult with a second DWI client, hereinafter referred to as Witness #3 (W3).[41] W3 told LA that W3 had been arrested by APD, breath tested, and not booked. Instead, the arresting officer told W3 they would be contacted.

121.    Soon thereafter, Ricardo MENDEZ called W3 and showed W3 a picture of W3's driver's license with an APD uniform visible in the background. Ricardo MENDEZ told W3 that if W3 agreed to pay Ricardo MENDEZ $7,000 in cash, there would be no charges filed and no hearing with the MVD.

122.    W3 did not ultimately retain LA.  The FBI conducted a query of court records and could not locate any record of charges ever being filed against W3.

123.    A review of toll records for the **MENDEZ PHONE** revealed that on June 9, 2023, at approximately 11:36 a.m., the **MENDEZ PHONE** sent a text message to a telephone number associated with W3. Approximately two minutes later, between 11:38 a.m. and 11:55 a.m., the **MENDEZ PHONE** exchanged nine (9) text messages via SMS with the **ALBA PHONE**. Later

---

[40] If a defendant is convicted of DWI in the State of New Mexico, there are associated fees that the offender must pay to the court as part of his or her judgment and sentence, in addition to any fine that the court may impose. *See* NMSA 1978 §§ 31-12-3, 66-8-102(E)-(J). These fines and fees vary depending on the offender's criminal history (specifically if they had sustained a prior DWI conviction and, if so, how many) and the programming ordered by the state sentencing judge. While the court may allow an offender to perform community service in lieu of payment, if a case is not filed against a DWI offender or if the case is dismissed because of this illegal scheme, the court will not recover the associated fees and fines that would have otherwise attached to the criminal proceedings upon a guilty conviction.

[41] FBI Agents have attempted to speak with W3 through the LA, but, so far, those efforts have not been successful.

that day, at approximately 6:31 p.m., Ricardo MENDEZ had an approximately 211 second telephone call with a telephone number associated with W3.

124. A review of toll records for the **MENDEZ PHONE** revealed that on June 12, 2023, at approximately 6:48 p.m., Ricardo MENDEZ had an approximately 42 second telephone call with W3.

125. A review of toll records for the **MENDEZ PHONE** revealed that on June 15, 2023, at approximately 3:56 p.m., Ricardo MENDEZ had an approximately 345 second telephone call with W3. Shortly thereafter, at approximately 4:47 p.m., Ricardo MENDEZ had an approximately 1,083 second telephone call with the **ALBA PHONE**.

126. LA reported that they later called Thomas CLEAR and confronted Thomas CLEAR with the allegations made by W2 and W3. According to LA, Thomas CLEAR acted shocked and denied any knowledge, stating, "I have no idea what you are talking about." LA told Thomas CLEAR to "put a stop to it," and that Thomas CLEAR's plausible deniability was gone because LA was putting Thomas CLEAR on notice.

## V.    The August 24, 2023, arrest of Witness #4 by Honorio ALBA

127. According to information obtained by the FBI from the City of Albuquerque, Civilian Police Oversight Agency (CPOA),[42] Witness #4 (W4)[43] was arrested by Honorio ALBA

---

[42] CPOA is an independent agency of the City of Albuquerque government, not part of either the City Administration or City Council, that consists of a Civilian Police Oversight Advisory Board and an Administrative Office led by the Civilian Police Oversight Agency Executive Director. CPOA receives, investigates and reviews complaints and commendations submitted by community members for/against the Albuquerque Police Department.

[43] FBI Agents have not yet spoken with W4, so the information contained herein is derived from the materials provided to CPOA.

on or about August 24, 2023, at approximately 1:29 a.m., for DWI, in the vicinity of I-25 and

Gibson Blvd. SE.

128.    According to records obtained from the New Mexico Department of Health,

Scientific Laboratory Division, a COBRA[44] instrument test record was made by Honorio ALBA

for W4 on August 24, 2023, at 2:01 a.m. The test result indicated, "No Sample Introduced." Based

on my training and experience, I understand this to mean that W4 likely refused a breath test.

129.    On or about November 3, 2023, the Court Executive Officer for Clerk of Court for

the State of New Mexico, Second Judicial District, submitted a complaint on behalf of W4 to

CPOA. The complaint stated:

> On behalf of the Second Judicial District Court, I am reaching out to you regarding an APD
> DWI citation that was issued to [W4]. [W4] is a former employee with the Court and notified
> us that [W4] was charged with driving while under the influence on around August 24 or 25,
> 2023. We did not question or conduct any sort of internal investigation however, we have been
> alerted that there may be questionable conduct by the arresting/citation officer. More
> specifically, that the arresting/citation officer put [W4] in contact with a specific attorney,
> possibly named "Rick," who if hired, would ensure that no court case would be filed in court
> by APD.
>
> While we do not have first-hand knowledge of what communications and actions have taken
> place, we are reporting this information out of concern.

130.    CPOA opened an internal investigation into these allegations. On or about

November 9, 2023, Honorio ALBA was sent a letter notifying him of the administrative

investigation, as well as a copy of the complaint. The letter stated, in relevant part:

> [The] Court Executive Officer, Second Judicial District Court, submitted the enclosed Civilian
> Police Complaint (CPC). Pursuant to City Ordinance, the relevant Albuquerque Police
> Department SOP, and the APOA Collective Bargaining Agreement, we are providing you this

---

[44] COBRA is an acronym meaning Computerized Online Breath Record Archive (COBRA). COBRA data is internal
data stored in the machines used to administer the breathalyzer tests. The data is kept by the machines for downloading
and review and analysis later.

copy. The Executive Director has assigned […] to this case. If an interview is needed, you will be contacted at a later date regarding the attached complaint. Your investigator's contact information is […].

At this time, the relevant SOPs to be reviewed during this investigation include but are not limited to Conduct 1-1 and Reports 2-16. Additional SOPs may be reviewed and addressed during the investigation.

At this time, you are considered a target of this investigation.

Please refer to the Collective Bargaining Agreement and Department SOP governing your rights and responsibilities regarding administrative investigations.

131.    On that same date, November 9, 2023, CPOA conducted a recorded administrative interview of Honorio ALBA via Zoom. Below is a summation of the interview as detailed in CPOA's investigative report:

Officer Alba was interviewed as a target because the investigation determined that he was the *"arresting/citation officer"* referred to in the submitted complaint. Officer Alba was informed and understood that he was a target in the complaint investigation. Officer Alba advised that he received and reviewed the complaint. Officer Alba advised that he had no questions about what he had been directed to do and read the APOA statement into the record.

132.    The FBI obtained a copy of a DWI citation filed by Honorio ALBA for W4. Although dated August 24, 2023, the DWI citation does not appear to have been filed until on or about November 13, 2023 (based on a stamp at the top of the summons) – which was the next business day after Honorio ALBA was notified of the administrative investigation against him and around two and a half months after the arrest. As stated previously, Honorio ALBA was notified of the administrative investigation and complaint on Thursday, November 9, 2023. I understand that Veteran's Day was observed by the City of Albuquerque on Friday, November 10, 2023, thereby making Monday, November 13, 2023, the next business day. According to the DWI citation, the section titled, "BLOOD ALCOHOL CONCENTRATION" indicates, "REFUSAL."

133.    As detailed previously, W4 was arrested by Honorio ALBA on or about August 24, 2023, at 1:29 a.m. A review of telephone records obtained from Verizon Wireless indicates that on or about August 24, 2023, between approximately 1:37 a.m. and 2:13 a.m., the **ALBA PHONE** exchanged approximately six (6) SMS text messages with the **MENDEZ PHONE**. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that Ricardo MENDEZ and Honorio ALBA discussed W4's arrest in these text messages.

134.    According to records obtained from Verizon Wireless, later that same day, on or about August 24, 2023, at approximately 12:38 p.m., the **MENDEZ PHONE** had an approximately 7 minute, 44 second telephone call with the phone number listed for W4 in the Albuquerque Police Department's Incident Report for the arrest.    Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ reached out to W4 to discuss their arrest by Honorio ALBA earlier that day. According to those same records, almost immediately thereafter, on or about August 24, 2023, at approximately 12:48 p.m., the **MENDEZ PHONE** had an approximately 15 minute, 52 second telephone call with the **ALBA PHONE**. Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that, in this call, Ricardo MENDEZ and Honorio ALBA discussed W4's arrest.

135.    A review of pen register and trap and trace device information indicates that on November 9, 2023, at approximately 1:51 p.m. (which was the same day that Honorio ALBA was notified of the administrative investigation), the **ALBA PHONE** placed an outgoing call to the **MENDEZ PHONE** and had an approximately 12 minute, 51 second phone call. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that,

in these calls, Ricardo MENDEZ and Honorio ALBA discussed W4's complaint against Honorio ALBA.

136.    The following day, on or about November 10, 2023, at approximately 11:03 a.m., the **MENDEZ PHONE** had an approximately 9 minute, 59 second telephone call with the **ALBA PHONE**. Then, at approximately 11:35 a.m., 1:10 p.m., and 4:11 p.m., the **MENDEZ PHONE** had telephone calls with the **ALBA PHONE** that lasted approximately (1) 30 minutes, 17 seconds; (2) 7 minutes; and (3) 6 minutes, 13 seconds, respectively. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that, in these calls, Ricardo MENDEZ and Honorio ALBA continued to discuss W4's complaint against Honorio ALBA.

137.    On or about November 11, 2023, the **ALBA PHONE** made an outgoing telephone call to the **MENDEZ PHONE** that lasted approximately 1 hour, 25 minutes, 52 seconds. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that, in this call, Ricardo MENDEZ and Honorio ALBA continued to discuss W4's complaint against Honorio ALBA.

138.    On or about November 13, 2023 (which as detailed previously is the date Honorio ALBA appears to have filed the DWI citation on W4), at approximately 10:39 a.m., the **ALBA PHONE** placed an outgoing telephone call to the **MENDEZ PHONE** lasting approximately 16 minutes, 45 seconds. Based on my training, experience, and familiarity of this investigation, there is probable cause to believe that, in this calls, Ricardo MENDEZ and Honorio ALBA discussed the status of W4's case.

139.    On or about November 10, 2023, CPOA investigators interviewed W4. Below is a summation of that interview as detailed in CPOA's investigative report:

[W4] was advised that a complaint had been received regarding the conduct of the officer related to [W4] arrest for driving under the influence. [W4] advised that [W4] was at the gym and requested to be contacted on 11/13/2023 at 1000 hours. [W4] asked what the complaint was regarding; the investigator advised [W4] that the complaint was against the arresting officer and not [W4] and read the complaint to [W4].

The following questions were asked just in case the investigator was unable to reach [W4] again. W4 was asked if [W4] had the reported conversation with an officer; [W4] stated, *"Umm, not that I remember."* [W4] was asked if [W4] had the reported conversation with Officer Alba, on or off duty, regarding [W4's] case; W4 stated, *"I, I don't remember."* [W4] was advised that the investigator would contact [W4] for a follow-up interview on 11/13/2023 at 1000 hours. The recorded interview concluded at approximately 1114 hours.

## VI.     *Intercepted Communications Between Honorio ALBA and Ricardo MENDEZ on the ALBA PHONE*

140.     On December 5, 2023, the Honorable Kea W. Riggs entered an Order authorizing the FBI to intercept wire and electronic communications to and from the **MENDEZ PHONE**. FBI commenced interceptions pursuant to that Order on December 6, 2023. *See* 23-MR-2223 (hereinafter the Title III Interception Order).

141.     On December 7, 2023, at approximately 10:24 a.m., Agents intercepted a text message between Ricardo MENDEZ and Honorio ALBA on the **ALBA PHONE**. This text message was recorded pursuant to the Title III Interception Order on the **MENDEZ PHONE**. In the message, Ricardo MENDEZ texted Honorio ALBA: "Tom just called me mysteriously to go meet him somewhere to talk". Based on my training, experience, and familiarity with this investigation, I believe when Mendez referred to "Tom" in the text message, I believe he is referring to Thomas CLEAR.

142.     On December 7, 2023, at approximately 10:26 a.m., Agents intercepted a telephone call between Ricardo MENDEZ and Honorio ALBA on the **ALBA PHONE**. This call was recorded pursuant to the Title III Interception Order on the **MENDEZ PHONE** and lasted

approximately 36 minutes and 50 seconds. In the call, Ricardo MENDEZ and Honorio ALBA discuss Thomas CLEAR's request to meet up with Ricardo MENDEZ. This call includes the following exchange:

HA:   . . . Did he say where at?

RM:   No, he said call me when you are on your way.

HA:   That's fucking weird. Most people would be like, Hey can you meet me at the fucking Sonic over here or we can get -- you know what I mean?

RM:   Yea.

HA:   'Cause then if he is not giving you the location it's 'cause he doesn't want you to be prepared or set up.

RM:   Yea.

HA:   'Cause most people fucking -- most people fucking are not secretive about that especially because you've been working together for years and years.

RM:   Yea.

HA:   'Cause if I were you, bro, what I would do is like, no offense to Tom bro, but fucking I don't trust the fucker. So it's like I'd be --

RM:   Oh, me neither.

HA:   I'd be running my own fucking countersurveillance, bro.

RM:   Yea, me either.

HA:   I'd be calling I'd be calling [unintelligible] be like hey bro, fuck I need you on the fucking unmarked fucking shit running surveillance on this fucking park dude.

RM:   No, but you -- you know what, that's exactly what I thought of the -- the very first thing when –

HA:   Yea.

RM:   -- he said that.

HA:   Yea.

**RM**:    It's like, I don't want you to make a scene. So --

**HA**:    Yea.

**RM**:    You know, in his head, so I'll take him somewhere else.

**HA**:    Yea. The fucker's stupid if he tries anything though dude.

**RM**:    But, what I am wondering is wh-why -- why -- why now?

**HA**:    Yeah. Well let's think -- what's -- what's fuckin' -- what's -- what's been an issue late -- like what's a new issue that wasn't an issue a year ago, you know what I mean?

**RM**:    Mmm…Mmmmm.

**HA**:    'Cause I would say my shit -- I'd say my shit Tom shouldn't be worried about because it's kind of handled already, bro, to be honest with you.

**RM**:    Yea, it -- it's -- it's -- he don't want me there 'cause he doesn't want me to get anything out of there, you know?

**HA**:    Yeah. Does he like -- just so like just so he knows though dude -- like I can tell you I can speak for me and Josh and pretty much the rest of the guys, bro, fuckin' if you're not there, bro, we're not fuckin playin' ball, just so like Tom knows.

**RM:**    Yea.

**HA:**    Like, I consider Tom too much of a liability to do business with him.

**RM:**    Yea.

**HA:**    Like it might not be nothing, dude, but like I said, fucking, I just don't like being fucking ambushed by shit. You know what I mean?

**RM:**    Yea. Yea.

**HA:**    'Cause that's weird bro. Fucking anything else I would be like, "meet me at the office real quick." And not giving you the location, bro.

**RM:**    Hm-hm.

**HA:**    That's weird.

**RM:**    [unintelligible] "When you're on your way up here, let me know. We'll meet up somewhere."

**HA:**    Yeah that's fuckin' weird, bro. It's either some shit like what we're talking about bro, or fuckin', I -- I can't even say I'm wouldn't even know what else to talk about to be honest with you, bro, 'cause what couldn't you guys talk about at the office like.

**RM:**    Yeah.

**HA:**    Because if you're paranoid about shit bro like if I'm gonna discuss like secret shit I'm gonna discuss it at the office where I know it's not fuckin bugged and shit dude.

**RM:**    Yea.

**HA:**    Not at a fucking park when you don't know who is recording you.

143.    Based on my training, experience, and familiarity with this investigation when Ricardo MENDEZ and Honorio ALBA refer to "Tom" in this call, there is probable cause to believe that they are referring to Thomas CLEAR. Based on my training, experience, and familiarity with this investigation, Honorio ALBA and Ricardo MENDEZ then discuss why Thomas CLEAR would want to meet Ricardo MENDEZ at an undisclosed location, and Ricardo MENDEZ and Honorio ALBA express a lack of trust in Thomas CLEAR. When Honorio ALBA tells Mendez, "Well let's think -- what's -- what's fuckin' -- what's -- what's been an issue late -- like what's a new issue that wasn't an issue a year ago, you know what I mean?", followed by, "'Cause I would say my shit -- I'd say my shit Tom shouldn't be worried about because it's kind of handled already, bro, to be honest with you," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Honorio ALBA is referencing the November 3, 2023 complaint from the CPOA stemming from W4's August 2023 arrest (outlined above). When Honorio ALBA states, "Does he like -- just so like just so he knows though dude -- like I can tell you I can speak for me and Josh and pretty much the rest of the guys, bro, fuckin' if

you're not there, bro, we're not fuckin playin' ball, just so like Tom knows," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Honorio ALBA is referring to himself, Joshua MONTANO, and other APD Officers involved in the criminal scheme not working with Thomas CLEAR if Ricardo MENDEZ's employment is terminated.

144.    Later in that same recorded conversation on December 7, 2023, Honorio ALBA and Ricardo MENDEZ continue to discuss Thomas CLEAR:

**HA:**    Hopefully Tom isn't stupid enough to like fuck -- to fuck up business though, bro.

**RM:**    Eh, it is what it is. [Clears throat] But I can – I can't think of anything else.

**HA:**    Yeah I'm like--But hopefully he is not believing [first name of LA] dumb ass, bro.

145.    Based on my training, experience, and familiarity with this investigation, when Honorio ALBA says that he hopes "Tom isn't stupid enough to . . . fuck up business," there is probable cause to believe that Honorio ALBA is referring to Thomas CLEAR potentially disrupting the "business" of extorting cash payments from suspected DWI offenders and kicking money back to the officers. When Honorio ALBA states "hopefully he is not believing [first name of LA] dumb ass, bro," based on my training, experience, and familiarity of this investigation, there is probable cause to believe that Honorio ALBA is referring to LA[45] confronting Thomas CLEAR about the criminal scheme, as outlined above.

146.    In this same recorded December 7, 2023, conversation, Honorio ALBA and Ricardo MENDEZ have the following exchange:

---

[45] In the call, Honorio ALBA uses a first name consistent with LA's, which, based on my training, experience, and familiarity with this investigation, there is probable cause to believe this is the same LA who confronted Thomas CLEAR as outlined herein.

**HA:**   I will say something that you could use a little leverage too, like, the chick that I arrested last night, bro, she'd be a good one for the office, bro. I guess the bitch is like a fucking engineer or some fucking shit dude. And, like, if he tries anything bro, like I said, you could be like, Tom do you realize that like -- I have like -- I can only speak for me, bro, I can't speak for like fuckin' like ███ and them, bro. But be like, do you realize that these fuckers like contact me directly and let me know shit like that. They're not gonna do that with you, Tom. [Pause] Nah, hopefully it's fucking hopefully it's nothing bro."

**RM:**   Yea, I don't know. [Unintelligible] But yea, I'm gonna tell him I don't want to meet him. Just tell me.

**HA:**   Has he been acting weird with you otherwise, dude?

**RM:**   No, not at all.

147.    Based on my training, experience, and familiarity with this investigation, when Alba says "I will say something that you could use a little leverage too, like, the chick that I arrested last night, bro, she'd be a good one for the office, bro," there is probable cause to believe that Honorio ALBA is referring to a DWI arrest he made during his last shift (which was the evening/night of December 6, 2023, until the early morning of December 7, 2023). Based on intercepted phone calls and text messages on the **MENDEZ PHONE**, and information gathered from the Albuquerque Police Department IA Unit and other public databases, there is probable cause to believe that Honorio ALBA arrested W5[46] for DWI on December 6, 2023, at approximately 10:12 p.m. Honorio ALBA transported W5 to PTC at approximately 10:51 p.m. and they were. booked into custody at the Metropolitan Detention Center at approximately 1:43 a.m. on December 7, 2023. W5 was released that same morning of December 7, 2023. When Honorio ALBA states that she (referring to W5) would be "good for the office," based on my

---

[46] W5 has not yet been interviewed to protect the covert nature of this ongoing investigation.

training, experience, and familiarity with this investigation, I believe that Honorio ALBA was telling Ricardo MENDEZ that W5 would be a potential victim for Ricardo MENDEZ to solicit money from in order to have W5's DWI charges and MVD hearings dismissed. When Honorio ALBA states "the bitch is like a fucking engineer," based on my training, experience, and familiarity with this investigation, there is probable cause to believe Honorio ALBA is describing W5's occupation.

148.    Moreover, based on my training, experience, and familiarity with this investigation, when Honorio ALBA said that "I can only speak for me, bro, I can't speak for like fuckin' like ▮▮▮ and them," there is probable cause to believe that Honorio ALBA was referring to other officers involved in the criminal scheme. Moreover, based on my training, experience, and familiarity with this investigation, when Honorio ALBA tells Ricardo MENDEZ to tell Thomas CLEAR that "they're not gonna do that with you, Tom," there is probable cause to believe that Honorio ALBA is referring to himself and other officers who are involved in the criminal scheme who would not want to continue to go to Thomas CLEAR if Ricardo MENDEZ was no longer working for him.

149.    The December 7, 2023, recorded conversation between Honorio ALBA and Ricardo MENDEZ on the **ALBA PHONE** continued, and included Honorio ALBA stating, "Like you need to you know what we need to do, bro? Fuckin' like one year, bro, fuckin need to like track, bro, like literally, like track, how many cases we have, like all of us dude, that fuckin', you can honest to God say wouldn't have came to Tom otherwise, bro, you know what I mean." Based on my training, experience, and familiarity with this investigation, when Honorio ALBA says "we" should "track how many cases like all of us" have that "wouldn't have came to Tom otherwise," based on my training, experience, and familiarity with this investigation, there is probable cause

to that Honorio ALBA is referring to DWI arrestees that Honorio ALBA and other officers have diverted to Ricardo MENDEZ and Thomas CLEAR as part of the criminal scheme that otherwise would not have gone to Thomas CLEAR.

150. The December 7, 2023, recorded conversation between Honorio ALBA and Ricardo MENDEZ on the **ALBA PHONE** continued, and included the following exchange:

**HA:** Does, does he realize that, fuckin' I'm not tryna sound stupid, bro, but does he realize, bro, that fuckin', there's too much stuff for him to play innocent?"

**RM:** No, no. He really thinks it has nothing to do with him. Well, you – you've seen that thing. I've seen him, I've seen him.

**HA:** Yeah, like, sure Tom, sure. Yeah he's -- but I can tell you, bro, fucking I don't know very many people that'll play ball with Tom, bro, fucking if you're not there dude, like, just so that he knows. 'Cuz the problem that I have with Tom where I think with the any heat that fucker was gonna roll over, dude.

**RM:** Oh yeah…yeah.

**HA:** I can guarantee and the moment that fucker gets a subpoena, bro, he's like "I'm gonna tell you everything! Fucking let me give you a statement."

**RM**: Yeah.

**HA**: Like really, fucker? Fucking…do you want to put a tail on him or some shit, bro? Fucking I got some buddies in the special secret squirrellies, bro, if you need that. You need -- you need trackers or audio devices or fucking anything, let me know, fucking little ███████ 's got all of that shit dude. I would say the big red flag is…well – do you want me to give you my brother advice to you, dude?

**RM**: Hm.

**HA**: You need to find something before this conversation comes up that -- that's very important to him, bro, that like -- he wouldn't want getting out or fucking so-something, you know what I mean? Like, hey fucker, how stupid do you want to be? This is what I got.

151. Based on my training, experience, and familiarity with this investigation, when Honorio ALBA says "does he realize bro that fuckin there's too much stuff for him to play innocent?" there is probable cause to believe that Honorio ALBA is referring to Thomas CLEAR's

awareness of and participation in the criminal scheme. Based on my training, experience, and familiarity with this investigation, when Honorio ALBA says "I don't know very many people that'll play ball with Tom, bro, fucking if you're not there dude, like, just so that he knows," Honorio ALBA is referring to Honorio ALBA and other law enforcement officers not continuing to refer DWI arrests as part of the criminal scheme to Thomas CLEAR if Ricardo MENDEZ is no longer employed there. Based on my training, experience, and familiarity with this investigation, when Honorio ALBA refers to Thomas CLEAR "roll[ing] over," there is probable cause to believe that Honorio ALBA is referring to ALBA's belief that Thomas CLEAR would not conceal their criminal dealings if approached by law enforcement.

152.    The December 7, 2023, recorded conversation between Ricardo MENDEZ and Honorio ALBA on the **ALBA PHONE** continued, and Honorio ALBA and Ricardo MENDEZ continue to discuss what may have caused Thomas CLEAR concern about Ricardo MENDEZ. The following exchange occurred:

**RM**:    You know the only other thing?

**HA**:    What's up?

**RM**:    If he found out, you know, that we did any cases without him.

**HA**:    Yea.

**RM**:    That's the only thing – that's the only thing he's been a cry baby about, you know?

153.    Based on my training, experience, and familiarity with this investigation, when Honorio ALBA says, "If he found out you – we did any cases without him", I believe Honorio ALBA is referring to Thomas CLEAR finding out that Honorio ALBA, Ricardo MENDEZ, and others extorted DWI offenders without including Thomas CLEAR.

154. The December 7, 2023, recorded conversation between Honorio ALBA and Ricardo MENDEZ on the **ALBA PHONE** continued, and Honorio ALBA and Ricardo MENDEZ continue to discuss who may have complained. After Ricardo MENDEZ stated he didn't know who would tell Thomas CLEAR, the following exchange occurred:

**HA**: But I'm like, it's not in these fuckers' best interest to fuckin' – you know what I mean?

**RM**: Yea, fuckin', fuckin'. Not going to help you then.

**HA**: That'd be like somebody gave you a fuckin' winning lottery ticket and then you go, like, fuck the person over.

**RM**: That's the only thing I can think of – that somebody said, "Hey, fuckin'." But it would have to be one of ours.

**HA**: That's what I'm saying though, so I'm like thinking I'm like – I don't, like anyone that's actually like, like, it worked out for, I don't see why they would complain though, dude. Or why they would – you know what I mean?

**RM:** Yeah.

**HA**: 'Cuz if you were any of those fuckers bro and you got that result bro, would you fucking complain? I wouldn't.

**RM**: No.

155. Based on my training, experience, and familiarity with this investigation, when Honorio ALBA and Ricardo MENDEZ discuss winning a "lottery ticket" and questioning why they would complain, they are discussing why a person who had their DWI charges dismissed or not filed would complain about the criminal scheme. Later in this same conversation, Honorio ALBA raises if the person could be W4, the DWI offender that led to the CPOA complaint, discussed herein.

156. The December 7, 2023, recorded conversation between Honorio ALBA and Ricardo MENDEZ on the **ALBA PHONE** continued, and Honorio ALBA discussed the arrest of W5, which included the following exchange:

**HA**: Bro, does he realize, like fucking, I'm not even like joking but, like, let's say the engineer chick I fucking sent you, just sent you fucking today, does he realize, bro, fuckin', that every one of those ones right there, bro, is fuckin', that's money in his pocket, bro.

**RM**: Yea. I don't know what he is thinking.

157. Based on my training, experience, and familiarity with this investigation, when Honorio ALBA discusses the "engineer chick" that ALBA "sent" MENDEZ "today," there is probable cause to believe that ALBA is referring to the arrest of W5.

158. The December 7, 2023, recorded conversation between Honorio ALBA and Ricardo MENDEZ on the **ALBA PHONE** continued, and Honorio ALBA said, "But if he tries to whatever like that blah blah blah . . . fuckin', uh, and he tries to play the innocent card whatever, bro, remind him about the fucking case, bro, the one that fucking, the one that he, uh, I was in MVD in person sitting next to him [unintelligible] and he dropped the ball and forgot about and he fucking asked me to fucking, if I could leave, and he would take care of it. So he is not totally innocent you know what I mean." The call concludes shortly thereafter. Based on my training, experience, and familiarity with this investigation, when Honorio ALBA said Thomas CLEAR "asked me to leave," Honorio ALBA was describing a time in which Thomas CLEAR improperly directed Honorio ALBA to leave an MVD hearing to trigger a dismissal of the MVD proceedings.

159. Later that same day on December 7, 2023, at approximately 12:51 p.m., Agents intercepted a telephone call between Ricardo MENDEZ and Honorio ALBA on the **ALBA PHONE**. This call was recorded pursuant to the Title III Interception Order on the **MENDEZ**

**PHONE** and lasted approximately 48 minutes and 51 seconds. In this call, Ricardo MENDEZ and

Honorio ALBA continue to discuss the criminal scheme and possible reasons that Thomas CLEAR

has asked to meet with Ricardo MENDEZ over the **ALBA PHONE**. This call included the

following exchange:

**HA**:   Do you think, well, who knows bro, it might be, like I said, I don't see it making sense for him to cut off a relationship like that, bro, over that because he has made so much money over the years and through this year, 'cause I tell you what a lot of attorneys struggled during COVID, bro.

**RM**:   Oh yeah, we had a fucking blast.

**HA**:   That is what I was saying, like. So that, but not only that, I would say that, but the other thing that I can see, bro, is and I'm just thinking like biased here, he might tell you bro to create some distance even like between me because if he is getting spooked about what is going on, he may want to distance himself, because Tom is going to look out for Tom.

**RM**:   Yeah. So that's what bugs me, you know, that's what bugs me that -- like, like I told you that day [unintelligible] "I wasn't here. It had nothing to do with me."

**HA**:   But that's what I'm saying is, I could, I could see, I could see it being that too dude.

**RM**:   Nah, I don't think so.

**HA**:   You don't think so, bro?

**RM**:   Nah. What's he going to say? "Hey keep Alba away from here?" [laughs]

**HA**:   You know what, bro? I could actually see himself saying that, bro. Because if he is getting spooked, do you know what I mean?

**RM**:   Yeah.

**HA**:   Because we all know that fucking Tom's not stand up, bro, he's not going to stare down the fucking barrel of a gun anytime soon, bro.

**RM**:   Yea.

160.    Based on my training, experience, and familiarity with the investigation, when Honorio ALBA says, "he is getting spooked about what is going on, he may want to distance himself, because Tom is going to look out for Tom," there is probable cause to believe that Honorio ALBA is referring to Thomas CLEAR wanting to distance himself from Honorio ALBA because of the CPOA complaint filed against him. When Honorio ALBA states, "fucking Tom's not stand up, bro, he's not going to stare down the fucking barrel of a gun anytime soon, bro," based on my training, experience, and familiarity with the investigation, there is probable cause to believe that Honorio ALBA is referencing Thomas CLEAR likely wanting to distance himself from Honorio ALBA to try to avoid being accused of being associated with this criminal scheme.

161.    The December 7, 2023, recorded conversation between Honorio ALBA and Ricardo MENDEZ on the **ALBA PHONE** continued, and the following exchange occurred:

**HA**:    I mean, fucking, bro, fucking, you would be really hard to replace, dude. Like I am not just saying that because you are my friend [unintelligible]. You know that I mean?

**RM**:    But I'm telling you, his -- his wife in her eyes, like, you could fucking do it with someone else.

**HA**:    Bro, let me like, I mean just like, we are both biased here bro, but let me ask you this, fucking, do you think ███ or anybody bro is gonna fucking deal with somebody new? No.

**RM**:    Nah, nah.

**HA**:    Like, do you think if I get a phone call from someone new and they approach I'll be like, ah fuck, that I don't know what the fuck you're talking about. Like, honestly bro, like no shit, like no shit, everyone is so skittish these days, the worst thing he could do for business is make changes.

162.    Based on my training, experience, and familiarity with the investigation, when Honorio ALBA says, "you would be really hard to replace," there is probable cause to believe that

Honorio ALBA is referring to the relationship Ricardo MENDEZ has with the police officers involved in this criminal scheme and how others could not serve in the same role for Thomas CLEAR's law firm. When Ricardo MENDEZ then discusses "his wife" and how "in her eyes, like, you could fucking do it with someone else," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ was referring to Thomas CLEAR's wife and how she believes that Thomas CLEAR could establish the same arrangement with another person other than Ricardo MENDEZ. When Honorio ALBA says, "but let me ask you this, do you think █████ or anybody bro is gonna fucking deal with somebody new? No." there is probable cause to believe that Honorio ALBA is referring to other officers involved in the criminal scheme, and how those other officers will no longer work with Thomas CLEAR's law firm on the criminal scheme if Ricardo MENDEZ is no longer working at Thomas CLEAR's law firm.

163.    On December 7, 2023, at approximately 3:48 PM, the Albuquerque Police Department (APD) Internal Affairs (IA) Division sent a letter via e-mail to Honorio ALBA informing him that the CPOA complaint (discussed herein) had been administratively closed. The e-mail was sent from APD IA to Honorio ALBA and included a copy to ████████████████ ███████████████████████████████. At approximately 4:10 p.m., Honorio ALBA sent a text message from the **ALBA PHONE** containing a photograph of the APD IA letter to Ricardo MENDEZ on the **MENDEZ PHONE**. This text message was intercepted as part of the Title III Interception Order on the **MENDEZ PHONE**.

164.    The APD IA Division issued the administrative closure of the CPOA complaint because it was aware of this much more serious criminal investigation related to this wide-ranging criminal scheme. However, Honorio ALBA was not yet aware of this criminal investigation when

he received the December 7, 2023, letter. Because of this, the **MENDEZ PHONE** interceptions captured conversations between Honorio ALBA and Ricardo MENDEZ on December 7 and December 8, 2023, in which Honorio ALBA indicates that he believed he had escaped any consequences stemming from the CPOA complaint.

165.    On December 7, 2023, Thomas CLEAR tried to call Ricardo MENDEZ at approximately 4:30 p.m., but Ricardo MENDEZ did not answer the call. On December 7, 2023, at approximately 5:35 p.m., Thomas CLEAR sent Ricardo MENDEZ a text message that stated, "All is good."[47] Following that text message, Ricardo MENDEZ and Honorio ALBA spoke on the phone that same day at approximately 7:32 p.m. on the **MENDEZ PHONE**. The following exchange occurred:

**RM**:    So he tried to call me (overlapping voices) and I wouldn't answer (overlapping voices) and I didn't answer an-and he text me, "All is good."

**HA**:    Huh . . . I think he . . . you think [UI] he might have come to his senses, bro? Hey, bro?

**RM**:    Yeah?

**HA**:    What time did he text you that and I'll tell you why it might matter, might matter.

**RM**:    Uuuhhh [UI] let me see.

**HA**:    Was it after 4 p.m.?

**RM**:    So when we were on the phone at 4:30 (overlapping voices), he called (overlapping voices) and I didn't answer and then he texted at 5:35.

**HA**:    Mm-kay.

**RM**:    What you thinkin'?

**HA**:    What I'm thinkin' is this. Remember I told you the other thing might have been that

---

[47] This text message was released to the investigative team following an order entered by Judge Riggs finding that it fell within the crime-fraud exception.

he was fuckin' scared about my shit?

RM:    Hmm . . . yeah?

HA:    What changed between say 3:00 p.m. and 5:30 p.m.? What . . . what's the one thing that changed?

RM:    How would he know?

HA:    You don't think Les told – you don't think, bro, who knows how that fucker would know, you know what I mean?

RM:    No, [UI] I told you Mike doesn't like him.

HA:    I know but what I'm say is, but, Tom probably has friends at district court, right? [pause] I'm just saying, what's the only one thing that's changed within the last couple hours?

RM:    -- I -- you know what I -- I seriously think?

HA:    What?

RM:    He said that I thought about it and said, fuck, you know, if [unintelligible]. I think he still wants [unintelligible]. But I think, fucking, you know, he says, how do I fucking piss somebody off in the fucking holidays. Or, how do I piss somebody off and then the holidays. [Unintelligible] fuck with somebody (overlapping voices).

HA:    Not only that, not only that, bro, but even with, even with, whatever he thinks he is missing out on, he's still making more than he ever did.

RM:    Oh, without a doubt, bro, I thought about it. So when, so when I went to him, guess how much he was charging for a DWI?

HA:    Would you say like 2,000, 3,000, something like that?

RM:    1,300.

HA:    Fuck that, bro, that's crazy.

RM:    And then I jumped it up 3, and then 5, and then 6. You know?

HA:    Yep. Bro, I guarantee you, th–chick -- I know like obviously we've had our hands full with other shi–today -- but if you call the woman I sent you to–y bro --

RM:    Yea.

HA:    -- I–uaran -- guarantee you, bro, that she will not have a hard time coming up with 8500. [pause]

RM:    [unintelligible]

78

**HA**: What I would do if I were you, bro, is I would fucking, tomorrow, whatever like that, I would fuck–g hit -- I'll try to snag you something good tonight obviously, bro, so fucking try to get you some results that way you have that in your back pocket, you know what I mean?

**RM**: Yea.

**HA**: Because like I said, bro, like you can't tell me like, like when [W6's first name][48] paid [W'6] bill and shit like that, bro, bro, you can't tell me fucking Tom didn't like seeing that sort of cash on the table.

**RM**: Yea. Of course he loves it, he loves it.

**HA**: That's what I'm saying.

166.    In this call, when Honorio ALBA and Ricardo MENDEZ discuss the timing of Thomas CLEAR's call and text message ("All is good"), and what things had changed that afternoon, based on my training, experience, and familiarity with this investigation, there is probable cause to believe that they were discussing whether Thomas CLEAR learned about the APD IA closure letter regarding the CPOA complaint. When Honorio ALBA says, "Even with, even with, whatever he thinks he is missing out on, he is still making more than he ever did," there is probable cause to believe that Honorio ALBA was talking about Thomas CLEAR, and how Thomas CLEAR was making more money than he earned before the criminal scheme. This portion of the conversation also indicates by probable cause that Thomas CLEAR had expressed that he believed he was missing out on payments made by DWI offenders. When Ricardo MENDEZ stated, "So when I went to him, guess how much he was charging for a DWI? . . . 1,300," there is probable cause to believe that Ricardo MENDEZ was explaining how Thomas CLEAR was

---

[48] In this portion of the call, Honorio ALBA refers to a DWI offender, hereinafter referred W6, by first name. FBI intelligence personnel and agents have identified this witness based on a review of filed DWI charges in which the defendant had that first name, the attorney of record was Thomas CLEAR, and the case was dismissed because the officers (Honorio ALBA and the officer who performed the initial traffic stop) did not show up for pretrial interviews.

charging $1,300 to represent a client charged with DWI prior to Ricardo Mendez working for Thomas CLEAR. When Ricardo MENDEZ stated, "and then I jumped it up 3, and then 5, and then 6," there is probable cause to believe that Ricardo MENDEZ was explaining how he increased the fee to handle DWI offender's cases to $3,000, to $5,000, then to $6,000. When Honorio ALBA says, ". . . but if you call the woman I sent you today bro, I -- guaran -- guarantee you that she will not have a hard time coming up with 8500," there is probable cause to believe that Honorio ALBA is referring to his DWI arrest of W5, and that they will be willing to pay $8,500 to resolve the DWI charges pursuant to the criminal scheme. When Honorio ALBA told Ricardo MENDEZ, "I'll try to snag you something good tonight obviously, bro, so fucking try to get you some results that way you have that in your back pocket," there is probable cause to believe that Honorio ALBA is telling Ricardo MENDEZ that he will attempt to arrest another DWI offender that he could provide to Ricardo MENDEZ as part of this criminal scheme so that Ricardo MENDEZ would have another victim making payments.

167.    When Honorio ALBA stated, "you can't tell me like, like when [W6's first name] paid their bill and shit like that, bro, bro, you can't tell me fucking Tom didn't like seeing that sort of cash on the table," there is probable cause to believe that Honorio ALBA was talking about the amount of money Honorio ALBA, Ricardo MENDEZ, and Thomas CLEAR were able to receive from W6, and that the handling of W6's case was part of this criminal scheme. According to the New Mexico State Court documents, officers conducted a traffic stop on the vehicle W6 was driving. The officers noted that W6 showed signs of intoxication, so the officers requested that Honorio ALBA respond to conduct a DWI investigation. W6 performed poorly on the field sobriety tests, and Honorio ALBA placed him under arrest. Honorio ALBA transported W6 to the Prisoner Transportation Center, and administered a breathalyzer test. The Criminal Complaint

80

stated that W6's BAC was above the legal limit. The Criminal Complaint also noted that W6 had two prior DWI convictions.

168.    A review of prior filings in the New Mexico State Court database reflects that W6 had two prior DWI arrests, both in 2019. One was on August 28, 2019, and the other was on September 9, 2019, and neither involved any of the officers known to be involved in this criminal scheme. W6 was represented by Thomas CLEAR on both matters. W6 entered a guilty plea to two counts of DWI and was sentenced on October 8, 2020, to 90 days jail with credit for time served and the remainder suspended.

169.    With respect to W6's 2022 new DWI arrest by Honorio ALBA, it is my understanding that based on New Mexico state laws, W6 was facing much harsher penalties based on their prior DWI convictions.[49] In the 2022 prosecution, W6 was once again represented by Thomas CLEAR. As part of the case, Thomas CLEAR requested that the court issue subpoenas for pretrial interviews of both the initial traffic officer and Honorio ALBA. Neither officer showed for the pretrial interviews, and Thomas CLEAR moved to dismiss. The dismissal motion was granted with prejudice, noting that Honorio ALBA and the other officer[50] failed to appear for the pretrial interview.

170.    Further, in the December 7, 2023, call in which Honorio ALBA tells Ricardo MENDEZ that when "[W6's first name] paid [their] bill and shit like that, bro, bro, you can't tell me fucking Tom didn't like seeing that sort of cash on the table," based on my training, experience,

---

[49] NMSA 1978 § 66-8-102(F)(2).

[50] At this point the investigation is ongoing as to whether the other officer who failed to show for the pretrial interview is part of this criminal scheme.

and familiarity with this investigation, there is probable cause to believe that Honorio ALBA was discussing Thomas CLEAR's involvement in the improper dismissal of the 2022 DWI case against W6. Moreover, because W6 was facing more severe DWI penalties have been convicted previously of DWI, there is probable cause to believe that Thomas CLEAR, Ricardo MENDEZ, and Honorio ALBA had greater leverage over W6 to extort more money as part of this scheme.

171.    Another conversation between Ricardo MENDEZ and Honorio ALBA occurred on the **ALBA PHONE** on December 8, 2023, at approximately 7:49 p.m., which was intercepted by agents and recorded pursuant to the Title III Interception Order on the **MENDEZ PHONE**. The call lasted approximately 14 minutes and 30 seconds. This call included the following exchange.

**HA**:    Fucking ██████ made me laugh, bro.

**RM**:    Why?

**HA**:    Oh god, so that, in my -- I'll tell you what, bro, -- my shit bro -- like I hate to say it, but like, fucking, there might – there might be some good that comes out of my shit, dude.

**RM**:    Why's that?

**HA**:    So fucking, uh, so he saw the email where I'm fucking cleared of everything and [unintelligible] shit. . . .

172.    Based on my training, experience, and familiarity with the investigation, when Honorio ALBA says, "Fucking ██████ made me laugh, bro," there is probable cause to believe that Honorio ALBA was referring to ██████████. When Honorio ALBA said, "there might be some good that comes out of my shit," there is probable cause to believe that Honorio ALBA was referring to the CPOA complaint based on my training, experience, and familiarity with this investigation. When Honorio ALBA said, "So fucking, uh, so he saw the email where I'm fucking cleared of everything," based on my training, experience, and familiarity with this investigation,

82

there is probable cause to believe that Honorio ALBA was discussing ███████████ receiving

the copy of the APD IA administrative closure letter that was sent to Honorio ALBA the day prior.

173.    The December 8, 2023, recorded conversation between Honorio ALBA and Ricardo MENDEZ on the **ALBA PHONE** continued, and the following exchange occurred:

**HA**:    . . . Fucking ████, he's like, "I tell you what, if I ever get in trouble, I tell you who I'm fucking calling, I'm calling Rick." And then fucking everybody busts up laughing, dude. And I'm like, so I was like, I was like, "You liked that one, huh, Sarg." He's like, "Fucking A, dude," he's like, "I was -- that's wicked." So I can tell you me getting off, bro, fucking impressed that fucker, I can tell you that.

**RM**:    Yea.

**HA**:    I -- I can honestly tell you, bro, that I think that impressed him more than even fucking helping him out on his last shit.

**RM**:    [Clears throat] That's good. That's good. You -- you know what? I think that and your situation makes it, like, you know, an untouchable.

**HA**:    That's what I -- that's what I was saying, you know? ████ like, "Fucking A, if they made that shit happen, dude like . . ."

**RM**:    Yea, and you should fucking egg it on.

**HA**:    Oh, no no. I'm fucking telling ████. I'm like, "Yea fucker. Now you fucking know. Now you know all the capabilities, you know what I mean."

**RM**:    Yea, unappreciative motherfucker.

174.    Based on my training, experience, and familiarity with the investigation, when Honorio ALBA says, "Fucking ████, he's like, 'I tell you what, if I ever get in trouble, I tell you who I'm fucking calling, I'm calling Rick.'" there is probable cause to believe that Honorio ALBA was talking about ███████████ reaction to the CPOA complaint being dismissed, and that ███████████ was referring to reaching out to Ricardo MENDEZ (Rick) if ███████████ ever got into trouble. When Ricardo MENDEZ tells Honorio ALBA that he is "untouchable," and Honorio ALBA discusses telling ███████████ about "knowing the capabilities," based on my

training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ and Honorio ALBA are discussing Honorio ALBA's perceived ability to get away with illegal criminal conduct without any adverse result by APD.

**VII.    *Intercepted Communications Between Nelson ORTIZ and Ricardo MENDEZ on the ORTIZ PHONE Related to Nelson ORTIZ No Showing at a Hearing***

175.    On December 12, 2023, at approximately 10:24 a.m., Agents intercepted a text message conversation between Ricardo MENDEZ and Nelson ORTIZ. This text message was recorded pursuant to the Title III Interception Order on the **MENDEZ PHONE**. The following text message exchange between Ricardo MENDEZ and Nelson ORTIZ occurred:

**RM**:    Hey brother don't forget this girl tomorrow 9am

**RM**:    [Photograph of W7 sent to Nelson ORTIZ[51]]

**NO**:    Cool you said no show right?

**RM**:    Yes please

**NO**:    Done!

**RM**:    Thank you

**NO**:    Anything for you

**RM**:    😯

176.    I reviewed the New Mexico court system related to the traffic violation issued by Nelson ORTIZ to W7. According to the New Mexico State Court docket, the citation was for "spectating a race or drag race, or spectating preparations for a race or drag race prohibited." On

---

[51] Ricardo MENDEZ texted Nelson ORTIZ a photograph of a state New Mexico Traffic Violation Citation. Nelson ORTIZ was the officer that issued the citation that was dated September 30, 2023. The individual who received the violation from Nelson ORTIZ, hereinafter referred to as W7, has not been interviewed to protect the covert nature of this ongoing investigation.

December 13, 2023, the aforementioned traffic violation was dismissed without prejudice, due to "For Trial, the Defendant having appeared, the Officer-Prosecutor failing to appear."[52] Based on my training, experience, and familiarity with the investigation, there is probable cause to believe that Ricardo MENDEZ coordinated with Nelson ORTIZ so Nelson ORTIZ would not show up for the W7's court hearing, thereby triggering the dismissal of the court proceedings. Based on my training and experience as a sworn law enforcement officer and the experiences of other law enforcement officers involved in this investigation, it would be highly inappropriate for a defense investigator or a defense attorney to contact a law enforcement officer and to direct the officer to not show up to court hearing at which the officer's testimony is required. Notices of such hearings are issued by the court, and attendance at those hearings is a mandatory part of being a sworn law enforcement officer. Agents have not yet intercepted any further communications between Ricardo MENDEZ and Nelson ORTIZ, to include whether there was a payment arrangement between Thomas CLEAR, Ricardo MENDEZ, Nelson ORTIZ, and W7, related to Nelson ORTIZ not showing up at the December 13, 2023, trial. However, based on my familiarity with this investigation, there is probable cause to believe that the arrangement of Nelson ORTIZ not showing up to W7's December 13, 2023, trial was part of this criminal scheme.

---

[52] My understanding is that, under the New Mexico Rules of Criminal Procedure for the Metropolitan Courts, officers can file and prosecute their own criminal complaints for certain misdemeanor violations. N.M. R. Crim. P. Metro. Ct. 7-108. Exceptions to this officer-prosecutor system exist for cases that are tried before juries, that involve a charge of driving under the influence of intoxicating liquor or drugs, or that involve certain domestic violence charges. *Id.* Based on this, there is probable cause that the reference to the "Officer-Prosecutor" failing to show is that Nelson ORTIZ did not appear at the court hearing, which triggered the dismissal.

## VIII.    Harvey JOHNSON, Nelson ORTIZ, and Ricardo MENDEZ Target W8 as Part of the Criminal Scheme.

177.    On January 2, 2024, Ricardo MENDEZ received a call from W8,[53] which was intercepted on the **MENDEZ PHONE** Title III interception order. According to information obtained from the New Mexico State Court database and APD IA, there is probable cause to believe that APD DWI Unit officer Harvey JOHNSON arrested W8 on December 28, 2023, and charged him with Aggravated DWI, reckless driving, and accidents involving damage to a vehicle. According to the Criminal Complaint, APD officers were dispatched to a traffic accident involving a vehicle (later determined to have been driven by W8) that crashed into a median and hit a tree. W8 left the scene of the accident. Officers located W8 at their residence and noted W8 appeared to be intoxicated. Harvey JOHNSON spoke with W8, who admitted to having consumed alcohol prior to driving and to driving the vehicle involved in the accident. Harvey JOHNSON noted that W8 had bloodshot watery eyes and a strong odor of an alcoholic beverage emanating from their facial area. W8 refused to perform the standard field sobriety tests, and Harvey JOHNSON placed W8 under arrest for DWI. W8 was transported to the Police Transportation Center, where W8 refused to submit to the breath test (or breathalyzer). W8 was then booked into custody at MDC. The call between Ricardo MENDEZ and W8 included the following exchange:

**RM**:    Hello?

**W8**:    Hi, I was trying to reach Rick.

**RM**:    This is he.

---

[53] W8 has not yet been interviewed to protect the covert nature of this investigation. A redacted portion of this call and other communications between Ricardo MENDEZ and W8 were released to the investigative team pursuant to an order issued by Judge Riggs finding that they were subject to the crime fraud exception.

**W8**: Rick, hey, this is [W8]. I, uh, got your name from Nelson ORTIZ, said to give you a call. I had a DUI last week.

**RM**: Okay.

**W8**: And he said you are the right guy to speak to.

**RM**: Uh, do you know who stopped you?

**W8**: Harvey JOHNSON. . . .

178. The conversation between Ricardo MENDEZ and W8 also included the following exchange:

**W8**: And I gotta get this stuff done. I mean, I'm more worried about my job than anything else, but what can you do.

**RM**: Right. So, uh, are you available today?

**W8**: Yeah.

**RM**: Um, we had a pretty busy weekend.

**W8**: Yeah, I bet.

**RM**: [laughs] So, um, I--I think I have an opening at 3:00 or 3:30. Will that work for you?

**W8**: Yeah, absolutely.

**RM**: Okay. Uh, is this your cell number?

**W8**: This is my cell number, yes.

**RM**: Okay, I'm going to text you a reminder and--and our address now.

**W8**: Okay.

**RM**: Just bring – just bring all the paperwork with you, uh, and, uh, we'll help you out.

**W8**: I appreciate it. Thank you so much man.

**RM**: You got it.

179.    Following this phone call between Ricardo MENDEZ and W8, at approximately 11:45 a.m., Ricardo MENDEZ sent a text message (which was recorded pursuant to the Title III authorization on the **MENDEZ PHONE**) to W8 with the Clear & Clear law firm address and a note, "Located in a residential area." On January 2, 2024, at approximately 11:47 a.m., agents intercepted a telephone call between Nelson ORTIZ and Ricardo MENDEZ. This call was recorded pursuant to the Title III authorization on the **MENDEZ PHONE**. This conversation included the following:

**NO**:    Yo!

**RM**:    What you doing baby cakes?

**NO**:    Ah, just sending you referrals. What are you doing man?

**RM**:    I know thank you.

**NO**:    You got that one?

**RM**:    Uh he's going to come by to uh today uh what's the scoop of him [UI]

**NO**:    Is Har…is Harvey on your fucking roster or not?

**RM**:    Yeah..yes sir.

**NO**:    Alright. Well that's the one it is.

**RM**:    Yeah, um, that's what I was I going to ask you. Is this guy down or what?

**NO**:    Harvey? Yeah.

**RM**:    No, no. no, no, no, your friend.

**NO**:    Oh yeah he's uh….he's an old uh…he's my old basketball coach or not mine but the old basketball coach from uh when I went to Valley.

. . .

**NO**:    But, yeah, no he'll..he'll be down.

. . .

**RM**:    We'll see…we'll see if [they] could come up with some cash.

**NO**: Sweet [UI]. He's got money.

**RM**: Yeah.

**NO**: Yeah.

**RM**: Eh, I told [them] come by 3:30.

**NO**: Yeah, yeah [they've] got money bro. Um, call Harvey real quick and see if he turned his shit in.

**RM**: Alright buttercup, I'll call you back.

**NO**: Alright man.

180. Based on my training, experience, and familiarity with this investigation, when Nelson ORTIZ told Ricardo MENDEZ, "just sending you referrals," there is probable cause to believe that Nelson ORTIZ was discussing the referral of a new DWI offender to Ricardo MENDEZ for representation.

181. When Nelson ORTIZ asked Ricardo MENDEZ, "is Harvey on your fucking roster or not", based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Nelson ORTIZ was asking Ricardo MENDEZ whether Harvey JOHNSON was part of the criminal scheme. When Ricardo MENDEZ responded, "Yeah..yes sir," there is probable cause to believe that Ricardo MENDEZ was affirming to Nelson ORTIZ that Harvey JOHNSON is a participant in the criminal scheme. When Ricardo MENDEZ asked Nelson ORTIZ, "Is this guy down or what?", there is probable cause to believe that Ricardo MENDEZ was asking Nelson ORTIZ whether W8 would be willing to pay money so that the charges would be dismissed as part of the criminal scheme. When Nelson ORTIZ told Ricardo MENDEZ, "But, yeah, no he'll..he'll be down," there is probable cause to believe that Nelson ORTIZ was telling Ricardo MENDEZ that W8 would be willing to pay the money in furtherance of the criminal scheme. When Ricardo MENDEZ said, "We'll see…we'll see if [they] could come up with some cash," there is

probable cause to believe that Ricardo MENDEZ was saying that he and Nelson ORTIZ will see if W8 is able to come up with the cash to pay the extortion/bribery amount. When Nelson ORTIZ said, "Sweet [UI]. [They've] got money," there is probable cause to believe that Nelson ORTIZ was affirming to Ricardo MENDEZ that W8 has money and will be able to pay the money in furtherance of the criminal scheme.

182.    On January 2, 2024, at approximately 12:00 p.m., agents intercepted a call between Ricardo MENDEZ and Harvey JOHNSON. This call was recorded pursuant to the Title III authorization on the MENDEZ PHONE. This conversation included the following exchange:

**RM**:    Uh, eh, I was calling you about the [person] that, uh, this weekend that wrecked in the median and shit.

**HJ**:    Wrecked in the median.

**RM**:    Yeah.

**HJ**:    Which [person]?

**RM**:    Er, fuck, I can't remember [their] name.

**HJ**:    Aw fuck. I'm trying to remember now.

**RM**:    Er, [they] wrecked the median and [they]-[they] said at first his dad was driving and then admitted that [they were] driving, asked you call the supervisor.

**HJ**:    Oh, yes, yep-yep. [UI]

**RM**:    --That one.

**HJ**:    Yeah-yeah, [they] fled the scene.

**RM**:    Yeah, yeah. That one.

**HJ**:    Yeah. [They] called you—

[non-pertinent conversation in the background]

**RM**:    Uh-uh, I don't remember [their] name but uhm—

[noise]

**HJ**:    [OV] Yeah, yeah.

**RM**:    The, uhm, did-did you send [their] shit up already?

**HJ**:    Uhm, I don't know if I did or not, honestly. 'Cause I've been just kinda like not sending shit up [laugh]

**RM**:    Ah, cool.

**HJ**:    Yeah, I don't think--I don't know if I did or not I'll be honest with you.

**RM**:    I can, uhm, I-I can call [them] and find out [their] name but I was driving when [they] called me so I was—

[non-pertinent conversation in the background]

**RM**:    --so I wasn't even paying attention then.

**HJ**:    [laughs]. Oh, I know who you're talking about now. Uh, did I, uh, Jesus . . .

**RM**:    So you think you're probably going to send [them] up yet.

**HJ**:    No, I don't think I sent it up, man, honestly, I don't think I did. All right. And if I did, then I don't remember. [laughs]

**RM**:    [They're]-[They're] coming by in the afternoon, so I'll-I'll get [their] name then.

**HJ**:    No, I remember, I remember who you're talking about. [. . .] .

[. . .]

**HJ**:    I know. Yeah, [they] took out the bush and acted like well this isn't like a bush, it's like a tree type deal that [they]took out. And then like uh all that debris hit another car apparently.

**RM**:    Oh, he was uh, [they were]uh, uh, yeah, uh, I wasn't drinking, I know better than to drink and drive. Yeah, I was like so's everybody that doesn't drink and drive and hits the fucking median.

**HJ**:    Hold on, that's what [they] said that [they weren't] drinking and driving?

**RM**:    Yeah.

**HJ**:    [laughs] Oh, man, no. [They] told me that [they were] coming from a bar called Twelfth [PH] Street Tavern.

**RM**:    Uh.

**HJ**:    And he said that, yeah, the reason why [they]left the scene of the accident was because [they were] drinking.

**RM**:    Uh, he's a dumbbell. [They-they], look how far gone [they]must have been that [they] forgot [they] told, that [they] admitted to you.

**HJ**:    Oh man, [they]admitted it. And it was one of those ones—the reason why I arrested [them] was because [they were] there already at [their] house but [they go] not I  haven't been drinking anything since I got to the house. And I was like all right perfect, man. [laugh]. Yeah, let me know if anything pans out from it.

**RM**:    [They were], uh, supposed to be, uh, Nelson have him my number—

**HJ**:    [OV] Cool, really.

**RM**:    So yeah, Nelson said [they've] got money so—

**HJ**:    [OV] Oh, okay.

**RM**:    --so I told him, well, I'll see if he does 'cause he's coming in but the only thing is—do you remember ▮▮▮▮▮▮▮▮ [PH]?

**HJ**:    Yeah.

**RM**:    He told [them] to call ▮▮▮▮▮▮▮▮ [PH].

**HJ**:    He told [them] what?

**RM**:    He told [them] to call ▮▮▮▮▮▮▮▮.

**HJ**:    Really?

**RM**:    Yeah.

**HJ**:    [laughs]

**RM**:    [UI] I'm like I don't know why.

**HJ**:    Yeah, I'm gonna say I don't know why.

**RM**:    I'm bitching, all fucking, good but whatever.

**HJ**:    Yeah.

**RM**:    I gu-hah, I guess 'cause, uh, [sneeze] ████ doesn't like us much.

**HJ**:    Oh really?

**RM**:    Yeah.

**HJ**:    I remember [them] saying something about that [they] played golf with that guy with that judge.

**RM**:    Yeah [UI]—

**HJ**:    [OV] [UI] [noise] Well fuck [UI]

**RM**:    We got all our cases in front of him dismissed, so . . .

**HJ**:    [OV] [laughs] Right.

**RM**:    You would figure if anything [they'd] say "Oh, I don't know how they do but these fuckers"—

**HJ**:    [OV] [laughs] Yeah, just let me know if he does come and I think I could try to get you the paperwork. Like what I'm saying, I don't remember if I did issue a revocation on [them] or not.

**RM**:    Okay.

**HJ**:    But even then, if I did--if I did issue one, yeah, I did I'm not going into it.

**RM**:    All right, brother, uh-uh, I'll see, I'll let you know this afternoon when [they] show up.

**HJ**:    Okay, cool man.

183.    Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that, when Ricardo MENDEZ said, "I was calling you about the [person] that, uh, this weekend that wrecked in the median and shit," he was referring to Harvey JOHNSON's arrest of W8 for DWI on December 28, 2023. When Ricardo MENDEZ asks, "did-

did you send [their] shit up already?" there is probable cause to believe that Ricardo MENDEZ was asking Harvey JOHNSON whether he had turned in the paperwork associated with W8's arrest. When Harvey JOHNSON responded, "Uhm, I don't know if I did or not, honestly. 'Cause I've been just kinda like not sending shit up," and "No, I don't think I sent it up, man, honestly, I don't think I did. All right. And if I did, then I don't remember," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Harvey JOHNSON was explaining how he could not remember if he did so in their particular case, as he has not really been submitting the paperwork from the arrests he makes on a regular basis. When Ricardo MENDEZ says, "[They're-they're] coming by in the afternoon," there is probable cause to believe that Ricardo MENDEZ was telling Harvey JOHNSON that Ricardo MENDEZ instructed W8 to come by (presumably at the law firm) in the afternoon.

184. Ricardo MENDEZ and Harvey JOHNSON later discuss how "Nelson" gave W8 Ricardo MENDEZ's phone number. Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that "Nelson" refers to Nelson ORTIZ. When Ricardo MENDEZ says, "Nelson said [they've] got money," there is probable cause to believe that Ricardo MENDEZ was explaining that Nelson ORTIZ said that W8 has money, thereby making him a good target for the criminal scheme. When Harvey JOHNSON says, "Yeah, just let me know if [they do] come and I think I could try to get you the paperwork. Like what I'm saying, I don't remember if I did issue a revocation on [them] or no," there is probable cause to believe that Harvey JOHNSON was agreeing to assist Ricardo MENDEZ in the criminal scheme if W8 paid and was referring to the driver's license revocation paperwork that needs to be sent to the MVD for the administrative revocation proceedings. When Harvey JOHNSON stated, "if I did--if I did issue one, yeah, I did I'm not going into it," based on my training, experience, and familiarity with

this investigation, there is probable cause to believe that Harvey JOHNSON was telling Ricardo MENDEZ that, even if he did submit the paperwork for the revocation, he would not follow through with the proceedings.

185.    On January 2, 2024, at approximately 12:13 p.m., agents intercepted a call between Ricardo MENDEZ and Nelson ORTIZ. This call was recorded pursuant to the Title III authorization on the MENDEZ PHONE. This conversation included the following exchange:

RM:    He said..uh..yeah..yeah no problem. He doesn't think he turned it in.

NO:    Sweet. Well fuck yeah. Should be a solid case then.

RM:    (Clears throat) Yeah.

NO:    Did he book [them] or no?

RM:    [UI] didn't ask [them]. (Overlapping Voices, or "OV") But probably because um..because um…what's his name..uh told him that they have to book everybody. (OV)

NO:    (OV) Yeah [UI] (OV)

RM:    (OV)                         told him they had to book everybody not to do summons anymore.

NO:    Ah that would have been an easy one on that one uh huh.

RM:    Well fucking                    was complaining.

NO:    It wasn't            You know who fucked it up was that            [Phonetical, or "PH"] fucker.

RM:    Oh yeah, yeah, yeah, your right (OV)

NO:    (OV) He was…he was summoning everybody. Every time PGC [PH] closed he was just fucking doing a summons and cutting them right there. Well that's a fucking issue. I'm mean get (OV) every once in a while but not every fucking guy [UI] dude. Every single one (OV).

**RM**: (OV) Yeah, you know you're right it wasn't that [UI]. What's up with ah…what's up with ah ▮▮▮ bro?

**NO**: He's checked out bro. I think he's shopping around getting back in the field.

**RM**: [makes a sighing noise]

**NO**: Why? (OV)

**RM**: (OV) Because [UI] fuck because [UI] that fucker he don't..he don't wanna play ball.

**NO**: No, he won't. He's a [UI] dude.

**RM**: His dad was down [UI] (OV).

**NO**: Yeah?

**RM**: A…And his brother (OV)

**NO**: (OV) Nah he won't (OV)….he won't fucking do it. Scott's down to?

**RM**: He was.

**NO**: Yeah.

**RM**: Yeah.

**NO**: Yeah. No, ▮▮▮ won't do it. He's all fucking…he tries to be all straight edged [UI].

**RM**: Well….kind of, kind of. I mean wh-wh-wh-wh-wh- why's he act crazy bro fucking he hooked them up with me he had his DWI.

**NO**: Eh, fuck it dude [UI] but [UI]…yeah [they've] got money bro. You'll be able to dig some out of [them]. A lot of something [UI] [slight giggle].

**RM**: Yeah?

**NO**: Yeah.

**RM**: [UI] I mean [are they] cool..[are they] cool enough to tell [them] "aye man fucking just shut up and fucking pay what you have to pay don't ask questions?"

NO:  Ahh..think you got to feel [them] out. Ah I'll call that other dude that I know and tell [them] [UI] to talk to him (OV) because he knows him a little better.

RM:  Yeah, tell [them] to shut the fuck up don't ask questions pay whatever and and fucking you'll be (OV – make it disappear) scot-free (OV).

NO:  (OV) Yeah. Watch, let me call him real quick. Let me call him and tell him.

RM:  Alright, buttercup.

NO:  Alright, later.

186.    There is probable cause to believe that when Ricardo MENDEZ said, "yeah no problem. He doesn't think he turned it in," Ricardo MENDEZ was referring to his conversation with Harvey JOHNSON and how Harvey JOHNSON stated he did not think he turned in the paperwork from W8's arrest. When Nelson ORTIZ responded, "Sweet. Well fuck yeah. Should be a solid case then," there is probable cause to believe that Nelson ORTIZ was telling Ricardo MENDEZ that W8 would be a good case to target as part of the criminal scheme. When Nelson ORTIZ asked, "Did he book [them] or no?" and Ricardo MENDEZ stated, "probably because . . . what's [their] name . . . told him that they have to book everybody," there is probable cause to believe that Ricardo MENDEZ and Nelson ORTIZ were discussing ███████████ instructing the DWI unit that all arrests have to be booked into MDC rather than being issued a summons at a later date. When Ricardo MENDEZ said, "███████ was complaining," there is probable cause to believe that Ricardo MENDEZ was referring to ███████████████████. When Ricardo MENDEZ said, "he don't wanna play ball," and Nelson ORTIZ said, "he tries to be all straight edged," there is probable cause to believe that Ricardo NELSON and Nelson ORTIZ were discussing how ███████ has not been willing to participate in the criminal scheme.

187.    When Nelson ORTIZ said, "[they've] got money bro. You'll be able to dig some out of him. A lot of something," there is probable cause to believe that Nelson ORTIZ was telling

Ricardo MENDEZ that W8 had money to pay in furtherance of the criminal scheme. When Ricardo MENDEZ said, "[are they] cool enough to tell [them] 'aye man fucking just shut up and fucking pay what you have to pay don't ask questions?'" there is probable cause to believe that Ricardo MENDEZ was asking whether W8 could just be told to not ask questions and pay the money in furtherance of the criminal scheme. When Nelson ORTIZ said, "I'll call that other dude that I know and tell him [UI] to talk to [them] (OV) because he knows [them] a little better," there is probable cause to believe that Nelson ORTIZ was going to call another person he knows to ask how upfront they could be with W8 about the criminal scheme.  When Ricardo MENDEZ says, "shut the fuck up don't ask questions pay whatever and and fucking you'll be (OV – make it disappear) scot-free (OV)," there is probable cause to believe that Ricardo MENDEZ was saying how, if W8 pays the money and does not ask questions, the DWI case will be dismissed as part of the criminal scheme.

188. On January 2, 2024, at approximately 12:20 p.m., agents intercepted a call between Ricardo MENDEZ and Nelson ORTIZ. This call was recorded pursuant to the Title III authorization on the MENDEZ PHONE. This conversation included the following exchange:

RM: Hey buttercup.

NO: Hey, so he said don't tell [them] all that stuff. He just said to tell [them]that you will…that [they have] a really good chance of winning it. Especially with you guys and that you will…you will get it handled. But yeah he said just charge [them]whatever you need to charge. He knows [they've] got money.

RM: Um

NO: So, yeah, just don't tell [them]what you're doing but just tell [them][they have] a good chance and you got…(OV)

RM: (OV) Oh I..I would never tell him that I would just say look (OV- yeah) man just fucking [UI] with the shut the fuck up, kick back and relax.

**NO**:    Yeah, and just tell [them] just that. Alright bro.

**RM**:    Me love you long time.

**NO**:    Love you long time, baby.

**RM**:    Alright [quick faint sigh in background]

**NO**:    Alright, later.

189.    Based on my training, experience, and familiarity with this investigation, when Nelson ORTIZ said, "so he said don't tell [them] all that stuff. He just said to tell [them] that you will…that [they have] a really good chance of winning it. Especially with you guys and that you will…you will get it handled. But yeah he said just charge him whatever you need to charge. He knows [they've] got money," there is probable cause to believe that Nelson ORTIZ called the other person who knows W8 better, and how Nelson ORTIZ was told to be less direct about the criminal scheme with W8. When Ricardo MENDEZ responded, "I would never tell [them] that I would just say look (OV- yeah) man just fucking [UI] with the shut the fuck up, kick back and relax," there is probable cause to believe that Ricardo MENDEZ was explaining that he does not get into the details of the scheme with the DWI offenders, but instead tells them to just not say anything and to not worry about the DWI case.

190.    As of January 6, 2024, Agents reviewed surveillance footage of Clear and Clear PA law firm from January 2, 2024, to January 4, 2024, were unable to identify any vehicles associated with W8 arriving at the law firm. However, a review of pen register and trap and trace data from January 2, 2024, to January 4, 2024, identified a phone number associated with W8 placed or received, *inter alia*, 3 phone calls and 17 text messages with the MENDEZ PHONE.

191.    On January 2, 2024, at approximately 12:29 a.m., Ricardo MENDEZ sent Harvey JOHNSON the following text message (which was recorded pursuant to the Title III authorization

order on the MENDEZ PHONE): "[hand waving emoji] [The person] said yes Let's see if [they get] the money." Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ was telling Harvey JOHNSON that W8 agreed to pay the money in furtherance of the criminal scheme. On January 2, 2024, at approximately 12:41 p.m., Harvey JOHNSON responded, "Awesome good way to bring in new year hahaha." At approximately 12:42 p.m. (Session 5216), Harvey JOHNSON texted, "I'm out sick today let me know if you [sic] anything from me tomorrow." These messages were recorded pursuant to the Title III authorization on the **MENDEZ PHONE**. Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Harvey JOHNSON was expressing to Ricardo MENDEZ that he was happy to hear that W8 was willing to participate in the criminal scheme, and offered to help Ricardo MENDEZ further with the scheme when Harvey JOHNSON was back at work.

192.    On January 2, 2024, at approximately 12:29 a.m., immediately after Ricardo MENDEZ had sent the text to Harvey JOHNSON, Ricardo MENDEZ sent Nelson ORTIZ the same text message (which was recorded pursuant to the Title III authorization order on the MENDEZ PHONE): "[hand waving emoji] Guy said yes Let's see if he gets the money." On January 3, 2024, at approximately 12:37 p.m. (Session 5212), Nelson ORTIZ responded, "Hell yea." Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Nelson ORTIZ was expressing to Ricardo MENDEZ that he was happy that W8 was willing to participate in the criminal scheme.

193.    On January 4, 2024, starting at approximately 10:13 a.m., Ricardo MENDEZ and W8 exchanged the following text messages, which were recorded pursuant to the Title III authorization on the **MENDEZ PHONE**:

100

**RM**:    Good morning

I would gladly explain everything to you in person again.
We have time 1,2 3pm today. Let me know what time is convenient.

Also we already sent of the request for the administrative hearing for your license along with the $25 & entered on your case with the courthouse.

Short answer if the case is dismissed, you Won't need the interlock and you Wouldn't do the first offenders program.

    Thank you

I will check with [W8's girlfriend's first name] if she can get out of work and let you know if she can make it.

Sorry…..I guess we are both a bit nervous

194.    On January 4, 2024, at approximately 10:16 a.m., Ricardo MENDEZ and Nelson Ortiz exchanged a series of text messages, which were recorded pursuant to the Title III authorization on the **MENDEZ PHONE**:

**RM**:    Good morning
That guy [nickname of the first name of W8] is a tart tart😵
[They] went home last night and asked [their] girlfriend who "works downtown", told [them] u will still need the interlock & first offender program.🤦‍♂️ 😡

**NO**:    Tell [them] not to get any of that shit that your gonna handle it

**RM**:    [They're] an idiot wants an explanation for [their] girlfriend
I told him
Just trust the process or don't 😡

[ . . . ]

Would you tell your friend to tell [nickname of W8] to shut the fk up and kick back its done

**NO**:    Yea I'll call him

**RM**:    IDIOT 😡
Tell [them] don't ask David Copperfield how he makes things disappear
Trust the magic

101

**NO**:   Yea [they need] to shut the fuck up and not ask

**RM**:   I'm like a black father
         Tell me you're pregnant and watch me disappear

**NO**:   Hahahaha

195.   Based on my training, experience, and familiarity with this investigation, there is probable cause that when Ricardo MENDEZ said that "[They] went home last night and asked [their] girlfriend who 'works downtown', told [them] u will still need the interlock & first offender program," Ricardo MENDEZ was talking about W8 talking to their girlfriend about what would still be required to resolve W8's DWI arrest. When Nelson ORTIZ responded, "Tell [them] not to get any of that shit that your gonna handle it," there is probable cause to believe that Nelson ORTIZ was saying Ricardo MENDEZ should tell W8 that Ricardo MENDEZ would handle the DWI case without having to do what otherwise would be required to resolve a first-time DWI arrest. Based on my training, experience, and familiarity with this investigation, then Ricardo MENDEZ said, "Just trust the process or don't," there is probable cause to believe that Ricardo MENDEZ was saying that W8 either needed to pay the money in furtherance of the criminal scheme and trust that Ricardo MENDEZ would be able to get the case dismissed, or not work with him. When Ricardo MENDEZ said, "Would you tell your friend to tell [nickname of W8]to shut the fk up and kick back its done," there is probable cause to believe that Ricardo MENDEZ asked Nelson ORTIZ to call W8 to tell W8 to stop talking to people and to not worry about the status of W8's DWI case. When Ricardo MENDEZ said, "Tell [them] don't ask David Copperfield how he makes things disappear . . . Trust the magic," there is probable cause to believe that Ricardo MENDEZ was telling Nelson ORTIZ that W8 needed to stop questioning how the case would be resolved and

trust that Ricardo MENDEZ and the officers had a way of getting it dismissed without revealing the details of how.

196.     On January 4, 2024, at approximately 10:24 a.m., agents intercepted a phone call between Ricardo MENDEZ and W8, which was recorded pursuant to the Title III authorization on the MENDEZ PHONE. This included the following exchange:

**RM**:     Hey, good morning, [W8]. How you're doing?

**W8**:     Good, Rick. How are you?

**RM**:     Good, good. So uhm, 1:00 o'clock got taken, but I still have 2:00, 3:00 and possibly 4:00 o'clock.

**W8**:     Okay, I just texted her. She's at work and we only got one car. So, I'm trying to see if she can get out.

**RM**:     So, as far as explaining to her . . . I wouldn't . . . uh, that's what I told you uh, I tell you uhm . . . so . . . it's uh, who you know, not what you know.

**W8**:     Right.

**RM**:     I'm-I'm sure you can figure that out on your own.

**W8**:     Sure.

**RM**:     Uh—

**W8**:     [OV] She just got, I-I got a little nervous when you said if it's dismissed. I was like, oh—

**RM**:     [OV] I'm not going—

**W8**:     Yes.

**RM**:     --I'm not going to put anything in writing—

**W8**:     Right.

**RM**:     --and . . . but I'm going, I'm sure you can figure it out on-on your own.

**W8**:     Yes.

**RM**:  So . . . you, there's nothing for you to worry about—

**W8**:  Okay.

**RM**:  --up front.

**W8**:  Okay. I appreciate—

**RM**:  It's not a matter, it's just a matter when . . . because it's-it's going to take up to six months.

**W8**:  Right. I appreciate that. I know that. And she's-she's just worked downtown. She worked for criminal justice reform and she used to, you know, work with attorneys and all this stuff. And she didn't throw out my name, she was just asking people what happened if this happens and . . . and every one of them said, well, you're going to [clearing throat], you know, [they're] going to have to do first offender's program regardless and interlock, and I'm going well, she doesn't want to pay that money . . . regardless.

**RM**:  You're not going to-you're not going to do any of that.

**W8**:  Okay.

**RM**:  I told you- I told you . . . several times.

**W8**:  Perfect.

**RM**:  That's, nothing's going to happen.

**W8**:  Okay. I'll—

**RM**:  It's a slow process, it's a slow process . . . it could take up to six months . . . uh . . . and that's what, that's what they have to uhm, the jurisdiction over you for six months.

**W8**:  Yeah.

**RM**:  Okay? So . . . the court can take up to six months.

**W8**:  Okay.

**RM**:  But [UI] do anything.

**W8**:  And you feel confident so, okay—

104

**RM**:    [OV] No, I don't- I don't feel confident at all. I know. I'm telling you.

**W8**:    Okay, all right. Well, I appreciate it and thank you—

**RM**:    Like I-like I told you. There's a difference uh . . . if you-if you want a maybe, yes . . . go send a $100, 500, 5,000, whatever.

**W8**:    Right.

**RM**:    If you need a maybe. If you-if you want a for sure, then you're at the right place.

**W8**:    Okay, prefect. Then I-I feel confident. And I appreciate it. Just . . . sitting out I let my head spin. So, we're-we're good.

**RM**:    Okay.

**W8**:    All right.

**RM**:    So, yeah, not a problem. Like I told you. We sent off everything immediately. Uh, you don't have to worry about uh, the license portion because we sent that off and uh . . . we answered on it.

**W8**:    Okay.

**RM**:    I'm not worry about the money. Uh, when you get it, you let me know.

**W8**:    You got it. I appreciate it. Thank you so much, Rick.

**RM**:    Su-sure.

**W8**:    All right. Bye-bye.

197.    Following this call, beginning at approximately 10:28 a.m., Ricardo MENDEZ and W8 exchanged a series of text messages, which was recorded on the MENDEZ PHONE pursuant to the Title III authorization order. This included the following exchange:

**RM**:    I apologize 1pm is taken now
But 2, 3 and maybe 4

**W8**:    I will call her and let you know
Thanks again

**RM**:    Again I would gladly explain to you again in-person

**W8**:    Thank you!!!
She has some meetings and stuff at work today that she can't miss.
She is off tomorrow but if that doesn't work I understand
I feel better but she is just unsure.
I appreciate your help and willingness to meet
Just a scary thing
Thanks again

**RM:**    You have nothing to worry about put out of your mind already

**W8**:    Thank you again !!!

**RM:**    It didn't happen

**W8**:    You got it
I appreciate the analogy
Thank you again !!!
I'm sure she will feel better as well

**RM**:    Just remember what happened there
Stayed there, no worries
Leave it behind

## IX.    *Intercepted Communication Between Thomas CLEAR and Ricardo MENDEZ*

198.    On December 6, 2023, at approximately 3:35 p.m., agents intercepted a phone call between Thomas CLEAR and Ricardo MENDEZ. This phone call was recorded pursuant to the Title III Interception Order on the **MENDEZ PHONE**.[54] This conversation included the following exchange:

**TC**:    Have they called to remind or let Josh know that he has to be there Friday?

---

[54] This is a portion of the telephone call between Thomas CLEAR and Ricardo MENDEZ on the MENDEZ PHONE. To ensure no attorney work product or privileged communications are released to the investigative team, a filter team has been in place on the **MENDEZ PHONE** wiretap. This excerpt from this communication was released to the investigative team pursuant to an order entered by Judge Riggs on December 18, 2023, which held that the relevant interceptions was subject to the crime-fraud exception.

RM: No, he just called me. I'll call him in a minute and see what he wanted.

TC: Yea. If they said, "Hey, they want me to be there Friday." Tell him, "Get rid of it now, just say you can't, you got something. Figure something out." Because then they'll dismiss it and then they'll try to figure out when to refile it, but they don't have much time. [coughs] 'Cause otherwise, if he comes down to it on -- on Friday, then it's a jury trial setting on the 21st. Does that make sense?

RM: Yea.

TC: So call him. I'm headed back [call breaks up]  -- back.

199.     Based on my training, experience, and familiarity with this investigation, when Thomas CLEAR asks Ricardo MENDEZ, "Have they called to remind or let Josh know that he has to be there Friday?", there is probable cause to believe that Thomas CLEAR is referring to the state prosecutor's office informing Joshua MONTANO that he needed to be present to a hearing on Friday, December 8, 2023. When Thomas CLEAR states that Ricardo MENDEZ should tell Joshua MONTANO to say he has "got something," there is probable cause to believe that Thomas CLEAR is instructing Joshua MONTANO, via Ricardo MENDEZ, to tell the state prosecutor that he is not available for the Friday hearing. When Thomas CLEAR then says, "Because then they'll dismiss it," there is probable cause to believe that he is referring to the state having to dismiss the criminal charges because Joshua MONTANO failed to show up for the hearing. When Thomas CLEAR then says, "if he comes down to it on -- on Friday, then it's a jury trial setting on the 21st," there is probable cause to believe that Thomas CLEAR is explaining how, if Joshua MONTANO attends the hearing as required, then the next setting would be a December 21st trial setting.

200.     In reviewing the New Mexico State Court cases, FBI intelligence analysts identified by probable cause that W9[55] is the DWI offender who was pending charges and for

---

[55] W9 has not yet been interviewed to protect the covert nature of this ongoing investigation.

whom Thomas CLEAR instructed Ricardo MENDEZ to have Joshua MONTANO to not show up for the December 8, 2023, hearing. On July 9, 2023, Joshua MONTANO arrested W9 and charged them with DWI. Thomas CLEAR represented W9 in the state court proceedings. On November 17, 2023, Thomas CLEAR filed a motion to suppress. The motion to suppress was scheduled for hearing on December 8, 2023. On December 8, 2023, the Assistant District Attorney (ADA) filed a motion to continue at 7:17 a.m. that morning. In that motion, the ADA advised the court that, on December 7, 2023, Joshua MONTANO informed the ADA that he would be unavailable for the December 8th motion hearing.[56] Defense counsel opposed the motion to continue, and the state court denied the continuance request. Based on that, the state filed a nolle prosequi of W9's criminal DWI charges, advising the court that the case was dismissed without prejudice because Joshua MONTANO was unable to attend the December 8th suppression hearing and the state court denied the continuance request. According to the state docket, the jury trial that had been scheduled for December 21, 2023, was cancelled based on the nolle prosequi that was filed.

201.    Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that when Thomas CLEAR directed Ricardo MENDEZ to contact "Josh" about not showing up "on Friday," Thomas CLEAR was referring to W9's motion to suppress hearing filed in the pending DWI case. There is also probable cause to believe that Joshua

---

[56] According to APD records, Joshua MONTANO logged off at approximately 3:00 a.m. on December 8, 2023, which based on information from APD IA, likely corresponded with the end of his shift. According to APD IA, Joshua MONTANO would have logged back in to claim overtime for the time he spent at court later that day (that being December 8, 2023). According to APD records, Joshua MONTANO did not log back in on December 8, 2023. Based on this, there is probable cause to believe that Joshua MONTANO did not attend the scheduled court hearing referenced by Thomas CLEAR in the December 6, 2023, phone call. Had Joshua MONTANO attended court, he would have logged in to reflect those hours worked in the APD system.

MONTANO failed to show up for that hearing based on Thomas CLEAR's directive, thereby triggering the filing of the nolle prosequi of the charges against W9.[57]

### X. *Intercepted Communications of Joshua MONTANO Discussing the Criminal Scheme.*

202.    On December 6, 2023, at approximately 3:24 p.m., Agents intercepted a text message conversation from Joshua MONTANO to Ricardo MENDEZ, which Ricardo MENDEZ responded to at approximately 7:45 p.m. that same night. This text message was recorded pursuant to the Title III Interception Order on the **MENDEZ PHONE**.[58] The text conversation was as follows:

> **JM**:    Hey what's the word on that 5? I'll get you the dl tonight.
>
> **RM**:    Good evening
> I'm sorry I missed your text.
> I'm sure you heard we were in trial with ███.
> And then I went to check on my brother at the hospital
> The guy paid us 2,000 I gave you 1,500 and he will pay us in payments.
> We kept 500 and he still owes us but when he makes another payment I will get it to you

203.    Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that when Joshua MONTANO wrote, "what's the word on that 5?", he was referring to the status of payment owed to him by Ricardo MENDEZ for a DWI offender that was targeted as part of this criminal scheme. When Ricardo MENDEZ responded with the amount

---

[57] Agents have not yet identified the interceptions on the **MENDEZ PHONE** between Ricardo MENDEZ and Joshua MONTANO related to Joshua MONTANO not showing up at the December 8, 2023, hearing.

[58] While the focus of this covert investigation to date has been on the text message and phone conversations between Ricardo MENDEZ and the officers, on December 13, 2023, Joshua MONTANO sent Ricardo a text message stating, "Check ur email bro." This text message was intercepted pursuant to the **MENDEZ PHONE** Title III intercept.

of money Ricardo MENDEZ had paid to Joshua MONTANO already, and the amount still owed by the DWI offender. Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that, when Joshua MONTANO stated, "I'll get you the dl tonight," he was referring to a driver's license seized from a DWI arrestee that he was going to provide to Ricardo MENDEZ in furtherance of this criminal scheme.

204.    On December 18, 2023, at approximately 10:45 a.m., Agents intercepted a phone call between Joshua MONTANO and Honorio ALBA. This conversation was intercepted and recorded pursuant to the Title III authorization on the **ALBA PHONE**. This conversation included the following exchange:

JM:    Well that kind of sucks. I can see that because Harvey [UI] ██████ has been acting like a little crybaby. I guess something with him and Harvey at the checkpoint or something like that and got butt hurt.

HA:    Yeah, that's what it seems like. I guess somebody complained to Harvey like blah blah blah like [UI] ██████ so they looked at the complaint and took the report and said [UI] like he said if I was going to sign off and he said he wasn't going to. And that's when ██████ was like ah—

JM:    Dude, I can see that happening because I mean you and me you know ...we keep it on the D-L.

HA:    Oh, yeah.

JM:    I mean we don't publicize it to the whole field.

HA:    Yeah.

JM:    I don't know if I ever told ██████ that I mean I just said we do it. But I never gave him like hey keep it 10-3 and don't be like telling everyone. You know like I don't know. Maybe I think that was what it was, probably.

110

**HA**: It seems like he wasn't even---like he had just done that you know. Like [UI] just says we have an escort in the morning or some shit.

**JM**: Yeah.

**HA**: I think, he would have been fine but because he got the attitude with the field officer. The field officer probably complained.

**JM**: Right, I'm going to call ███ later and talk to him about it because he got chewed out. Only ███ was called about it so I sent a group message out but he was the only who talked to ███ directly. He never talked to anybody else about it.

**HA**: Yeah, like I said I think it was because --Harvey is like yeah I know that you and Josh do that and it's not a big deal like. If anything it was the way it was articulated it was handled with the attitude. You know what I mean?

**JM**: Yeah.

**HA**: Because, honestly you can do almost whatever you want in this unit, bro. But if you don't broadcast it if you don't tell the whole world. You know what I mean?

**JM**: Yeah.

**HA**: How many times [UI]. Yeah, Harvey said, don't worry it has absolutely nothing to do with you and Josh.

**JM**: Yeah. Well that sucks dude because now it destroys the whole fucking system.

**HA**: Yeah, even like that [UI]. Our friend started butting heads a little bit with fucking Tom a little bit, dude.

**JM**: Oh really?

**HA**: Yeah, it's like they always have issues like lover's quarrels, bro. So they're beefing a little bit and stuff like that but it will all work out.

**JM**: Tom and our friend?

**HA**: Yeah.

**JM:** Oh great--that's not what we need.

**HA:** Yeah, I'm going to talk to our friend and be like bro like we need everybody. Like everybody needs to be on the same page. You know what I mean?

**JM:** Yeah, well that sucks.

**HA:** Yeah, I feel like its one of those that fucking ---that our friend was told by Tom that somebody complained to him saying that he he's giving officers items to help out in the past and blah blah blah. And I guess it came up... Like I said Tom is so like [UI] that it's not an issue.

**JM:** Yeah, yeah.

**HA:** The biggest thing is that everyone can do to make it go easy is that everyone being on the same page. You know what I mean?

**JM:** Yeah.

**HA:** So I'm going to talk to our friend. Like I said because he mainly gets hurt feelings with Tom. I'm going to try to talk sense to him. I'm going to be like bro like tell him to play nice and make this all work out. You know what I mean?

**JM:** Yeah, there's so much drama at that [UI] Everyone needs to [UI]

205.    Based on agents' training, experience, and familiarity with this investigation, when Joshua MONTANO and Honorio ALBA discuss "███████," it is believed that they are talking about ███████████████████████████. When Joshua MONTANO and Honorio ALBA mention "Harvey," it is believed that they are referring to Harvey JOHNSON, who also is an APD officer assigned to the DWI unit. In this call, there is probable cause to believe that Joshua MONTANO and Honorio ALBA are discussing Harvey JOHNSON complaining about how ███████████ handled an arrest. From earlier parts of this conversation and other intercepted communications, agents are aware that ███████████

████████████████, sent out a message to the DWI unit officers stating that new arrests had to be booked into custody (rather than being brought in later by summons). In this portion of the conversation, there is probable cause to believe that Honorio ALBA and Joshua MONTANO are discussing how this was likely triggered by complaints about ████████████ openly issuing a criminal summons to DWI offenders.

206.    There is probable cause to believe that Joshua MONTANO and Honorio ALBA then discuss the importance of keeping how they handle arrests quiet (or on the "D-L"). For example, when Joshua MONTANO states "I mean we don't publicize it to the whole field. . . .  I don't know if I ever told ██████ that I mean I just said we do it.  But I never gave him like hey keep it 10-3[59] and don't be like telling everyone", there is probable cause to believe that Joshua MONTANO is explaining how he never told ████████████ not to tell other people that Joshua MONTANO, Honorio ALBA and other officers in the APD DWI unit were issuing criminal summons to DWI offenders.  Later on during the conversation, when Joshua MONTANO states "Yeah well that sucks because now it destroys the whole fucking system," there is probable cause to believe that he is referring to jeopardizing the criminal scheme. Based on agents' training, experience, and familiarity with this investigation, when Honorio ALBA states, "Because, honestly you can do almost whatever you want in this unit, bro. But if you don't broadcast it if you don't tell the whole world.  You know what I mean," there is probable cause to believe that Honorio ALBA is referring to being able to  fail to file criminal complaints

---

[59] Based on the Albuquerque Police Department 10 codes, 10-3 refers to stop transmitting, or keeping things off the air.

on DWI offenders or to refer cases to Ricardo MENDEZ and Thomas CLEAR for dismissal without causing concern so long as they are discreet in how they handle it.

207.    When Honorio ALBA and Joshua MONTANO refer to "our friend" and "Tom," there is probable cause to believe they are referring to Ricardo MENDEZ and Thomas CLEAR respectively. When Honorio ALBA refers to the "lover's quarrel" and needing everyone to be on the "same page," there is probable cause to believe that Honorio ALBA was stressing the importance of Joshua MONTANO, Ricardo MENDEZ, Thomas CLEAR, and himself all working together so the criminal scheme could continue.

208.    On December 22, 2023, at approximately 12:27 a.m., Agents intercepted a phone call between Joshua MONTANO and Honorio ALBA. This conversation was intercepted and recorded pursuant to the Title III authorization on the **ALBA PHONE**. This conversation included the following exchange:

**HA**:   Dude, how-how fucking strict is the sarge being with that shit dude?

**JM**:   I don't know, I was thinking the same thing, I was like what're we gonna do you know, like fuck, if word gets out you know what I mean. Like he won't even know if we did it.

**HA**:   Yeah.

**JM**:   And then, cause he doesn't read our 42s.

**HA**:   Nah, no.

**JM**:   But

**HA**:   Like, I'm like even at that I'll be like, if I could approve yours the only one that I can't approve is my own.

**JM**:   [laughs] damn I need to be acting so I can approve yours and vice versa.

114

**HA**:    No shit.

**JM**:    [laughs]

**HA**:    But I'm like they really, I think its beef between ▮▮▮▮▮ [PH] and fucking Harvey [PH] that's turned into a big deal dude.

**JM**:    It is dude, it really is.

209.    Based on agents' training, experience, and familiarity with this investigation, there is probable cause to believe that when Honorio ALBA says, "how fucking strict is sarge being with that shit dude?" he is referring to ▮▮▮▮▮▮▮▮ rule about not issuing summonses to DWI arrestees. It is also believed that Joshua MONTANO and Honorio ALBA then discuss how they can continue the scheme of diverting offenders to Ricardo MENDEZ and/or Thomas CLEAR if no summons are allowed. Because Honorio ALBA is an acting supervisor in the DWI unit, it is believed he has the authority to review and approve others' reports (like Joshua MONTANO). However, it is believed that Honorio ALBA and Joshua MONTANO discuss how Honorio ALBA cannot approve his own. There is probable cause to believe that, in this conversation, Joshua MONTANO and Honorio ALBA discuss how to keep the criminal scheme going in light of ▮▮▮▮ ▮▮▮▮▮'s directive about not bringing people in on summonses.

210.    On January 2, 2024, Joshua MONTANO and Ricardo MENDEZ exchanged a series text messages. These messages were recorded pursuant to the Title III authorization order on the **MENDEZ PHONE**. At 6:33 a.m., Joshua MONTANO texted Ricardo MENDEZ, "Happy New Year bro, gimmie a call today when you can." At 11:28 a.m., Ricardo MENDEZ sent Joshua MONTANO the following text, "Good morning Are you available?" At 11:29 a.m., Joshua MONTANO responded to Ricardo MENDEZ, "Yeah man." Based on my training, experience,

115

and familiarity with this investigation, and the timing of a call that immediately followed these messages, Ricardo MENDEZ and Joshua MONTANO exchanged these text messages to arrange a time in which they could discuss payment in furtherance of the criminal scheme.

211.    On January 2, 2024, at approximately 11:29 a.m., agents intercepted a phone call between Ricardo MENDEZ and Joshua MONTANO. This call was recorded pursuant to the Title III authorization on the **MENDEZ PHONE**. During this call, the following exchange occurred:

JM:    . . . I was gonna ask you . . . that one dude, when – when are you going to get that 5 do you think? 'Cause I need to submit my wife's, um, paperwork for –

RM:    [overlapping conversation] Okay.

JM:    - for immigration stuff and it is due now, and if I don't do it soon, they're gonna [sighs] kinda cancel our file that we have going on, so I gotta get a cashier's check for like $550 [noise] send it to the government.

RM:    Uh, well, he's paying us the payments, but, er-er, I can, uh, I can give you the 500.

JM:    And then just keep it when he gets it to you.

RM:    Yeah, he's just giving it to us, you know, a couple hundred a week, so-

JM:    [overlapping conversation] Oh.

RM:    -- so I'll just get you.

JM:    That works, that would help, that way I can them that right away 'cause we've had this file open for like a year, not even a year, like longer than that, like three years and they're, like, if you don't submit it now, then they're gonna cancel the – so all the work we've done so far will kind of be for nothing.

RM:    Yea, yea. No problem.

212.    Based on my training, experience, and familiarity with this investigation, when Joshua MONTANO says, "when are you going to get that 5 do you think?" there is probable cause to believe that Joshua MONTANO is asking Ricardo MENDEZ about the status of a payment

from a DWI offender targeted as part of this scheme. When Joshua MONTANO said, "'Cause I need to submit my wife's, um, paperwork for . . . for immigration stuff and it is due now, and if I don't do it soon, they're gonna [sighs] kinda cancel our file that we have going on, so I gotta get a cashier's check for like $550 [noise] send it to the government," there is probable cause to believe that Joshua MONTANO is telling Ricardo MENDEZ about needing the money for immigration paperwork for Joshua MONTANO's wife. When Ricardo MENDEZ says, "Uh, well, he's paying us the payments, but, er-er, I can, uh, I can give you the 500," there is probable cause to believe that Ricardo MENDEZ was explaining that he can provide the $500 to Joshua MONTANO upfront, rather than waiting on the payments from the DWI offender. Finally, there is probable cause to believe Joshua MONTANO agrees that if Ricardo MENDEZ provides him a $500 share of the proceeds now, Ricardo MENDEZ can keep his share of the future payments made by the DWI offender.

213.    On January 4, 2024, Joshua MONTANO and Ricardo MENDEZ exchanged a series of text messages. The messages were recorded pursuant to the Title III authorization order on the **MENDEZ PHONE.** At approximately 2:40 p.m., Ricardo MENDEZ sent Joshua MONTANO the following text message, "Can u talk". At approximately 2:41 pm Joshua MONTANO sent Ricardo MENDEZ the following message "Yea man". Based on my training, experience, and familiarity with this investigation, the aforementioned exchange of text messages were Ricardo MENDEZ and Joshua MONTANO identifying each other's availability to call and discuss matters involving the criminal scheme.

214.    On January 4, 2024, at approximately 2:41 p.m., Ricardo MENDEZ called Joshua MONTANO. This call was recorded pursuant to the Title III authorization on the **MENDEZ PHONE**. During this call, the following exchange occurred:

**JM**:    Yo

**RM**:    Hey, how's it going?

**JM**:    Good. I'm just at the gym, bro.

**RM**:     Can you talk?

**RM**:    [Unintelligible, hereinafter "UI"] kid that you got last night.

**JM**:    Aw, you're serious?

**RM**:    Yeah.

**JM**:    I already turned in the MVD on him.

**RM**:    Huh?

**JM**:    I already turned the MVD on him.

**RM**:    You-you turned it in?

**JM**:    Yeah, I turned it in yesterday. I'll try to see if I can grab it.

**JM**:    How do you know him?

**RM**:    Huh? I don't know him, but I know his girlfriend. And I know his girlfriend's dad forever.

**JM**:    Really?

**RM**:    Yeah.

**JM**:    Ah, I got you.

**RM**:    And I said he's a hu—he was with his side piece [UI] girlfriend.

118

**JM**:  He said, I don't think it was his-his girlfriend, but… he said that…it was his coworker…and that they were coming from Sandia. They work at Sandia as bartenders.

**RM**:  Uhm…so yeah, it's my friend's daughter.

**JM**:  Oh, wow.

**RM**:  Yeah.

**JM**:  Chances are I can snag it bro. Maybe it's there—

**RM**:  Alright. Let-let me uhm… I'm going to… I'm going to call him and tell him what the fuck is his problem. Yeah, it sounds like a little bum.

**JM**:  Yeah, I mean he was respecting me. He was like.. It wasn't an issue, but… I think the kid is like… a little gangster. You know?

**RM**:  Yeah… I'm going to tell him uh… that it could be done, but he-he's got to pay.

**JM**:  Yeah, I would.

**RM**:  Alright. Alright, I'm going to call you back later.

**JM**:  Alright, cool.

215.    Based on my training, experience, and familiarity of the investigation when Ricardo MENDEZ said "kid that you got last night" and Joshua MONTANO responded, "Aw, you're serious? . . . I already turned in the MVD on him. . . Yeah, I turned it in yesterday. I'll try to see if I can grab it, there is probable cause to believe that Ricardo MENDEZ and Joshua MONTANO are discussing an attempt to intercept MVD Driver's License Revocation paperwork filed by Joshua MONTANO in attempt to prevent or interfere with the filing of charges against an associate of Ricardo MENDEZ in furtherance of the criminal scheme.

216.    Based on my training, experience, and familiarity of the investigation when Ricardo MENDEZ texted, "Yeah… I'm going to tell him uh… that it could be done, but he-he's

got to pay," and Joshua MONTANO responded, "Yeah, I would," there is probable cause to believe that Ricardo MENDEZ and Joshua MONTANO are agreeing that they can prevent or interfere with DWI charges being filed in exchange for the associate of Ricardo MENDEZ providing payment as part of the criminal scheme.

217.    On January 5, 2024, Joshua MONTANO and Ricardo MENDEZ exchanged a series text messages. These messages were recorded pursuant to the Title III authorization order on the **MENDEZ PHONE**. From approximately 11:15 a.m. to 3:27 p.m., Joshua MONTANO and Ricardo MENDEZ exchanged the following text messages:

**JM**:    Hey you at the office today?

**RM**:    Good morning Yes sir

**JM**:    Nice, I'll head over shortly man

**RM**:    Okay

**RM**:    I only have 4 on me I didn't know you were coming today. I was waiting for u the last couple of nights

**JM**:    Sorry I got stuck on drunks man, I can for sure come by tonight instead.

**RM**:    Ok I'll get u the 500

**JM**:    Thanks Man.

218.    Based on my training, experience, and familiarity with the investigation when Ricardo MENDEZ says "I only have 4 on me I didn't know you were coming today. I was waiting for u the last couple of nights" and "Ok I'll get u the 500" there is probable cause to believe Ricardo MENDEZ is referring to his previous conversation with Joshua MONTANO that took place on January 2, 2024, where Ricardo MENDEZ agreed to provide Joshua MONTANO $500

120

in lieu of waiting for the DWI offender to provide an additional payment to Ricardo MENDEZ before providing Joshua MONTANO with the funds.

219.    On January 6, 2024, Joshua MONTANO and Ricardo MENDEZ exchanged a series text messages. These messages were recorded pursuant to the Title III authorization order on the **MENDEZ PHONE**. From approximately 12:49 a.m. to 12:50 a.m., Joshua MONTANO and Ricardo MENDEZ exchanged the following text messages:

**JM**: Sorry bro. Just finished a call. You up? If not I'll come by tomorrow night

**RM**: Yes

**RM**: I'm watching movies

**RM**: Whatever you want

220.    Based on my training, experience, and familiarity with the investigation, in this text message exchange, Joshua MONTANO was asking Ricardo MENDEZ if he was awake so Joshua MONTANO could come by Ricardo MENDEZ's residence to pick up the $500.

221.    On January 6, 2024, at approximately 12:50 a.m., Honorio ALBA and Ricardo MENDEZ exchanged the following text messages, which were recorded pursuant to the Title III authorization order on the **MENDEZ PHONE:**

**RM**:   Hey there brother

**RM**:   U out

**HA**:   Yea brother just booked a warrant arrest trying to snag a drunk downtown

**RM**:   Is J finning [sic]?
          Been asking for bread
          Just text if he could stop by

121

**HA**:    hahaha he just snagged a drunk right this minute

222.    Based on my training, experience, and familiarity with the investigation, in this text message exchange, when Ricardo MENDEZ asked, "Is J finning?" there is probable cause to believe that Ricardo MENDEZ was asking Honorio ALBA if Joshua MONTANO was getting off work soon to be able to come by Ricardo MENDEZ's house for the money. When Ricardo MENDEZ wrote, "Been asking for bread," there is probable cause to believe that Ricardo MENDEZ was telling Honorio ALBA that Joshua MONTANO was asking for money. When Honorio ALBA responded, "he just snagged a drunk right this minute," there is probable cause to believe that Honorio ALBA was telling Ricardo MENDEZ that Joshua MONTANO was at another drunk driving stop at the time.

223.    On January 6, 2024, at approximately 1:10 a.m., Joshua MONTANO and Ricardo MENDEZ exchanged the following text messages, which were recorded pursuant to the Title III authorization order on the **MENDEZ PHONE**:

**RM**:    At what time u cruising by

**JM**:    Sorry man. I'm booking one now bro. Let me see how long it takes me.

**RM**:    Be safe No rush

224.    Based on my training, experience, and familiarity with the investigation, in this text message exchange, Ricardo MENDEZ was asking Joshua MONTANO what time he would be stopping by Ricardo MENDEZ's residence for the money, and Joshua MONTANO explained he was processing the arrest of another DWI offender at that time.

225.    On January 6, 2024, at approximately 1:10 a.m., Honorio ALBA and Ricardo MENDEZ exchanged the following text messages, which were recorded pursuant to the Title III authorization order on the **MENDEZ PHONE**:

**RM**:   Do u have 5 on u to give him

**HA**:   Yeah I can get him brother

**RM**:   I got u tonight or tomorrow

**HA:**   No worries brother haha . I'll swing by Ptc and get him in a bit

**RM**:   [fist bump emoji]

**RM**:   Amor brother

**HA**:   Amor Hermano

226.    Based on my training, experience, and familiarity with the investigation, in this text message exchange, Ricardo MENDEZ asked Honorio ALBA if Honorio ALBA had $500 that he could give to Joshua MONTANO. When Ricardo MENDEZ wrote, "I got u tonight or tomorrow," there is probable cause to believe that Ricardo MENDEZ was telling Honorio ALBA he could pay Honorio ALBA the $500 back either that night or the next day. When Honorio ALBA wrote, "I'll swing by Ptc and get him in a bit," there is probable cause to believe that Honorio ALBA was telling Ricardo MENDEZ that he would go by the Prisoner Transportation Center (where new arrests are processed) and pay Joshua MONTANO the $500 on behalf of Ricardo MENDEZ.

227.    On January 6, 2024, at approximately 1:10 a.m., Ricardo MENDEZ sent Joshua MONTANO the following text message, which was recorded pursuant to the Title III authorization order on the **MENDEZ PHONE**: "Alba said he has some & ill get him bk." Based

123

on my training, experience, and familiarity with the investigation, there is probable cause to believe that Ricardo MENDEZ was telling Joshua MONTANO that Honorio ALBA would pay Joshua MONTANO on Ricardo MENDEZ's behalf, and that Ricardo MENDEZ would pay Honorio ALBA back.

228.    On January 6, 2024, at approximately 1:27 a.m., Honorio ALBA and Ricardo MENDEZ had the following text message exchange, which was recorded pursuant to the Title III authorization order on the **MENDEZ PHONE**:

**HA**:    He got his cash [bag of money emoji]

**RM**:    Thank you

**HA**:    Anytime brother

**HA**:    Guy is a nut

229.    Based on my training, experience, and familiarity with the investigation, there is probable cause to believe that when Honorio ALBA wrote, "He got his cash," that he was telling Ricardo MENDEZ that Honorio ALBA paid Joshua MONTANO the $500 on behalf of Ricardo MENDEZ.

230.    On January 6, 2024, at approximately 1:44 a.m., Joshua MONTANO and Ricardo MENDEZ had the following text message exchange, which was recorded pursuant to the Title III authorization order on the **MENDEZ PHONE**:

**JM**: Thank you bro!!!!

**RM**: I got you [fist emoji]

124

231.    Based on my training, experience, and familiarity with the investigation, there is probable cause to believe that when Joshua MONTANO texted "Thank you bro!!!!" he was thanking Ricardo MENDEZ for arranging to have Honorio ALBA to provide Joshua MONTANO the $500 on Ricardo MENDEZ's behalf.

## XI.    *Arrest and Attempted Extortion of W10*

232.    In addition to the witnesses already discussed herein, another witness (hereinafter referred to as W10) was also targeted by this criminal scheme and was directed by Ricardo MENDEZ to meet at the **SUBJECT PREMISES 1** to discuss the scheme.

233.    On September 29, 2023, W10 was arrested by Joshua MONTANO for DWI; W10 was taken to a police building in the vicinity of Civic Plaza where Joshua MONTANO administered a breathalyzer test.[60] After taking the breathalyzer test, Joshua MONTANO directed W10 to a bench within the building, removed W10's handcuffs, and handed W10 their cellular telephone to call somebody to give W10 a ride home. Joshua MONTANO gave W10 their personal items (other than their driver's license) and walked W10 outside of the police building. Joshua MONTANO provided W10 with a copy of their paperwork and released W10. Later that same morning, W10 received a call from Joshua MONTANO around 4:00 a.m. telling them that they forgot their purse in the back of Joshua MONTANO's police vehicle. W10 stated that they could pick it up at a police station later, but Joshua MONTANO offered to drop W10's purse off at their residence as he was on his way home. Joshua MONTANO then drove to W10's home, and W10 met Joshua MONTANO at his police unit to retrieve the purse. Joshua MONTANO then left.

---

[60] According to the New Mexico Department of Health (NMDOH) COBRA Logs, Joshua MONTANO administered W10 a breathalyzer test on September 29, 2023, resulting in a 0.10 BAC.

234.    On October 5, 2023, W10 was at work and missed a telephone call from Ricardo MENDEZ on the **MENDEZ PHONE**, who left a voicemail stating he worked for a criminal defense attorney and wanted to discuss the events of September 29, 2023. When W10 later returned Ricardo MENDEZ's call, Ricardo MENDEZ requested W10 meet him after work at the **SUBJECT PREMISES 1** to discuss W10's DWI arrest. After the call concluded, Ricardo MENDEZ sent W10 an appointment reminder via text message.

235.    On October 5, 2023, at approximately 6:00 p.m., W10 arrived at the **SUBJECT PREMISES 1** and was greeted at the door by Ricardo MENDEZ. W10 described the **SUBJECT PREMISES 1** as looking like a house with no sign indicating that the residence was a law firm. W10 described the interior as nicely decorated and recalled Ricardo MENDEZ escorting W10 down a hallway and down a set of stairs into an office with a desk and computer in the office. W10 also recalled seeing a nameplate on the desk with Ricardo MENDEZ's name and several pictures and credentials on the wall behind the desk. Ricardo MENDEZ escorted W10 through a walkway and downstairs into an office. Ricardo MENDEZ sat W10 down at his desk and turned the monitor of his computer around towards W10. The computer screen displayed W10 criminal complaint, which W10 felt was unusual as W10 had searched for their court case in nmcourts.gov earlier in the day and could not find anything.[61] Ricardo MENDEZ then reached inside his pocket and produced W10 driver's license and asked if W10 recognized this person. W10 replied to Ricardo MENDEZ that the driver's license was theirs. Ricardo MENDEZ then directed W10 to pay $6,000 by October 10, 2023, and, if they paid, W10's DWI charge "would all go away like it never

---

[61] In fact, Joshua MONTANO did not file W10's criminal complaint for the DWI charges until October 26, 2023. As such, the criminal complaint would not have been publicly available until October 26, 2023, or shortly thereafter.

126

happened." W10 asked Ricardo MENDEZ if they could arrange a payment plan, Ricardo MENDEZ declined, explaining that the officer has ten days to file the paperwork. Ricardo MENDEZ further stated that if W10 did not pay by October 10, 2023, the payment would increase to $10,500. Ricardo MENDEZ did not return W10 driver's license to her.

236.    W10 told Ricardo MENDEZ that they could try and get the money from a family member or get a loan. W10 departed from the **SUBJECT PREMISES 1**. W10 called Ricardo MENDEZ later that same evening and asked about how the process worked and if Ricardo MENDEZ had heard about their case from "Joshua" (referring to Joshua MONTANO).[62] Ricardo MENDEZ responded that they could not discuss it over the phone. W10 arranged to meet with Ricardo MENDEZ on October 9, 2023, but did not attend.

## XII.    Other Offenses That Are Part of the Criminal Scheme

237.    As noted above, there is probable cause to believe that the majority of the offenders targeted by Ricardo MENDEZ, Thomas CLEAR, and these officers are persons arrested for DWI. However, the interceptions on the **MENDEZ PHONE** between Ricardo MENDEZ and Nelson ORTIZ establish by probable cause that this scheme extends to other types of criminal offenses.

238.    As referenced above, W7 was issued a citation for "spectating a race or drag race, or spectating preparations for a race or drag race prohibited" by APD officer Nelson ORTIZ. The citation that Nelson ORTIZ issued to W7 involved a non-DWI-related traffic citation. The intercepted text messages between Ricardo MENDEZ and Nelson ORTIZ establish, however, that probable cause exists that Ricardo MENDEZ's requests  APD officers to not appear for court as

---

[62] W10 explained that they had seen Joshua MONTANO's name on his computer during their arrest, and so they recalled his name when speaking with Ricardo MENDEZ. W10 had no prior knowledge of or relationship with Joshua MONTANO.

expected are not limited solely to DWI prosecutions. As such I submit there is probable cause to

believe that this scheme extends beyond just DWI offenses, and that Nelson ORTIZ has used the

**ORTIZ PHONE** in the commission of the TARGET OFFENSES.



















### XIV.    Thomas CLEAR and Ricardo MENDEZ's Connection to the APD DWI Unit

246.    As discussed herein, there is probable cause to believe that there are multiple APD officers currently in the DWI Unit (Honorio ALBA, Joshua MONTANO, and Harvey JOHNSON) involved in the criminal scheme with Ricardo MENDEZ and Thomas CLEAR, and that an officer who used to be in the DWI Unit and now works in another APD unit is still involved in the scheme (Nelson ORTIZ). During the holiday season, agents intercepted a series of communications over the MENDEZ PHONE and the ALBA PHONE, which were recorded pursuant to the Title III authorization order, discussing how Ricardo MENDEZ purchased gift cards for members of the DWI unit. For example, on December 23, 2023, at approximately 1:44 p.m., agents intercepted a phone call between Ricardo MENDEZ and Honorio ALBA, which was recorded pursuant to the Title III authorization on the **MENDEZ PHONE**. In this call, there is probable cause to believe that Honorio ALBA and Ricardo MENDEZ were discussing whether Ricardo MENDEZ should get gift cards for the APD DWI officers and, if so, who. This included the following exchange:

**RM**:    [W]hat did you decide? What do you think? You know fucking, uhm, uh, your coworkers.

**HA**:    No, probably not 'cause the only time I'll really fucking see them is tomorrow for the fucking Luminaria [PH] tour with everyone fucking there.

**RM**:    And you don't want to give them shit? You don't think so?

**HA**:    The only ones [stutter] like I said the unit is kind of weird right now, bro. Fucking…like ████ [PH] is kind of weird. ████ [PH] is being kind of weird.

I'm like Neil [PH] isn't here. We haven't seen that fucker in months, bro, so it's really only like me, Josh [PH], Harvey [PH], and ██████ [PH] really, dude. And ████ [PH].

RM:    And what do you think about ████ now then?

HA:    Yeah she's been cool. Like I said I can pick up some gift cards, bro, and just say they are from you, what you think bro.

RM:    No, no

247.    The December 23, 2023, call that began at 1:44 p.m. between Honorio ALBA and Ricardo MENDEZ continued, and also included the following exchange:

RM:    Well then I'll do that then. I'll get some, uh-uh, get some gift cards sent, uh, are you in town or?

HA:    Yeah I'm in town now. . . .

[. . . ]

RM:    Well-well what I'll do is grab this shit and [UI] then I'll see where you're at and try to meet up with you.

HA:    Alright, cool. Just hit me up [UI].

RM:    Yeah so, uh, just, uhm, Josh, ████████, Harvey. Just four?

HA:    Yeah.

RM:    Alright.

HA:    ██████ is a weirdo though, bro.

RM:    Yeah. [break] So you don't think it's even fucking worth it giving him one?

HA:    We could if you want to. Like I said he took it last year, bro, but remember how I told you he's being all fucking weird, bro. About bringing new guys up all the PTC [PH] and shit.

RM:    Yeah.

HA:    That's my-that's my only hesitation.

137

**RM**:    Yeah, alright.

248.    Based on my training, experience, and familiarity with this investigation, when Honorio ALBA and Ricardo MENDEZ discuss "█████," there is probable cause to believe that they are referring to APD DWI Officer ███████. As noted above, there is probable cause to believe that ███████ has not participated in the criminal scheme. Agents intercepted other communications between Ricardo MENDEZ and Honorio ALBA indicating that they met up that afternoon. From those communications, there is probable cause to believe that Ricardo MENDEZ purchased the gift cards and delivered them to Honorio ALBA.

249.    On December 23, 2021, at approximately 3:01 p.m., agents intercepted a text message exchange between Thomas CLEAR and Ricardo MENDEZ, which stated:[66]

**RM**:    I got everyone in apd a gift card [Santa face emoji]

should i send █████ coal?

**TC**:    Send him a dildo.

**RM**:    I guess he's still talking.

250.    In terms of others in APD who received and/or were aware of the gift cards from Ricardo MENDEZ, on December 24, 2023, at approximately 8:04 p.m., Honorio ALBA sent Ricardo MENDEZ the following text message, which was recorded pursuant to the Title III authorization orders on the MENDEZ PHONE and the ALBA PHONE: "████ got a laugh out of the Santa Rick part lol he was happy". Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Honorio ALBA was telling Ricardo Mendez

---

[66] This was recorded pursuant to the Title III authorization on the MENDEZ PHONE and released to the investigative team pursuant to a crime-fraud exception order entered by Judge Riggs.

that ████████████████████████████ was happy about receiving the gift card from Ricardo MENDEZ.

251.    On December 23, 2023, at approximately 4:07 p.m., agents intercepted a call between Honorio ALBA and ████████████, which was recorded pursuant to the Title III authorization on the **ALBA PHONE**.

> **HA**:    . . . Tomorrow I've got to play Santa Clause for Rick.
>
> ███ :    How much are the gift cards for?
>
> **HA**:    I don't know. They are always usually pretty good.
>
> ███    Instead of ummm....ahhh.....bottles of booze?
>
> **HA**:    Yeah
>
> ███    Less heavy [laughs]
>
> **HA**:    Yeah so [UI] my old thought process is last round hauling around the fucking liquor drawer in my car.
>
> ███    And now...
>
> **HA**:    He obviously like, he got me a gift card too but then he got me my bottle of whiskey too.

252.    Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that when Honorio ALBA states, "they are usually pretty good," there is probable cause to believe that Honorio ALBA was referring to the gift cards that Ricardo MENDEZ gave the APD officers, and how this was not the first time such gifts had been sent to the unit.

253.    On December 25, 2023, starting at 12:25 p.m., agents intercepted the following text message exchange between Ricardo MENDEZ and ████████████████████

139

███████████████████████████████████████████████████ works as an

officer for APD. The following exchange occurred:

██ :    I must have been bad

██ :    Santa didn't come

██ :    😟❤️

**RM**:    Send me a list of the squad at your earliest convenience have a great day

254.    Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that when ████████████ stated, "I must have been bad . . . Santa didn't come," there is probable cause to believe that ████████████ was referring to how Ricardo MENDEZ gave gift cards to some APD officers, but not to ████████████. When Ricardo MENDEZ responded, "Send me a list of the squad at your earliest convenience," there is probable cause to believe that Ricardo MENDEZ was asking ████████████ to provide him a list of the other officers currently assigned to ████████████ squad at APD for the purposes of buying them gift cards. No further communications between Ricardo MENDEZ and ████████████ were intercepted on this topic, however, and it is not known if Ricardo MENDEZ gave gift cards to additional APD officers.

255.    On December 25, 2023, Joshua MONTANO sent Ricardo MENDEZ the following text message, which was recorded pursuant to the Title III authorization on the MENDEZ PHONE: "Merry Christmas bro! Thank you for the Xmas gift." Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Joshua MONTANO was

thanking Ricardo MENDEZ for the gift cards that Honorio ALBA delivered on Ricardo MENDEZ's behalf.

## XV.    *Discussion of Thomas CLEAR's Concern About a Covert Investigation*

256.    In a call on December 21, 2023, Ricardo MENDEZ and Honorio ALBA discussed Thomas CLEAR expressing concern about the FBI having an open investigation. This call was recorded as part of the Title III order authorization interceptions on both the **ALBA PHONE** and **MENDEZ PHONE**. The following exchange occurred:

**HA**:    . . . So what-what was the problem with num nuts, bro? Why was he acting stupid with you, bro?

**RM**:    Uhm, so one of Josh's—uh, one of Josh's cases [sigh] Josh told me to go-to call this guy that he had his wallet. I think I told you about him.

**HA**:    Yeah.

**RM**:    A bracelet and it was—

**HA**:    [OV] [UI]

**RM**:    --A bunch of jewelry, fake jewelry.

**HA**:    Yeah.

**RM**:    And I told Josh, I said, "That's all fake jewelry." And he's all, "I don't know, I think it's real." And I said, "Josh, i-I know jewelry. This is all fake."

**HA**:    [UI]

**RM**:    And so-so he's like, "Give it back to him." So I said, "Okay." So I gave him—I gave it to, uhm, and, uh, god this was-this was months ago. I-this was [UI] maybe half a year ago. It's been a long time. And that guy got a public defender, and he told the public-the public defender all that.

**HA**:    Yeah.

**RM**:    So the public defender said, uhm, that how do we have all that, that-that was some sort of coercion or, uh, or, uh, bribery scam.

**HA**:    Fuck that.

**RM**: Yeah. That how-how would we have access to that. And so I told Tom, "All you have to have done is say, 'You know what, we call the officers and say how bad is the case—

**HA**: [OV] Yeah.

**RM**: --and the officers said, "Oh, by the way I have his shit" Or the clients asks [UI] to ask the cop for his shit.

**HA**: Dude that happens all the time, bro.

**RM**: A-And-I asked him, "You couldn't have done that. You couldn't have just fucking said that? Instead of fucking making a big old to do about it." And he's like, "Well at the time I-I-I was scared I didn't know if the FBI it-it was a set up or what." And so I tell him…it was-it w-like how long ago was that? Month—

**HA**: [OV] Yeah.

**RM**: --month ago.

**RM**: I-i-I just don't believe it. I don't know, I mean I really don't believe it. But he made a big old—that the FBI was listening at the office and monitoring our phones and I'm like, "You're retarded."

**HA**: Bro, if-lets-lets be real, bro. Fucking if they're monitoring phones, that's the least of anyone's fucking concerns is that.

**RM**: Yeah.

**HA**: I'm not worried about that shit, bro.

257.    Based on my training, experience, and familiarity with this investigation, when Ricardo MENDEZ discusses what "Tom" should have told the Public Defender, there is probable cause to believe that Ricard MENDEZ was referring to Thomas CLEAR. Additionally, when Ricardo Mendez stated, "And he's like, 'Well at the time I-I-I was scared I didn't know if the FBI it-it was a set up or what'"," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ was telling Honorio ALBA that Thomas CLEAR was concerned about the FBI having an open investigation of the Clear & Clear law firm (which would include Thomas CLEAR and Ricardo MENDEZ). When Ricardo MENDEZ stated, "I-i-I just don't believe it. I don't know, I mean I really don't believe it. But he

made a big old—that the FBI was listening at the office and monitoring our phones and I'm like, 'You're retarded.'", there is probable cause to believe that Ricardo MENDEZ was expressing doubt that the FBI was conducting a covert investigation, including wiretaps at the office and the phones. When Honorio ALBA responded, "I'm not worried about that shit, bro", based on my training experience, and familiarity with this investigation, there is probable cause to believe that Honorio ALBA did not share in Thomas CLEAR's concern about the FBI monitoring phone calls, and that he is not worried about an investigation.

### XVI.    *Honorio ALBA Missed Court to Trigger a Dismissal in Furtherance of the Scheme.*

258.    As noted above, when agents first began intercepting communications on the **MENDEZ PHONE**, agents recorded numerous conversations between Ricardo MENDEZ and Honorio ALBA discussing Thomas CLEAR's December 7, 2023, text message requesting to meet with Ricardo MENDEZ somewhere (as in, not the law firm) to go talk. In those calls, there is probable cause to believe that Honorio ALBA and Ricardo MENDEZ were discussing if Thomas CLEAR was going to fire Ricardo MENDEZ. In one call, which occurred on December 7, 2023, at approximately 12:51 p.m., Honorio ALBA and Ricardo MENDEZ discussed how difficult it would be for Thomas CLEAR without Ricardo MENDEZ working for him. This call was recorded on the MENDEZ PHONE pursuant to the Title III authorization. The following exchange occurred:

> **HA**:    I mean, fucking, bro, fucking, you would be really hard to replace, dude. Like I am not just saying that because you are my friend [UI]. You know that I mean?
>
> **RM**:    But I'm telling you, his -- his wife in her eyes, like, you could fucking do it with someone else.
>
> **HA**:    Bro, let me like, I mean just like, we are both biased here bro, but let me ask you this, fucking, do you think ███ or anybody bro is gonna fucking deal with somebody new? No.

143

**RM**:    Nah, nah.

**HA**:    Like, do you think if I get a phone call from someone new and they approach I'll be like, ah fuck, that I don't know what the fuck you're talking about. Like, honestly bro, like no shit, like no shit, everyone is so skittish these days, the worst thing he could do for business is make changes.

**RM**:    [UI] maybe fucking [UI] all that happen, either you're showing up to fucking [W11] and—

**HA**:    [overlapping voices, or OV] Yeah.

**RM**:    --and fuckin'-is [W9][67] yours or whose is that?

**HA**:    [W9]'s is—

**RM**:    [OV] That's, er, Josh's, huh?

**HA**:    Yeah. [UI]

**RM**:    [UI] Wait until we tell the ones so we have [W11], we [UI]—

**HA**:    [OV] We have-we have a few of them, bro. We have [W11], we got, it's, so we got like two or three more, bro. Fuck.

**RM**:    [laughs] I would tell [UI]—

**HA**:    [OV] [UI]

**RM**:    --I would tell [UI] to show up too.

---

[67] In this part of the conversation, Ricardo MENDEZ uses the first name of a person for whom there is probable cause to believe Ricardo MENDEZ is referring to W9.

259.    Based on my training, experience, and familiarity with the investigation, when Honorio ALBA says, "you would be really hard to replace," there is probable cause to believe that Honorio ALBA is referring to the relationship Ricardo MENDEZ has with the police officers involved in this criminal scheme and how others could not serve in the same role for Thomas CLEAR's law firm. When Ricardo MENDEZ then discusses "his wife" and how "in her eyes, like, you could fucking do it with someone else," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ was referring to Thomas CLEAR's wife and how she believes that Thomas CLEAR could establish the same arrangement with another person other than Ricardo MENDEZ. When Honorio ALBA says, "but let me ask you this, do you think █████ or anybody bro is gonna fucking deal with somebody new? No." there is probable cause to believe that Honorio ALBA is referring to other officers involved in the criminal scheme, and how those other officers will no longer work with Thomas CLEAR's law firm on the criminal scheme if Ricardo MENDEZ is no longer working at Thomas CLEAR's law firm.

260.    Based on my training, experience, and familiarity with this investigation, when Ricardo MENDEZ said, "either you're showing up to fucking [W11]," there is probable cause to believe that Ricardo MENDEZ was talking about W11. According to a review of the New Mexico State Court online database, Honorio ALBA arrested W11 on May 14, 2023, and charged them with Aggravated DWI and other traffic-related offenses. W11 was booked into custody that same day and was later released on conditions. Thomas CLEAR entered his appearance on behalf of W11 on June 7, 2023. In October 2023, Thomas CLEAR filed a motion to suppress on behalf of W11. The suppression hearing and trial were scheduled on November 14, 2023. On November 13, 2023, the State filed a motion to continue the November 14th setting, stating, "Due to a family

145

medical emergency, Officer Alba is unavailable on 11/14/23." The State further explained that Thomas CLEAR "was not contacted because of the time sensitive nature of the motion." The State Court granted the continuance and reset W11's suppression hearing and trial for January 10, 2024. When Honorio ALBA said, "We have-we have a few of them, bro. We have [W11], we got, it's, so we got like two or three more, bro," there is probable cause to believe that Honorio ALBA was talking about additional victims of the criminal scheme that were still pending.

261.    On January 2, 2024, at approximately 2:08 p.m., Ricardo MENDEZ and Honorio ALBA had the following text message exchange, which was recorded pursuant to the Title III authorization order on the MENDEZ PHONE:

**RM**:    CB is bugging about $

I told him we had to wait

[W11] is next week Wednesday

**HA**:    Ok sounds good brother. Kelly will be good

262.    On January 5, 2024, at approximately 12:17 p.m., agents intercepted a call between Honorio Alba and a Supervisory Assistant District Attorney (hereinafter, ADA1).[68] This call was recorded pursuant to the Title III authorization on the **ALBA PHONE**. The beginning of the call was not monitored or recorded, so the call was in progress when it was intercepted. In the call, ADA1 was touching base with Honorio ALBA about two cases that were set for hearing on January

---

[68] Agents do not believe that ADA1 is involved in the criminal scheme. Instead, ADA1's contact with Honorio ALBA about W11's hearing are a normal part of ADA1's duties.

10, 2024. From a review of the New Mexico State Court online database, there is probable cause to believe that one of those cases was one that had a pending motion to continue that had been filed on December 29, 2023. There is probable cause to believe that the other case was W11's suppression hearing and trial scheduled on January 11, 2024. In the call, Honorio ALBA told ADA1 that he did not receive notice of the other hearing (referencing W11's suppression hearing and trial). The following exchange then occurred:

| | |
|---|---|
| **ADA1**: | Um, so are you going to be able to make it or . . . |
| **HA**: | I don't think— |
| **ADA1**: | [OV][69] [UI][70] |
| **HA**: | --I don't think so cause I already told my sister that I was going to take my dad. |
| **ADA1**: | Uh. |
| **HA**: | [OV] Is the plaintiffs [PH][71]—Is the plaintiff [PH] scheduled for one? |
| **ADA1**: | Would you be able to send us like um, like some kind of confirmation of his appointment? Cause— |
| **HA**: | [OV] [UI] |
| **ADA1**: | --we had continuance [PH] the last time. |
| **HA**: | Ok. |
| **ADA1**: | Um, so [Judge last name presiding over W11's case] been asking for more— |

---

[69] Call participants had overlapping audio.

[70] "Unintelligible."

[71] "Phonetic"

147

**HA**:  [OV] I--[audio cuts out] ok.

**ADA1**:  --verification and stuff. So if you can send us something showing um your dad's appointment, I think she'd probably grant another one.

**HA**:  Ok. Uh--yeah, I'll send—send it over today.

**ADA1**:  Awesome. Perfect.

**HA**:  It's so weird.

**ADA1**:  [OV] And then I'll just keep you updated with if she wants anything else. But I think that would work.

**HA**:  Ok. It's so weird, that they like, how somethings like don't show up on our docket.

**ADA1**:  Yeah, that is really weird.

**HA**:  Cause I'm like, cause the other one showed up fine. The other one for the [case that was pending the continuance].

**ADA1**:  And that rule date is not until the 27th so technically there should be enough time for her to get a reset um, quickly.

**HA**:  Ok, well I'll call my dad and see what he can send me over.

**ADA1**:  Awesome. Perfect. Thank you.

263.    Based on my training, experience, and familiarity with this investigation, when ADA1 stated, "so are you going to be able to make it or," there is probable cause to believe that ADA1 was asking Honorio ALBA if he was going to be able to attend W11's suppression hearing and trial scheduled on Wednesday, January 10, 2024. When Honorio ALBA responded, I don't think so cause I already told my sister that I was going to take my dad," there is probable cause to believe that Honorio ALBA was telling ADA1 that he would not be able to attend W11's January 10th suppression hearing and trial because he was taking his father to an appointment. When ADA1 asked for "verification" and "if you can send us something showing um your dad's

appointment, I think she'd probably grant another one," there is probable cause to believe that ADA1 was asking for proof from Honorio ALBA about his father's doctor's appointment to present to the State Court in support of the continuance request. Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Honorio ALBA was planning to fail to appear for W11's suppression hearing and trial because it is believed that W11 paid money as part of the conspiracy and criminal scheme in order to ensure that Honorio ALBA's non-appearance in court would trigger a dismissal of all charges.

264.    On January 10, 2024, at approximately 11:51 a.m., agents intercepted a telephone call between Honorio ALBA and Harvey JOHNSON. This call was recorded pursuant to the Title III authorization on the **ALBA PHONE**. In this call, Honorio ALBA discussed the hearing he had scheduled in W11's case that afternoon. This included the following exchange:

HA:    But don't-don't stress bro like it's a fucking—from what you said bro I-I don't think there's anything to it.

HJ:    Okay. [UI] to.

HA:    So what do you—what do you think I should do today. Do you think I should go with the I took my dad to the doctor bro because she's bugging me for a fucking excuse or do you think I should do the whole fuck I didn't end up taking him because I got sick. What do you think dude?

HJ:    Well dude, just take him. I would. I'd take the day off. Dude I took all this last week off.

HA:    Yeah, I'm like huh. She's like [UI] just so you know, they're bugging for doctor's excuses bro. They-they're actually blaming the judges.

HJ:    Who?

HA:    The ADAs.

HJ:    Really?

HA:    Yeah.

149

**HJ**:    What are they saying?

**HA**:    "Oh, oh can we get a doctor's note just to show the judge, and blah, blah, blah." And like this is like—some of like was after like legit—like legit shit like remember when I fucking tore my tendon and shit?

**HJ**:    Yeah.

265.    Based on my training, experience, and familiarity with this investigation, when Honorio ALBA said, "So what do you—what do you think I should do today. Do you think I should go with the I took my dad to the doctor bro because she's bugging me for a fucking excuse or do you think I should do the whole fuck I didn't end up taking him because I got sick. What do you think dude?" there is probable cause to believe Honorio ALBA is asking Harvey JOHNSON if the excuse Honorio ALBA provided the ADA1 is sufficient to allow Honorio ALBA to not show up for W11's court hearing without arousing suspicion.

266.    On January 10, 2024, at approximately 12:38 p.m., Honorio ALBA called ADA1 on the **ALBA PHONE**. This call was recorded pursuant to the Title III authorization on the ALBA PHONE. The following exchange occurred:

**HA**:    Oh, yeah, so, anyways, when I sent you a snap chat [UI] last night, I got home, I ended up waking up and throwing up all over my, like, TMI, but, I, like, threw up all over myself and shit.

**ADA1**:    Oh no. That's awful.

**HA**:    [OV] Yeah, so, uhm, we're going to blame McDonald's. I shouldn't have ate that fuckin' hot and spicy.

**ADA1**:    [Breath] I gotcha.

**HA**:    Yeah, I mean, anyways, so, my dad's, like, no offense bro, but I don't want to fuckin' ride with you … [UI] like--

**ADA1**:    Which is fair.

150

HA:          Yeah, which is fair. So, my sister ended up, like, driving to take him, and shit like that.

ADA1:        Okay.

HA:          I'm running a fever right now. I don't even know if I can go to the courtroom.

ADA1:        Okay.

HA:          I can get a doctor's note—

ADA1:        [OV] um-uhm.

HA:          —from myself, like do one of those telehealth whatever. If that helps you out.

ADA1:        Yeah, if you can do that, that'd be great.

HA:          Okay. And then, like, I like, [UI] TMI, but, legit, I'm like washing sheets.

ADA1:        Oh, no. Uh, well hopefully it's just, it's just the food poisoning, and not like the flu or anything.

HA:          Yeah, well, my, it sucks 'cus, like, I didn't tell people, but, like, me and Johnna had COVID, like, uuuh, three weeks ago, two and a half weeks ago, so I've been, like, weathering, like, that storm. And then I'm like you know what sounds good after [UI], the fuckin' hot and spicy.

267.    Based on my training, experience, and familiarity with this investigation, when Honorio ALBA tells ADA1 that he is "throwing up" and "running a fever," and that "I don't even know if I can go to the courtroom," there is probable cause to believe that Honorio ALBA was pretending to be sick and telling ADA that he would be unable to attend W11's hearing and trial scheduled for that afternoon. There is further probable cause to believe that Honorio ALBA offered to provide ADA1 a doctor's note.[72]

---

[72] Because the **ALBA PHONE** is an iPhone, agents have not been intercepting iMessages (which are electronic messages sent between iPhones). In a later call the same day, Honorio ALBA told another officer he took a screen

268.    On January 10, 2024, at approximately 1:18 p.m., agents intercepted the following text message exchange between Ricardo MENDEZ and Honorio ALBA, which was recorded pursuant to the Title III authorization on the MENDEZ PHONE. This exchange included:

**RM**:    Fkrs told Tom trial is still on

**HA**:    Idk how I called in

269.    Based on my training, experience, and familiarity with this investigation, when Ricardo MENDEZ stated, "Fkrs told Tom trial is still on," there is probable cause to believe that Ricard MENDEZ was telling Honorio ALBA that the District Attorney's Office told Thomas CLEAR that W11's trial was still on for that afternoon. When Honorio ALBA stated, "idk how I called in," there is probable cause to believe that Honorio ALBA was telling Ricardo MENDEZ that he had called the DA's Office to tell them that he would not be available for the trial, so he did not know how the DA's Office told Thomas CLEAR the trial was still on.

270.    On January 10, 2024, at approximately 2:05 p.m. agents intercepted a call between Honorio ALBA and Harvey JOHNSON. This call was recorded pursuant to the Title III authorization on the **ALBA PHONE**. In this call, Honorio ALBA discussed a scheme involving a local chiropractor's office issuing doctor's notes that could be used by DWI officers to provide the court as reason for not appearing at a scheduled court hearing. This included the following exchange:

**HA**:    So remember how I told you now they're asking for doctor's notes? So I used to have a scam back in the day bro. What I used to do is I used to be like—You know, that place called The Joint Chiropractic [PH]?

**HJ**:    The Joint? I've, yeah I've heard of it.

---

shot of doctor's office showing no appointments were available that afternoon. However, the message containing the screenshot was not captured on the **ALBA PHONE** interceptions.

**HA:** Yeah they have—I mean they have locations everywhere bro. Fuckin' west side, east side, fuckin' everywhere. Well it's like $40 a month bro and it's gonna—it's like a membership. You just walk in and you fucking—they adjust you and shit like that and they give you a doctor's note.

**HJ:** Holy shit.

**HA:** Yeah so I'm like fuck—'cause now they're asking for doctor's notes. I'm like, huh. I'm like $40 a month you walk in get your back. Be like hey you want to get a doctor's note for today? And they don't put the time, they just put the date.

**HJ:** Yeah.

**HA:** So if they won't set you [UI] be like oh fucking you went there at ten and it's fucking two. Like—

**HJ:** Yeah. [laughs]

**HA:** That's only [UI] when you need to miss a court date or whatever like that. Uh, I was at the fucking doctor. I fucking slipped a disc.

**HJ:** [laughs]

**HA**: Here's a doctor's note.

**HJ:** Yeah.

**HA:** So I'm going to do it. I know Josh is like fuck that's brilliant dude.

**HJ:** Yeah, and just go get a—he's gonna get an adjustment that day?

**HA:** Oh yeah, absolutely bro. Fucking they'll do it [stutters] then-right then and there for you. But what I'm saying is like you get an adjustment plus you're fucking covered for court.

**HJ:** Yeah. Damn.

**HA:** And they have like the letterhead fucking chiropractic and blah, blah, blah. You know what I mean?

271. Based on my training, experience, and familiarity with this investigation, when

Honorio Alba told Harvey JOHNSON, "So remember how I told you now they're asking for

doctor's notes? So I used to have a scam back in the day bro. What I used to do is I used to be like—You know, that place called The Joint Chiropractic [PH]? . . . You just walk in and you fucking—they adjust you and shit like that and they give you a doctor's note.," there is probable cause to believe Honorio ALBA and Harvey JOHNSON are discussing a scheme where they could obtain a doctor's note from The Joint Chiropractic, a chiropractic care company with offices in Albuquerque, New Mexico, to provide to the court as justification for failing to appear for a scheduled DWI hearing as part of the criminal scheme to have DWI arrestees DWI charges dismissed.

### XVII.   Discussions about the State Dismissing Pending Cases.

272.    At the beginning of January 2024, the United States Attorney's Office informed the Second Judicial District Attorney's Office that it had confirmed that four APD officers had significant Giglio material (Honorio ALBA, Joshua MONTANO, Harvey JOHNSON, and Nelson ORTIZ) but that the U.S. Attorney's Office could not provide details about the Giglio impairment or the source of the information at this time (details were not shared because the information was collected primarily through the Court-authorized wiretaps in this investigation). Based on this, the Second Judicial District Attorney's Office determined that it could no longer sponsor any of these witnesses on behalf of the State. As such, if there were any hearings or trials scheduled that would require any of these officers to testify, the State would file a nolle prosequi, citing the interests of justice.

273.    This included several nolle prosequis that the State filed in several cases that Harvey JOHNSON had set for trial. On January 10, 2024, in the same call referenced above that begin at approximately 11:51 a.m., agents intercepted a call between Honorio ALBA and Harvey JOHNSON. This call was recorded pursuant to the Title III authorization on the **ALBA PHONE**.

**HJ**:  Fuck dude. No I called Josh dude.

**HA**:  What's up?

**HJ**:  Ah so, dude yesterday and today is just very very fishy dude.

**HA**:  Ok.

**HJ**:  Yesterday and today, I got an email from the DA's office from the same person.

**HA**:  Ok.

**HJ**:  It was [ADA2's Paralegal].

**HA**:  Ok.

**HJ**:  And [they work] for [ADA2]. Do you know who [ADA2] is?

**HA**:  [OV] Oh. Yeah bro, I know.

**HJ**:  Who [are they]?

**HA**:  So [they're], [they're] like uh, [they're] like [. . .] a [DA's office position].

**HJ**:  Ok. Cause I guess [they] said [they] would review two of my cases that are supposed to go to trial like, yesterday and today.

**HA**:  Ok.

**HJ**:  And, [they] fucking nolle'ed them.

274.  Based on my training, experience, and familiarity with this investigation, when Harvey JOHNSON says "Ah so, dude yesterday and today is just very very fishy dude", "Ok. Cause I guess [they] said [they] would review two of my cases that are supposed to go to trial like, yesterday and today" and "And, [they] fucking nolle'ed them" there is probable cause to believe that Harvey JOHNSON is expressing concern that the DA's Office may have discovered the criminal scheme and refers to the ADA2 contacting Harvey JOHNSON by phone on January 5, 2024 to inform Harvey JOHNSON that the ADA2 would file separate nolle prosequis (or

155

dismissals) for hearings that Harvey JOHNSON would be called to testify as the government's witness.

275.    On January 10, 2024, at approximately 3:18 p.m., Honorio ALBA and Harvey JOHNSON had another telephone conversation on the **ALBA PHONE**. This call was recorded pursuant to the Title III authorization on the **ALBA PHONE**. In this call, Honorio ALBA and Harvey JOHNSON continued to discuss the dismissals that had been filed by ADA2. The following exchange occurred:

| | |
|---|---|
| **HA**: | So this is a—this is a way that you can tell that nothing's going on. So look at some of your other cases that are active [UI] right now. |
| **HJ**: | Yeah. |
| **HA**: | If they ha—if they haven't filed a motion… Like a—it's called like a [UI] motion or a Brady motion. |
| **HJ**: | Yeah. |
| **HA**: | If they—if they haven't filed those on your pending cases then they have nothing. |
| **HJ**: | Oh yeah dude. Yeah I checked everything and I didn't see anything like that. There was a few that were like on warrant status because you know— |
| **HA**: | Yeah. |
| **HJ**: | --people didn't show up. |
| **HA**: | Yeah you would have to fucking—like I said if they find something out on one case they have to notify all your other cases so you would have seen that. |
| **HJ**: | Yeah. Yeah dude and then I still have the other one. So I was like oh whatever. |
| **HA**: | Yeah like I said and ███ — |
| **HJ**: | And this [UI] had text me about some—about a case. |
| **HA**: | Yeah. |
| **HJ**: | And I-I haven't heard back from him since. |

**HA**:   I said ███ fucking— ███ 's chilled out a little bit on fucking worrying and shit since he saw my shit.

**HJ**:   Oh really?

**HA**:   That's why he's been fucking cracking jokes. He's like fuck if I get in trouble, he's like I'm gonna call Rick.

**HJ**:   [laughs]

**HA**:   Just like—

**HJ**:   I'm like ███ you just need to chill out man.

**HA**:   But—

**HJ**:   You're doing it already.

**HA**:   I'm like bro look at—look at like what I dealt with bro with what I had going on and if I skated off of that.

**HJ**:   Yeah.

**HA**:   Like I'm not like just-just [UI] Harvey like [UI].

**HJ**:   Very true.

**HA**:   Like I got a letter sent to IA from the fucking district court.

**HJ**:   Yeah.

**HA**:   Like from the CEO of district court.

**HJ**:   [laughs] The CEO—

**HA**:   [OV] Yeah.

**HJ**:   --of district court.

**HA**:   Yeah.

**HJ**:   [coughs]

**HA**:   And mine was fucking, case gone.

**HJ**:    Yeah.

276.    Based on my training, experience, and familiarity with the investigation, when Honorio ALBA told Harvey JOHNSON, "So this is a—this is a way that you can tell that nothing's going on. So look at some of your other cases that are active [UI] right now. . . . If they ha—if they haven't filed a motion… Like a—it's called like a [UI] motion or a Brady motion. If they—if they haven't filed those on your pending cases then they have nothing," there is probable cause to believe that Honorio ALBA was explaining to Harvey JOHNSON that Harvey JOHNSON did not need to worry about the DA's Office discovering their criminal scheme based on the dismissals that were filed in several of his cases so long as some of his other pending motions didn't have a "Brady motion" pending. There is probable cause to believe that Honorio ALBA was telling Harvey JOHNSON this to put his mind at ease over the dismissals that had been filed.

277.    When Honorio ALBA referred to "███," there is probable cause to believe that Honorio ALBA is talking about ████████████████████████████████████ ████████████████████████████████ When Honorio ALBA stated, "I said ███ fucking—███'s chilled out a little bit on fucking worrying and shit since he saw my shit," there is probable cause to believe that Honorio ALBA is referring to the civilian complaint that was filed with the Civilian Police Oversight Board (CPOA) by the Court Executive Officer for the Clerk of the Court for the State of New Mexico on behalf of W4. The complaint stemmed from W4's arrest by Honorio ALBA in August 2023, As discussed more fully in the original **ALBA PHONE** wire affidavit, the civilian complaint was referred to APD, and Honorio ALBA and ███ ███ were made aware of the complaint. On December 7, 2023, in light of the covert criminal investigation of Honorio ALBA and other officers, APD IA issued a letter closing the civilian complaint. That closure letter was sent to Honorio ALBA, as well as ██████████. In

interceptions between Honorio ALBA and Ricardo MENDEZ on the **MENDEZ PHONE**, Honorio ALBA discussed having the CPOA complaint against him closed. For example, in a call on December 8, 2023, between Honorio ALBA and Ricardo MENDEZ, which was recorded pursuant to the Title III authorization on the **MENDEZ PHONE**, Honorio ALBA told Ricardo MENDEZ that ▇▇▇▇ said, "Fucking ▇, he's like, "I tell you what, if I ever get in trouble, I tell you who I'm fucking calling, I'm calling Rick." And then fucking everybody busts up laughing, dude. And I'm like, so I was like, I was like, "You liked that one, huh, Sarge." He's like, "Fucking A, dude," he's like, "I was -- that's wicked." So I can tell you me getting off, bro, fucking impressed that fucker, I can tell you that." Based on my training, experience, and familiarity with the investigation, in the December 8, 2023 call, when Honorio ALBA says, "Fucking ▇, he's like, 'I tell you what, if I ever get in trouble, I tell you who I'm fucking calling, I'm calling Rick.'" there is probable cause to believe that Honorio ALBA was talking about ▇▇▇▇ reaction to the CPOA complaint being dismissed, and that ▇▇ ▇▇▇ was referring to reaching out to Ricardo MENDEZ (Rick) if ▇▇▇▇ ever got into trouble. When Ricardo MENDEZ tells Honorio ALBA that he is "untouchable," and Honorio ALBA discusses telling ▇▇▇▇ about "knowing the capabilities," based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ and Honorio ALBA are discussing Honorio ALBA's perceived ability to get away with illegal criminal conduct without any adverse result by APD.

278.     With respect to the January 10th call between Honorio ALBA and Harvey JOHNSON, when Honorio ALBA stated, "look at like what I dealt with bro with what I had going on and if I skated off of that," there is probable cause to believe that Honorio ALBA was conveying to Harvey JOHNSON that ▇▇▇▇▇ needs to relax because Honorio

159

ALBA was able to avoid any consequences stemming from the November 3, 2023, CPOA complaint.

279.    The wiretaps on the **MENDEZ PHONE**, **MONTANO PHONE**, and **ALBA PHONE** captured numerous additional conversations between Honorio ALBA, Joshua MONTANO, Harvey JOHNSON, and RICARDO MENDEZ in which they discuss why the State has been dismissing the various cases. Based on these conversations, there is probable cause to believe that Thomas CLEAR, Ricardo MENDEZ, and the involved officers are trying to figure out if the DA's Office was aware of the criminal scheme, or if the dismissals are unrelated to their criminal conduct. These conversations included a call intercepted on the ALBA PHONE pursuant to the Title III authorization order that occurred on Januarcy 12, 2024, at approximately 6:48 p.m. The call was between the MENDEZ PHONE and the ALBA PHONE, however, the call captured Thomas CLEAR participating in the call as well, likely having been brought in as a three-way call. During this call, the following exchange occurred between Thomas CLEAR, Ricardo MENDEZ, and Honorio ALBA:

HA:    I guess—I guess like the nolle isn't so much the weird part as it is them just putting in the interest of justice and then like [ADA2] not really wanting to talk.

TC:    What—so what did [they] put on… What were those n-nolle's [UI]?

HA:    On which?

TC:    On any of them that you were pulling up.

HA:    Yeah, [they're] just putting in the interest of justice.

TC:    So she's not putting… Well why are they just—why did they dismiss one that they filed motions and stuff on?

HA:    That's what I'm saying. So I have a [LA] one that was supposed to go to trial on Tuesday and it's been continued for over a year and w-like he's requesting continuances this, that, and the other but I just got a notification today saying that

they nolle'ed it.

TC:    Why?

HA:    That's the hard part. So [they] wouldn't give… Harvey had some cases of his they did the same thing to and [they]—he called [them] and asked [them] hey is it something that I'm doing and then [they] just told him that I'm not going to get into it with you.

TC:    So they're looking. I-I guarantee you they're looking.

HA:    And I guess the weird part about it is they're looking—they're like cherry picking the cases which is the hard part.

RM:    What-what was the—do you remember the name of the--Harvey's?

HA:    Uh, uh, let me see I have a—I think I have it, one second. So let's see here, so ▮▮▮▮▮▮▮▮ [PH] and ▮▮▮▮▮▮▮▮ [PH].

[pause]

TC:    That's really weird because that has all of that… They've got discovery on all that. These aren't new cases.

HA:    Yeah, they're all older cases.

TC:    What are they doing?

HA:    That's what we're trying to figure out. And the hard part is is I don't know if [ADA1] is playing stupid but I tried asking [them].

RM:    [OV] [UI]

TC:    What did [they] say?

HA:    I asked her about it. [They] said [they're] in the dark. [They don't] know anything. Which I don't know if [they're] being truthful or not.

TC:    So when I went down on the one on, uh, [W11]—

HA:    Yeah.

TC:    --I had, um, we had filed motions on it and I went in and got set up.

HA:    Yeah.

161

**TC**: And [UF] and [ADA1] were there and [ADA3] was sitting in the back row taking notes.

**HA**: [OV] [ADA2] or—

**TC**: I went in, opened up my file, got the motion's out, and, um, the DA goes we can call the PV first. Well the public defender was meeting with the probation violation case.

**HA**: Yes.

**TC**: So I said is [UI] case this afternoon. The judge goes well let's call Mr. Clear's case and so [they] called it and he said give me a minute. He walked back and talked to [ADA1] and [ADA1] said, uh, Officer Alba's sick. And so he came up and we're-we're moving to, um, we're not ready Officer Alba's sick. And I said well I move to dismiss.

**HA**: Yeah.

**TC**: And [they go] State what do you want to do? And he goes, um, uh, w-I think we won't oppose the dismissal and then… Pull that up Rick. See if… Cause it looked like [they] dismissed it with prejudice.

**RM**: Yeah it was.

[background noise]

**RM**: Yeah, I looked it up that day.

**TC**: Yeah, but I want to see the order because it didn't come in yet.

**HA**: Yeah, so I was texting [ADA1], "I'm like hey I'm sick blah, blah, blah." [They] kept going for the doctor's note. So I'm like hey, I'm like I sent her a screen shot. I'm like—

**TC**: [UI]

**HA**: --all the Presbyterian doctor's, there's no appointment's until next Wednesday.

**TC**: What did [they] say?

**HA**: [They were] trying to get me to go to the doctor to be able to provide a doctor's note.

**TC**: Okay.



**RM:** What was that—what was the other one? Uh, ███████ and what was the other one?

**HA:** Uh, ███████████

**TC:** So [they're] dismissing all the DWI unit's cases. Is that what [they're] doing?

**HA:** It's us three. I mean I haven't seen—I tried looking for ████████████████. I haven't—they dismissed one of ████ 's because like they couldn't identify the driver this, that, and the other.

**RM:** [OV] But ████████—

**HA:** When did it—

**RM:** --████████████ is not dismissed.

**TC:** Except for trial on 2/19 is go down.

**RM:** Who's-who's the—

**TC:** ███████████ [PH].

**HA:** Oh, is it because that one—is that—is that Harvey's case? I think one of them was arrested twice.

**RM:** Yeah I'll look it up in a sec.

**HA:** Because one of those names they have two pending cases right now.

**TC:** See and I heard… I was talking to somebody, uh, inside the office who said that, uh, uh, I don't remember how I brought it up. I said—I said yeah I saw [ADA2] over at-at Metro Court. After that time he's going back to the case intercept.

**HA:** Yeah.

**TC:** And he goes I think that was [UI] she's starting up, uh, they must have told her to oversee it. Uh, they're—the—[they're] setting up the Domestic Violence—

**HA:** [OV] Yeah.

**TC:** --Division at the DA's office. So [they're] doing more than that because she was taking notes and I think she wanted to see if I was coming in ready for trial or if I acted l like I-I knew anything.

HA:   Yeah.

TC:   And I came right in, I got my motion out, and we were ready to go.

RM:   Yeah, you were right. Same-same attorney, different cop. It was Harvey. Yep.

TC:   They dismissed Harvey's?

RM:   Yeah.

TC:   So who are they dismissing?

HA:   Me, Josh, Harvey.

RM:   [UI] pull out the ones that… [UI] I'll try to find the other one. And see it's on [UI] says from [them].

      [pause]

RM:   It says [UI].

TC:   Well careful.

RM:   Yeah, but those ones don't even matter. We didn't even have anything with them.

TC:   [UI]

RM:   Those are two different attorneys.

TC:   Well we haven't had—they haven't done that with any of ours. Didn't they go on Military?

RM:   No, we did have some dismissed when you… I don't even remember what he was available but it was way before.

HA:   Yeah FMLA.

RM:   [UI] another case.

HA:   It was the baby leave.

RM:   Yeah, yeah. Yeah, right in the beginning of the case they nolle'ed them.

TC:   Yeah, we haven't had any.

164

**RM**:    And that was last year like in the beginning.

280.    Based on my training, experience, and familiarity with this investigation, there is probable cause to believe that when this discussing refers to "Harvey," they are referring to Harvey JOHNSON; when they are referring to "Josh," they are referring to Joshua MONTANO. There is also probable cause to believe that, in this conversation, Thomas CLEAR, Ricardo MENDEZ, and Honorio ALBA are trying to figure out the reasoning behind the State (specifically ADA2) filing the dismissals in cases involving Honorio ALBA, Joshua MONTANO, and Honorio ALBA.

*XVIII. There is Probable Cause to Believe this Scheme has been Occurring Over an Extended Period of time*



165









288.    In terms of the length of time that Ricardo MENDEZ has worked for Thomas CLEAR, in a loan application that Ricardo MENDEZ submitted to the Sandia Area Credit Union and signed on January 3, 2022, Ricardo MENDEZ stated that he has been employed by Clear & Clear law firm for 17 years, or since January 3, 2005. Based on this, there is probable cause to believe that Thomas CLEAR and Ricardo MENDEZ have worked together at the Clear & Clear law firm since 2005. There is also probable cause to believe that Thomas CLEAR and Ricardo

MENDEZ have been involved in this criminal scheme since at least May 1, 2009, ███████

████████████████████████████████████

289.    Based on Ricardo MENDEZ's conversations about his experience and connections intercepted on the Title III authorizations, there is probable cause to believe that Ricardo MENDEZ's involvement in this criminal scheme extends further back in time. For example, in a January 10, 2024, call between Ricardo MENDEZ and Harvey JOHNSON, which was recorded pursuant to the Title III authorization on the **MENDEZ PHONE**, Ricardo MENDEZ discussed the length of time he had been in the business and the various people he knows. This included the following exchange:

**HJ**:    [laughs in the background] Now [PH] I like Alba's spot man. He's got it nice right there.

**RM**:    Um, down at uh, um, off of Martin Luther King?--

**HJ**:    [OV] Yeah like kind of like, yeah kin-, well, kind of more by like that the Central Park Hotel.

**RM**:    Yeah, yeah.

**HJ**:    Yeah, like over there. I'm like this is a nice spot of which you found.[ [Background noise] hotel [UI].

**RM**:    Yeah that was ah ████ 's spot before ████ it was ah ah ██ 's spot.

**HJ**:    Yeah.

**RM**:    Before ██ it was ah….a was it ██ or no? Not ██ it was [sighs]. Shit. Man, you know, it's been, I've been doing this 20 years brother.

**HJ**:    Shit.

290.    Based on Ricardo MENDEZ and Harvey JOHNSON's conversation regarding a location used by Honorio ALBA and other officers to identify DWI suspects, there is probable cause to believe that Ricardo MENDEZ has been involved in the criminal defense of DWI court

cases for approximately twenty years. While it is unclear whether the criminal scheme involving Ricardo MENDEZ, Thomas CLEAR, and various law enforcement officers has continued for approximately twenty years, there is probable cause to believe the scheme may extend to as yet to be identified officers from various law enforcement agencies extending for approximately twenty years and is not limited to the officers discussed herein.[79]

291.    In summary, with respect to Thomas CLEAR and Ricardo MENDEZ, there is probable cause to believe that Thomas CLEAR and Ricardo MENDEZ have been involved in this scheme for at least the last five years, or since January 1, 2019. With respect to Thomas CLEAR, there is probable cause to believe that he has been involved in this criminal scheme since at least May 1, 2009, ███████████████████████████████████████.

292.    With respect to the other officers from APD currently participating in this criminal scheme (Honorio ALBA, Ricardo MENDEZ, Harvey JOHNSON, and Nelson ORTIZ), there is probable cause to believe that this has been occurring since at least the beginning of the Covid pandemic, which began on March 11, 2020.[80] As discussed above, during a December 7, 2023, call that occurred at approximately 12:51 p.m. between Ricardo MENDEZ and Honorio ALBA,[81] Ricardo MENDEZ and Honorio ALBA discussed at length Thomas CLEAR's request to meet

---

[80] *See* https://www.who.int/europe/emergencies/situations/covid-19 (last visited January 14, 2024)

[81] This call was recorded pursuant to the Title III Interception Order on the **MENDEZ PHONE.**

with Ricardo MENDEZ in person and speculated as to whether Thomas CLEAR was going to fire

Ricardo MENDEZ This call included the following exchange:

**HA**:   Do you think, well, who knows bro, it might be, like I said, I don't see it making sense for him to cut off a relationship like that, bro, over that because he has made so much money over the years and through this year, 'cause I tell you what a lot of attorneys struggled during COVID, bro.

**RM**:   Oh yeah, we had a fucking blast.

293.   Based on this call, there is probable cause to believe that the APD officers currently participating in this scheme (Honorio ALBA, Joshua MONTANO, Harvey JOHNSON, Nelson ORTIZ, and others not yet identified) have been working with Ricardo MENDEZ and Thomas CLEAR for the last several years and at least since the beginning of the Covid pandemic.















### XX.    *Impact on Interstate Commerce*

303.    There is probable cause to believe that this criminal scheme has had an impact, and will continue to have an impact, on interstate commerce. As noted herein, the scheme deprives the court of fees and fines associated with DWI convictions, which would otherwise have been paid to the state court for deposit and use in its crime laboratory fund. This fund is used to pay various expenses and costs associated with DWIs, including community programs to prevent DWI, testing and laboratory expenses, and traffic safety expenses. There is further probable cause to believe that these programs and expenses require goods that would have traveled in interstate commerce. There is probable cause to believe that goods associated with these purchases would have come from out-of-state. As such, there is probable cause to believe that this scheme decreased the revenue that would be paid to the State of New Mexico through court fees and fines that would have been used to purchase goods that would have traveled in interstate commerce.

304.    Further, my review of Verizon Wireless records of **MENDEZ PHONE** revealed that the aforementioned SMS text message exchanges between **MENDEZ PHONE** and **MONTANO PHONE** were transmitted through servers in Tempe, Arizona, and Aurora, Colorado. The records revealed the SMS text message exchanges between **MENDEZ PHONE** and **ALBA PHONE** were transmitted through servers in Tempe, Arizona, and Southlake, Texas. The records revealed the SMS text message exchanges between **MENDEZ PHONE** and CW1 were transmitted through servers in Tempe, Arizona, and Aurora, Colorado. Based on my

knowledge and experience and on the knowledge and experience of FBI Special Agent Sean Macmanus, a Cellular Analysis Survey Team Agent, who has received specialized training on Verizon Wireless and AT&T, SMS text messages sent from New Mexico using Verizon Wireless service are routed through servers outside of the state of New Mexico. As such, I submit there is probable cause to believe the text messages between **MENDEZ PHONE**, **ALBA PHONE**, and CW1 were transmitted interstate commerce as **MENDEZ PHONE's** service provider is Verizon Wireless.

## XXI. *Identification of Additional DWI Offenders Who Were Targeted By This Criminal Scheme*

305.    As discussed here, the FBI has identified several DWI offenders who were victims or attempted victims of the criminal scheme based on their reporting this concerning conduct directly to the FBI or to the LA, who brought it to law enforcement attention. However, the FBI has identified numerous other persons who, based on the circumstances discussed further below, were likely targeted as part of this scheme. As part of this warrant, the FBI seeks authorization to search the **SUBJECT PREMISES 1**, as described in Attachment A, for specific files related to these DWI offenders, as there is probable cause to believe that these specific files contain evidence of the SUBJECT OFFENSES, as described in Attachment B.

306.    Below is a description of how the FBI has identified by probable cause additional victims or attempted victims of this criminal scheme. These are discussed by how the individuals were identified by FBI intelligence personnel and agents. The list of names for these specific files

from these sources are then detailed below.[83] This warrant seeks authorization to search these specific files for the items contained in Attachment B.

<u>Department of Health Breathalyzer Testing Information and Lack of Court Filings</u>

307.    As part of its investigation, the FBI served a federal grand jury subpoena on the New Mexico Department of Health (NMDOH) for breathalyzer machine results from January 1, 2022, to the present (November 2023). The NMDOH is responsible for overseeing the certification and operation of breathalyzers (or breath alcohol instruments). *See* NMAC 7.33.2.2. Law enforcement officers who use the breathalyzer instruments are required to submit copies of the logbooks documenting all of the tests administered by the law enforcement agency. *See id.* at 7.33.2.10(B).

308.    In response, the NMDOH provided the FBI with the logbooks on file for the requested time period. The logbooks reflected the name of the person on whom the breathalyzer was performed, the operator name (who usually matched the arresting DWI officer), the date and time of the test, and the blood alcohol concentration result (BAC). As noted above, under New Mexico state law, it is unlawful for a person who is under the influence of intoxicating liquor to drive under the influence. *See* NMSA 1978, § 66-8-102(A). A person commits driving under the influence (DWI) if that person has a blood alcohol concentration (BAC) of at least .08. *See id.* at § 66-8-102(C)(1). A person commits aggravated DWI if he or she has a BAC of .16 or higher. *See id.* at § 66-8-102(D)(1).

---

[83] The list combines the different sources of these names into one list in an effort to protect the identity of the witnesses who have cooperated with the FBI as part of this investigation.

309. The FBI intelligence personnel then reviewed the DOH records for breathalyzer results that reflected a BAC greater than 0.08. The FBI intelligence personnel then cross-checked those results against the New Mexico State Court online court database to determine whether, despite having a BAC greater than 0.08, criminal charges were not initiated. Based on this, the FBI has identified the persons who had a BAC greater than 0.08, but from whom no criminal court case was found in the New Mexico State court online database. Based on my training, my experience, my familiarity with this investigation, and the APD SOPs for DWI offenses, there is probable cause to believe that the persons who had a BAC above 0.08, but were never charged were likely DWI offenders who were successfully targeted as part of this criminal scheme. Based on this, there is probable cause to believe that a target search of files for these persons at the **SUBJECT PREMISES 1**, as described in Attachment A, will contain evidence of the SUBJECT OFFENSES, as described in Attachment B.

310. Of these persons specified below, the two persons that the LA reported had been approached about the criminal scheme (W2 and W3) were captured on this list (that is, confirming that the NMDOH BAC information came back as being higher than 0.08 on both W2 and W3, but neither ever being charged with DWI).

Late/Delayed Filing of Charges and Complainants

311. The FBI has also identified another group of DWI offenders who may have been victims or attempted victims of this criminal scheme. The APD SOP on DWI offenses discusses the process by which DWI offenders should be arrested and booked. *See* APD SOP 2-42. In speaking with an APD Commander who used to work in the APD DWI unit, I learned that it would be highly unusual for a DWI offender who submitted to a breathalyzer test and who had a BAC greater than 0.08 to not be transported to the Metropolitan Detention Center (MDC) for booking

immediately following the arrest and processing. Two exceptions to this general rule are if someone was injured or so intoxicated that the MDC will not accept the offender. In those instances, the offender should be transported to the hospital. The officer must then later complete the criminal complaint (referred to as a summons). While this is necessary if medical attention was required, the summons is typically sought within a matter of days after the arrest at the latest.

312.    The FBI intelligence personnel reviewed the dates that the breathalyzer tests were administered (based on the logbook from the NMDOH) and cross-referenced it with the date that charges were filed by the DWI officer filing the Criminal Complaint/Summons (or, in some instances, the citation). The FBI intelligence analyst then identified the persons who had a delay of more than eight days[84] between the date the breathalyzer was administered (which would correspond with the date of the DWI arrest) and the date the charges were initiated. A delay in filing charges is not only inconsistent with APD SOPs and practice, it also is how both of the cases against CW1 and W10 proceeded: when CW1 and W10 did not pay the demand immediately, delayed charges were then filed against them. For CW1, they were arrested on August 26, 2023, and they were not charged until September 11, 2023; for W10, they were arrested on September 29, 2023, and not charged until October 26, 2023. These other persons listed below are ones who faced similar delays between their arrest date and when they were charged. There is probable cause to believe that records at the **SUBJECT PREMISES 1**, as described in Attachment A, in these specific files will contain evidence of the SUBJECT OFFENSES, as described in Attachment B.

---

[84] As noted above, some delay in charging may occur if the DWI offender required medical care and/or was refused by MDC personnel following their arrest. However, even in those cases, according to the APD Commander, it would be very uncommon for a delay of more than a few days before the Summons was filed. Under this analysis, the parameters were set to a delay of eight days to capture only those filings that were unusually late.

Dismissed Cases Because Honorio ALBA, Joshua MONTANO, or Harvey JOHNSON
Failed to Appear

313.     Another group of persons for whom there is probable cause to believe their records

will contained evidence of the criminal are those who were charged with DWI by the state

stemming from an arrest conducted by Honorio ALBA, Joshua MONTANO, or Harvey

JOHNSON, who were represented by Thomas CLEAR, and whose case was dismissed because

the officer (Honorio ALBA, Joshua MONTANO, or Harvey JOHNSON) failed to show up to a

hearing, trial, or pretrial interview. There is probable cause to believe that the files on these persons

will contain evidence of the criminal scheme. From this investigation, there is probable cause to

believe that, for DWI offenders who pay Ricardo MENDEZ and Thomas CLEAR pursuant to the

criminal scheme, Honorio ALBA, Joshua MONTANO, or Harvey JOHNSON purposefully miss

trials or other settings at which their attendance is mandatory to trigger the dismissal of the pending

DWI case. For example, W11's suppression hearing and trial was scheduled on January 10, 2024.

From the information collected as part of this investigation and detailed herein, there is probable

cause to believe that Honorio ALBA purposefully missed the trial to trigger a dismissal, and did

so by claiming to be sick. There is further probable cause to believe that he did so in furtherance

of the criminal scheme. As such, the specific DWI offender files detailed below include other

persons who were in a similar situation and had their case dismissed because Honorio ALBA,

Joshua MONTANO, or Harvey JOHNSON failed to appear.

Specific Alleged DWI Offender Files

314.     The following list reflects a compilation of names for which there is probable cause

to believe that records pertaining to them at the **SUBJECT PREMISES 1** will contain evidence

of the SUBJECT OFFENSES. This list includes the following persons: (1) those persons identified

by the BAC results with no charges filed; (2) the delayed charging;, (3) persons represented by Thomas CLEAR with Honorio ALBA, Joshua MONTANO, or Harvey JOHNSON as the arresting officer and the case was dismissed because the officer failed to show for a hearing, trial, or pretrial interview; (4) the cooperative witnesses who provided law enforcement and/or the LA information about the criminal scheme:







***XXII. Possession and Retention of Driver's Licenses in Furtherance of the Criminal Scheme, Tracking of Persons Targeted, and Cash Payments***

315.    As discussed above, based on my training, experience, and familiarity with this investigation, there is probable cause to believe that Ricardo MENDEZ's possession driver's licenses during his initial meetings with DWI offender meetings is done in furtherance of this criminal scheme and in violation of APD Standard Operating Procedures (SOPs). Moreover, based on the information set forth in this affidavit, there is probable cause to believe that the police officers retain the driver's licenses following a DWI offender's arrest, which is in contravention

of the APD SOPs, and then the police officers provide the driver's license to Ricardo MENDEZ for use in the criminal scheme.

316.   As discussed herein, several of the DWI offenders met with Ricardo MENDEZ at Clear and Clear PA law firm (the **SUBJECT PREMISES 1**) to discuss the criminal scheme. During these meetings, Ricardo MENDEZ solicited bribe payments from the DWI offenders in order to prevent the filing of DWI charges or have the charges dismissed if they were already filed.

317.   Moreover, based on intercepted communications on the MENDEZ PHONE, there is probable cause to believe that Ricardo MENDEZ and the officers have cut Thomas CLEAR out of some of the DWI offenders who were targeted as part of this scheme. There is also probable cause to believe that, in some instances, Ricardo MENDEZ directs the DWI offender to meet him at Freddy's, at a location close to **SUBJECT PREMISES 2**, rather than the law firm (**SUBJECT PREMISES 1**) for meetings to discuss the mechanics of the criminal scheme, and to accept payment as part of this scheme. For example, shortly after the November 4, 2023, meeting with CW1 in which Ricardo MENDEZ showed up in a DWI unit, agents observed Honorio ALBA's DWI unit parked near **SUBJECT PREMISES 2**. Because Ricardo MENDEZ and the officers may have excluded Thomas CLEAR from some of the DWI offenders targeted in this scheme, and Ricardo MENDEZ sometimes directs the DWI offenders to meet close to **SUBJECT PREMISES 2**, there is probable cause to believe that evidence and instrumentalities of the criminal scheme will be located in **SUBJECT PREMISES 2**.

318.   Similarly, because Ricardo MENDEZ showed that he possessed the DWI offender's driver's licenses at the meeting at the **SUBJECT PREMISES 1**, and because these driver's licenses were not returned to them, there is probable cause to believe that these driver's licenses and others will be located in the **SUBJECT PREMISES 1** and **SUBJECT PREMISES**

**2**, as described in Attachment A, which will constitute evidence of the SUBJECT OFFENSES, as described in Attachment B.

319.     Moreover, because the payments made in furtherance of this scheme are in cash, there is probable cause to believe that there will be evidence related to these cash payments, including large sums of cash, inside the locations further described in Attachment A.

## SUBJECT PREMISES 1

320.     SUBJECT PREMISES 1, as more fully described in Attachment A, is a law firm[85] owned and run by Thomas CLEAR III, esq. Based on agent observations and information obtained from witnesses, **SUBJECT PREMISES 1** is located in a home in a residential neighborhood in Albuquerque, New Mexico.

321.     Based on agent observations and witness information, there is no posted law firm sign outside of the home, or any other markings to indicate from the outside that the residence functions as a law firm. However, according to the Clear & Clear website, this residential address is the location of its law firm. Moreover, this is the address that Thomas CLEAR has listed with the New Mexico State Bar as his address of record.[86]

322.     Recent surveillance of **SUBJECT PREMISES 1** confirmed it is still being used by Thomas CLEAR and Ricardo MENDEZ as the Clear & Clear law firm.

---

[85] http://www.clearlawnm.com/contact-us.html (last visited December 20, 2023).

[86] https://www.sbnm.org/For-Public/I-Need-a-Lawyer/Online-Bar-Directory/Lawyer-Info/customercd/519 (last visited December 20, 2023).

## SUBJECT PREMISES 2

323.    **SUBJECT PREMISES 2** is the personal residence of Ricardo MENDEZ. Agents have conducted surveillance of Ricardo MENDEZ over the past few months, and has been observed entering and leaving this residence on multiple occasions, with him last being observed at SUBJECT PREMISES 2 on [Update with last date prior to finalizing], 2023.

324.    The address listed on Ricardo MENDEZ's Sandia Area bank records was **SUBJECT PREMISES 2.**

325.    The address listed on Ricardo MENDEZ's TransUnion credit report was the **SUBJECT PREMISES 2**.

326.    Approximately eight (8) vehicles are registered to Ricardo MENDEZ with the New Mexico Motor Vehicle Division. The address listed on all eight (8) vehicle registrations with the New Mexico Motor Vehicle Division is the **SUBJECT PREMISES 2**.

327.    The address listed on Ricardo MENDEZ's New Mexico driver's license is the **SUBJECT PREMISES 2**.

328.    On or about January 11, 2024, at approximately 3:50 p.m., the FBI conducted surveillance at the **SUBJECT PREMISES 2**. Ricardo MENDEZ was observed departing from **SUBJECT PREMISES 2**, in a gray Lexus sedan bearing New Mexico temporary tag 24T007842 then returning to 412 Judith Lane SW, Albuquerque, New Mexico 87121 at approximately 4:30 p.m.

329.    On or about January 9, 2024, at approximately 11:55 a.m., the FBI conducted surveillance at the SUBJECT PREMISES 2. Ricardo MENDEZ was observed departing from **SUBJECT PREMISES 2** in a gray Lexus sedan bearing New Mexico temporary tag 24T007842, then driving to and entering 7112 Aztec Road NE, Albuquerque, New Mexico, 87110.

330.    For the reasons stated above, I believe Ricardo MENDEZ resides at the **SUBJECT PREMISES 2**.

## ITEMS TO BE SEIZED DURING THE SEARCH WARRANT

331.    Based on my experience and training, and the training of other agents with whom I have consulted, individuals who participate in a scheme to obtain payments in exchange for an officer refraining from filing charges or from appearing for interviews or court settings routinely conceal in vehicles and on their person evidence of their criminal scheme, instrumentalities of the scheme, and/proceeds of the scheme, as described in Attachment B. It is also common for individuals who are engaged in this type of scheme to use their vehicles as a place to store evidence and instrumentalities of this scheme. In this case, Ricardo MENDEZ typically required payments in excess of $1,000, so there is probable cause to believe that bulk cash, currency, and other financial instruments in excess of $1,000 are instrumentalities and evidence of the criminal scheme. Moreover, based on my training and experience, and the experience of other agents, it is common for individuals who engage in an schemes that involve the fraudulent and criminal solicitation and receipt of payments to attempt to conceal the ill-gotten gains from this scheme through the purchase of goods – including vehicles, clothing, jewelry, travel, or other things of value.

332.    There is probable cause to believe that the items maintained in **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2** include records and items pertaining to Thomas CLEAR, Ricardo MENDEZ, Honorio ALBA, Joshua MONTANO, Harvey JOHNSON, Nelson ORTIZ, and others' a scheme to obtain payments in exchange for an officer refraining from filing charges or from appearing for interviews or court settings, in violation of 18 U.S.C. § 1951 (Hobbs Act extortion under color of official right); 18 U.S.C. § 1952 (Travel Act interstate travel or

transportation in aid of racketeering enterprises); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 666 (bribery); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. §§ 1343, 1346 (honest services wire fraud); and 18 U.S.C. § 2 (aiding and abetting), from May 1, 2019, to present:

a. Driver's licenses (other than those belonging to Ricardo MENDEZ, Thomas CLEAR, or other persons at the **SUBJECT PREMISES 1** or **SUBJECT PREMIES 2** at the time of the search);

b. Records reflecting how DWI offender payments were tracked;

c. Records related to payments to Thomas CLEAR, Ricardo MENDEZ, Honorio ALBA, Joshua MONTANO, Nelson ORTIZ, Harvey JOHNSON, or other officers involved in this scheme;

d. Any and all lists or notes containing information such as names, telephone numbers, or addresses of DWI offenders targeted as part of this scheme;

e. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators;

f. Evidence related to the purchase of goods – including vehicles, clothing, jewelry, travel, or other things of value – with ill-gotten gains of criminal activity;

g. Bulk cash, currency, or other financial instruments above $1,000 in value that constitute proceeds of or are intended to facilitate the scheme described above;

h. Messages, notes, correspondence, and/or communications between co-conspirators;

i. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit

191

box keys, vault keys and other items evidencing the obtaining, secreting, and/or concealment, and/or expenditures of money;

j.   Photographs or videos of Thomas CLEAR, Ricardo MENDEZ, Honorio ALBA, Joshua MONTANO, Nelson ORTIZ, Harvey JOHNSON, their co-conspirators, and the property and assets purchased with proceeds of the criminal scheme;

k.   Any and all wireless telephones, digital media, and storage media that reasonably appear to contain some or all of the records, information.

333.   As noted herein, the Clear & Clear law firm operates out of **SUBJECT PREMISES 1**, and **SUBJECT PREMISES 2** is the personal residence of paralegal Ricardo MENDEZ. This warrant seeks to seize records related to the DWI offenders whom I believe, based on probable cause, were targeted as part of this DWI criminal scheme. These DWI offenders are listed above, and enumerated with specificity in Attachment B.

334.   This warrant seeks authorization to access any containers in which such records may be stored, including briefcases, backpacks, bags, shoe boxes, safes, storage containers, or tool boxes.

335.   Based on the foregoing information, I believe that probable cause exists that fruits, evidence, and instrumentalities used in the commission of the TARGET OFFENSES described in Attachment B may be found at the **SUBECT PREMISES 1** and **SUBJECT PREMISES 2**, further described in Attachment A.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

336.   As described above and in Attachment B, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES 1** or **SUBJECT**

192

**PREMISES 2**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

337.    *Probable cause.*  I submit that if a computer or storage medium is found on the **SUBJECT PREMISES 1** or **SUBJECT PREMISES 2**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few

examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.  Based on actual inspection of other evidence related to this investigation, I am aware that computer equipment was used to generate, store, and print documents used in the criminal scheme. There is reason to believe that there is a computer system currently located on the **SUBJECT PREMISES 1** or **SUBJECT PREMISES 2**.

338.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES 1** or **SUBJECT PREMISES 2** because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail

programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations,

computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

196

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

339. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or

imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

340.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

341.  Clear & Clear PA ("the Company") is a functioning company that conducts legitimate business. The seizure of the Company's computers may limit the Company's ability to conduct its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption.  If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## CONCLUSION

342.    I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Zackari S. Mercado
Special Agent
Federal Bureau of Investigation

Subscribed and sworn telephonically and signed electronically on January 16, 2024

KAREN B. MOLZEN
UNITED STATES MAGISTRATE JUDGE

200